# DEPOSITION TRANSCRIPT OF:

## Mitchell A. Wood

## DATE TAKEN:

## 6/25/2021

## CASE:

## Jonathan Ramos vs Iron Mountain Secure Shredding Inc

Affiliated Reporting
650 Poydras Street, Suite 2610
New Orleans, LA 70130
Phone: 504-568-9111
Fax: 504-568-9110
Email: pages@affiliatedreporting.com
Website: www.affiliatedreporting.com

The transcript files, exhibits and invoice have been emailed to the attorney.

If you'd like an electronic version, please email pages@affiliatedreporting.com

**EXHIBIT**

**2**

CS 4665150 Mitchell A. Wood

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NO. 2:19-CV-11202        SECTION "F" (4)

JONATHAN RAMOS

VERSUS

IRON MOUNTAIN SECURE SHREDDING INC., ET AL.

Deposition of MITCHELL A. WOOD, P.O. BOX 82881, Baton Rouge, Louisiana 70884, taken in the offices of BRUNO & BRUNO on Friday, June 25, 2021, at 10:20 a.m.

APPEARANCES:

BRUNO & BRUNO
Attorneys at Law
BY:  DANIEL A. MEYER, ESQUIRE
855 Baronne Street
New Orleans, Louisiana  70115

ATTORNEYS FOR PLAINTIFF

LEWIS BRISBOIS BISGAARD & SMITH, LLP
Attorneys at Law
BY:  MICHAEL L. BARRAS, ESQUIRE
24 Greenway Plaza, Suite 1400
Houston, Texas  77046

ATTORNEYS FOR DEFENDANT

ALSO PRESENT:  BAILEY BOESCH

REPORTED BY:

THERESA (TERRI) MATHERNE
Certified Court Reporter

AFFILIATED REPORTING      Ph. (504)568-9111
www.affiliatedreporting.com   Fax (504)568-9110

---

**Page 2**

1  JONATHAN RAMOS VS. IRON MOUNTAIN SECURE

2     SHREDDING INC., ET AL.

3

4        Deposition of MITCHELL A. WOOD

5          Taken on June 25, 2021

6

7

8          EXHIBIT INDEX

9  1.  Affidavit of Mitchell A. Wood RA EIT ICC

10    CAPS.

11  2.  A Gmail.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 3**

1              INDEX

2

3                 Page  Line

4  EXHIBIT # 1            6    8

5  EXHIBIT # 2            45   2

6

7

8  EXAMINATION BY MR. BARRAS      5    5

9  EXAMINATION BY MR. MEYER       99   12

10 EXAMINATION BY MR. BARRAS      104  6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 4**

1        S T I P U L A T I O N

2

3     It is stipulated and agreed by and between

4  counsel for the parties hereto that the deposition

5  of the aforementioned witness is hereby being

6  taken under the Federal Rules of Civil Procedure,

7  for all purposes, in accordance with law;

8     That the formalities of reading and signing

9  are specifically not waived;

10    That the formalities of sealing,

11 certification, and filing are specifically waived;

12    That all objections, save those as to the form

13 of the question and the responsiveness of the

14 answer, are hereby reserved until such time as

15 this deposition, or any part thereof, may be used

16 or sought to be used in evidence.

17        *   *   *   *

18    THERESA (TERRI) MATHERNE, Certified Court

19 Reporter, in and for the Parish of Jefferson,

20 State of Louisiana, officiated in administering

21 the oath to the witness.

22

23

24

25

---

Page 5

1         MITCHELL A. WOOD,
2  after having been first duly sworn by the
3  above-mentioned court reporter, did testify  as
4  follows:
5  EXAMINATION BY MR. BARRAS:
6  Q.  Good morning, sir.  My name is Michael Barras.
7     I'm an attorney who represents a defendant in
8     an action pending here in the Federal Court
9     for the Eastern District of Louisiana,
10    defendants, Iron Mountain Information
11    Management.
12       Please state your name for the record.
13 A.  Mitchell Allen Wood.
14 Q.  Mr. Wood, you have been retained by the
15    plaintiffs in this litigation to render an
16    expert opinion on several topics.  That would
17    be correct?
18 A.  Yes, sir.
19       MR. BARRAS:
20          Go off the record.
21          (Off the record.)
22 BY MR. BARRAS:
23 Q.  You can answer.
24 A.  Yes.
25 Q.  And those opinions are included in a document

Page 6

1     indicated "affidavit of Mitchell A. Wood, RA
2     EIT ICC CAPS."  Correct?
3  A.  Yes.
4  Q.  And that document is right here before us?
5  A.  Yes, sir.
6  Q.  We'll attach it to the deposition.  We'll mark
7     it as Defendant's 1.
8       (Exhibit 1, affidavit of Mitchell
9        A. Wood RA EIT ICC CAPS, was marked
10       for identification.)
11    Your CV is attached to the back of this
12    document that I mentioned with your opinions
13    in it?
14 A.  Yes, sir.
15 Q.  So before we get into the nitty-gritty of the
16    document, what was the nature of your -- if
17    you could just describe, generally, what you
18    were retained to opine on, in your own words.
19 A.  The litigation related to dispute of how --
20    who is responsible for disassembly of a rack
21    system at Iron Mountain in Harahan of New
22    Orleans.  And who was responsible or dictated
23    the procedure for removal or disassembly of
24    the rack system or shelving system within the
25    Iron Mountain facility.

Page 7

1  Q.  Thank you.
2     I'm going to go through your full CV.  But
3     why don't you just tell me about your, the
4     credentials that you have, and the disciplines
5     that under which you are giving these opinions
6     in this document.
7  A.  You want me to start with education first?
8  Q.  Sure, yes, sir.
9  A.  Graduate of Tulane, master's and bachelor's in
10    architecture.  A graduate of L.S.U. in
11    Baton Rouge in civil engineering.
12       I'm about six hours short from an MBA.  I
13    started in L.S.U., completed, or was to
14    complete at University Maryland in College
15    Park.  So work experience starts probably back
16    when I finished Tulane in '77.
17 Q.  What's the nature of your work experience?
18 A.  Basically, I do -- at one time I did three
19    different functions.  I ran an inspection
20    service.  I ran an architectural firm.  I ran
21    a construction company.
22       For the last 20 years, it's predominant
23    just the construction firms and the
24    architecture.
25 Q.  Are you relying on your experience in any of

Page 8

1     those jobs to provide the opinions in this
2     document?  We'll just call it the affidavit
3     for short.
4  A.  In the affidavit, I list my background in
5     there.  So it's some of the line items in the
6     affidavit.
7  Q.  Sure.  So these are the backdrop, if you will,
8     for the opinions that you're providing?
9  A.  Yes.
10 Q.  I'm sorry.  You know what, I didn't -- I took
11    it for granted the ground rules for the
12    deposition.  I'm sure you've taken a
13    deposition before.  Correct?
14 A.  Yes, sir.
15 Q.  I'm going to try my best not to interrupt you.
16    Sometimes I have a bad habit of doing that.
17    I'm going to try my best not to interrupt you
18    in your testimony.
19       If you could do the same and try not to
20    interrupt my questioning.  We'll go with that.
21    It will make it a lot easier for the court
22    reporter.
23       I've probably already gotten a couple stern
24    looks for interrupting.
25       So the first paragraph, looking at the

Page 9

1  document, the affidavit.
2  A.  The affidavit?
3  Q.  Yes, sir.
4      The first paragraph just simply is --
5  you're over 21, we don't really need to talk
6  about that.  The second paragraph talks about
7  your master's in architecture from Tulane.
8  It's what you just indicated.
9      And said you were employed by Marriott
10  Corporation outside of Washington D.C.  What
11  did you do for Marriott?
12  A.  I was a design manager for Courtyard by
13  Marriott.
14  Q.  What did you design?
15  A.  At the time courtyard was the largest
16  worldwide hotel program.  We were building
17  Courtyards in probably 34 to 38 different
18  states in America.
19      We had different regions.  I was assigned
20  to the Midwest region.
21      So we were building sometimes as many as
22  six to eight hotels at one time.  It was an
23  amazingly large and complex program to roll
24  out this particular product.
25      Some of these hotels were identical, some

Page 10

1  were all custom designed.  But it was a
2  massive program that Marriott undertook.
3  Q.  How down into the details of the planing did
4  your role go?  In other words, designing the
5  structures and the layout of the rooms and the
6  features, versus the components of the various
7  rooms and whatnot.
8  A.  That's a good question.  It's a huge team
9  enterprise.  You're talking $3 billion.
10  Certainly, I'm just a cog in the wheel.
11  Q.  Right.  My apologizes, go ahead.
12  A.  So I wouldn't say I had any overreaching role
13  in terms of this project.  There were so many
14  different people involved:  Mechanical
15  engineers, structural engineers, site
16  engineers, landscapers, architects.
17      It was a massive undertaking.  I was just
18  one person in that massive project.
19  Q.  What was the function of your job?
20  A.  My function, as a design manager, was to make
21  sure the product, the Marriott product, or
22  Courtyard, is implemented in a proper manner
23  and meeting local building codes, whether it
24  was in Detroit or Chicago, or any major city
25  where the Courtyards were located.

Page 11

1      So we had to coordinate with the local
2  architect, get his plan submitted and
3  approved, not only by the management of
4  Marriott but also reviewed and approved, and
5  get contractors to -- have contractors -- we
6  had bid on the project to make sure that they
7  got the plans received and that they
8  understood what they were supposed to provide.
9  Q.  Thank you.
10     The next paragraph talks about your
11  architecture license and your license as a
12  commercial general contractor and residential
13  builder.
14     Remind me, did you say that one of your --
15  yes, degree in civil engineering.  So are you
16  licensed as an engineer in Louisiana?
17  A.  No.  I did not -- I took the engineering
18  training test, passed that.  But you have to
19  work for an engineering firm for four to five
20  years, and I never did.
21     Once I got my license as an architect, I
22  didn't think I needed it.  I had no regrets
23  taking my engineering degree.
24  Q.  Paragraph four, you reference your company,
25  building/safety code reviewed, site

Page 12

1  inspection, project management?
2  A.  Yes, sir.
3  Q.  How much of your business would you say
4  involves building and safety code review?
5  A.  You're talking about for expert witness work?
6  Q.  No.
7      MR. MEYER:
8          Like today or historically?
9  BY MR. BARRAS:
10  Q.  In general.
11  A.  Probably 20 percent.
12  Q.  I'm not trying to lock you down or a specific
13  number right there.  I'm just trying to get an
14  idea.
15  A.  I kind of spelled that out in my CV.
16  Q.  Okay.
17      How about site inspection, what percentage
18  would you say?
19  A.  I'm a builder.  I do site inspections almost
20  every day.  Sometimes as many as half my day
21  is spent checking the progress of a project or
22  renovation to make sure that what I've
23  designed or what I required is being done
24  properly.
25  Q.  Number six, details some projects you've been

Page 13

1  involved in, commercial facilities, including
2  an Iron Mountain facility in a Port Allen; is
3  that correct?
4  **A. Yes.**
5  Q.  Are you using that work as a basis for your
6      opinions in this document in any way?
7  **A. I'm familiar with the rack systems because my**
8  **men and myself have been inside numerous times**
9  **within that facility.  So it gives me a frame**
10 **of reference to understand how the rack**
11 **systems are installed or built.**
12    **I walked them.  I've been on them.  I used**
13 **this.  That's part of my repair -- I didn't**
14 **build the Iron Mountain facility in Port**
15 **Allen.**
16    **It's a rather huge warehouse facility, just**
17 **like the one here in Harahan.  It gives me a**
18 **frame of reference to understand what it looks**
19 **like, how it's built.**
20 Q.  Right.  I'm going to unpack some of that right
21     now.
22    You referenced that that facility helped
23     you -- if for some reason I'm misquoting you,
24     please let me know.  I'm doing my best.
25    You referenced that facility helped you

Page 14

1  understand how the racking -- what about the
2  racking systems?
3    MR. MEYER:
4       Object to form.  You can answer if
5       you know.
6  BY MR. BARRAS:
7  Q.  What about the racking -- let me clean that up
8  for you.
9    What about the racking systems in Port
10 Allen that you -- what did you learn about
11 that you are using in your opinions here?
12 **A. If you just use a reference that I'm an**
13 **architect, I wouldn't be -- most architects**
14 **would not be familiar with an Iron Mountain**
15 **facility.**
16 Q.  Sure.
17 **A. My knowledge or experience, being inside the**
18 **building numerous times, I think provides me a**
19 **frame of reference that's valuable.**
20 Q.  How?
21 **A. I know how they're put together.  I know**
22 **how -- basically, I'm familiar with their --**
23 **how the rack systems are installed, how**
24 **they're built.**
25    **I've walked them.  I've been there.  Some**

Page 15

1  of them are as high as two or three floors
2  high.
3    **I've use the stairs which access the**
4  **storage facility to make the various repairs.**
5    **As a frame of reference as a builder, I**
6  **understand exactly how these racks are put**
7  **together.  In many ways, obviously gives me**
8  **the knowledge of a frame of reference that I**
9  **understand how these things are put together**
10 **and assembled.**
11 Q.  By "these things," you mean the racks that
12     were in the Port Allen location of Iron
13     Mountain?
14 **A. The shelving systems that's in them.  Pretty**
15 **much the -- from what I understand, the rack**
16 **systems or shelving systems are pretty much**
17 **common for most Iron Mountain facilities**
18 **throughout the country.**
19    **What's built in Port Allen is pretty much**
20 **similar to what's in Harahan.  In these large**
21 **warehouses, sometimes two or three levels**
22 **high.**
23 Q.  In there was your understanding that Iron
24     Mountain built that facility?
25 **A. Iron Mountain either contracted or built the**

Page 16

1  **facility.**
2    **The only thing different about that**
3  **building, it was a stand-alone building.  And**
4  **the whole facility was owned by Iron Mountain,**
5  **or run by Iron Mountain.  That was a precast**
6  **wall system.**
7  Q.  Going back to the knowledge that -- you say
8  you know -- please, if I'm saying this wrong,
9  let me know.  You know how these things, as in
10 the racking system, were put together; is that
11 correct?
12 **A. No.**
13    **I'm fairly knowledgable from actually**
14 **working on them to see how they're put**
15 **together.  In other words, I never had to**
16 **disassemble one.**
17 Q.  That's my next question I was getting to.
18 When you were working in that Iron Mountain
19 facility, you never observed the racking
20 system being disassembled?
21 **A. If it was, it wasn't by us.**
22 Q.  Did you ever observe the disassembly of the
23 racking system while in the Iron Mountain
24 facility in Port Allen?
25 **A. That's a great question.  I'm not sure.  It's**

Page 17

1  been at least six years ago.
2  Q.  So you wouldn't have been able to remember
3     that or rely on any observation of that nature
4     in making your opinions here?
5  A.  No.  We weren't -- that's true.
6  Q.  In the frame of reference that you mentioned,
7     carries an assumption that the racking system
8     in Port Allen was identical to the one in
9     Harahan.  Correct?
10        MR. MEYER:
11           Objection.
12        THE WITNESS:
13           I didn't use the word "identical."
14           I use the word "similar."
15 BY MR. BARRAS:
16 Q.  Okay.
17        I'm thinking this is probably a typo on the
18     next paragraph.  It looks like six was --
19 A.  What page are you on?
20 Q.  The transition between one and two.  It looks
21     like paragraph seven should just actually be a
22     continuation of paragraph six; is that
23     accurate?
24 A.  That's correct.
25 Q.  I just wanted to clarify that.

Page 18

1        To wrap up on those two paragraphs.  Prior
2     to you being retained for this case, your time
3     in Iron Mountain in Port Allen was your only
4     exposure to racking system of this nature?
5  A.  That's probably it.
6        I've been in other buildings when I've
7     ordered materials from supply houses, and been
8     inside warehouses when I ordered equipment or
9     supplies for my construction company.  So I've
10     been inside numerous warehouses with obviously
11     tall storage facilities.
12        My first exposure probably to rack systems
13     is when I had to do -- when I was involved --
14     when I was the fire marshal for the State of
15     Louisiana.  I had to reviewed compliance for
16     safety codes, and also predominately the fire
17     sprinkler systems that go in tall warehouse
18     structures such as Sam's and similar to Iron
19     Mountain.
20        They have multiple storage levels.  They
21     all have to be protected by fire sprinkler
22     systems.
23        I got the full understanding of how complex
24     racking systems, shelving systems, and how to
25     protect them with fire equipment and fire

Page 19

1     safety systems.
2        That was my first, really, true exposure to
3     seeing a warehouse building in terms of plans
4     and how they laid out storage areas.
5  Q.  Your inspections -- just let me ask this
6     first.  You were a deputy fire marshal, or
7     were you the state fire marshal for the State
8     of Louisiana?
9  A.  I was a deputy fire marshal.
10        At the time I was at Engineering School of
11     L.S.U., I was working part time, and full time
12     in school.
13 Q.  The nature of those inspections that you just
14     described were relating to the sprinkler
15     systems?
16 A.  Yeah.  They put me in charge of fire sprinkler
17     review.  My title was plan review architect.
18 Q.  Got you.
19        Moving on to paragraph eight.  It's just
20     your qualifications, stated you have been
21     accepted as an expert in the fields of
22     construction, inspection, project management,
23     site safety, architecture and design.
24     Correct?
25 A.  Yes, sir.

Page 20

1  Q.  Codes related to building.  Are we talking
2     about local --
3  A.  Well, the two dominantly --
4        MR. MEYER:
5           Let him ask the question.
6  BY MR. BARRAS:
7  Q.  Are we talking about local building codes or
8     the -- I'll tell you this, I do have some
9     knowledge.  When I ran my solo practice back
10     in another life, I renovated an old building,
11     and I had to get all that.
12        Are you talking about local codes, or I
13     guess the overarching, the life safety code,
14     maybe it's ANSI; is that it?
15        MR. MEYER:
16           Object to form.  You can answer.
17        THE WITNESS:
18           Whether you are doing a renovation
19     of a home -- not a home.  Renovation of a
20     building, anything commercial related,
21     the two codes that -- actually, there are
22     three.  That two codes that are
23     predominant that you have for compliance
24     are the IBC, international building code,
25     and the NFPA 101, which is the life

Page 21

1 safety code.
2     The two authorities usually are your
3 local building department and the other
4 authority is the state fire marshal.
5 BY MR. BARRAS:
6 Q. Moving on to paragraph nine. It talks about
7 your -- we may spend some time on this one.
8 It talks about your methodology in determining
9 the opinions in the affidavit. So we're going
10 to go through these documents that you list.
11     The first one is contract rules for Exxon
12 Chemical Company safety; is that correct?
13 A. Yes, sir.
14 Q. Number one, where can I find that document?
15 A. The bad news is, my office flooded about a
16 month ago.
17 Q. Yikes.
18 A. I don't have any of this documentation
19 anymore.
20     I had a Walmart Guide Book for, basically,
21 safety rules. It was very detailed, very
22 thorough. Exxon has another one, which is
23 very good for basically industrial facilities,
24 storage facilities.
25     There is a large -- we did some work in the

Page 22

1 Exxon facility in Baton Rouge, which is a
2 rather large warehouse. We had all these
3 documents that we had to comply with. They
4 were given to us since we were a contractor of
5 record on a project there. Unfortunately, a
6 lot of that documentation is no longer
7 available.
8     I do have the OSHA General Industry
9 Regulations on a disc when I say that.
10 Q. So I'll go through them one by one. Are you
11 able today, as we sit here, to point to what
12 parts of the contract rules for Exxon Chemical
13 Company safety you used to determine your
14 opinion in this affidavit?
15 A. No.
16 Q. Are you able, as we sit here today, to point
17 to what parts of the Walmart Safety Manual you
18 used in formulating your opinion in this
19 affidavit?
20 A. No.
21 Q. Are you able to, as we sit here today, to
22 point to what parts of the U.S. Department of
23 Labor, OSHA 3146 Fall Protection document used
24 by you in formulating your opinions in this
25 affidavit?

Page 23

1 A. Again, same issue. I don't have that
2 information anymore.
3 Q. So you cannot point to the specific?
4 A. No. All that documentation that I had is no
5 longer available.
6 Q. Same question for D. As you sit here today,
7 are you able to point to what part of the OSHA
8 1910 and 1926 General Industry Regulations you
9 used in formulating your opinions in this
10 affidavit?
11 A. I focused, when I reviewed that, on the
12 regulations on scaffolding. Really,
13 scaffolding didn't play a role in this
14 accident.
15 Q. We can strike D out of this?
16 A. Yeah.
17     I didn't review all of the documentation
18 that's in 1910 and 1926 OSHA regulations. I
19 got to go back and look at it again.
20     Basically, the initial thoughts were, I got
21 to review more information related to safety
22 issues related to scissor lifts.
23 Q. Move on to paragraph ten. You reviewed these
24 documents listed in paragraph ten. And these
25 documents assisted in you forming your

Page 24

1 opinions in the affidavit. Correct?
2 A. Yes, sir.
3 Q. By the way, if you want to take a break at any
4 time, you are more than welcome to.
5 A. No.
6 Q. The first document listed in paragraph ten,
7 paragraph 10A, is the U.S. Labor OSHA report
8 inspection No. 1323824. Correct?
9 A. Yes, sir.
10 Q. With witness statements and accident
11 photographs dated June 19, 2018. Correct?
12 A. Yes, sir.
13 Q. Did you -- let me rephrase that.
14     What parts of that inspection report were
15 pertinent to you forming the opinions in this
16 affidavit?
17 A. Well, the purpose of the OSHA report was
18 basically determining that the employer, which
19 is Rack Master, was fined and cited for
20 violations. So they obviously had a role in
21 this accident and injuries related to the
22 plaintiff.
23 Q. How what -- let me be a little more specific.
24     What from the OSHA report did you find
25 related to Iron Mountain? Strike that. I'm

Page 25

1 going to rephrase that.
2    What portions of the U.S. Department of
3 Labor OSHA inspection No. 1323824 relative to
4 Iron Mountain helped you form your opinions in
5 this affidavit?
6 **A. One of the key pieces of the puzzle in terms**
7 **of understanding this accident or fall or**
8 **injuries, was a statement by the foreman,**
9 **Glenn Thomas. That provided his opinion or**
10 **his explanation of the event.**
11 Q. Okay.
12 **A. Glenn Thomas was a foreman working for Rack**
13 **Master, the employer.**
14 Q. What was in the statement of Glenn Thomas that
15 was important, in your opinion?
16 **A. I have to look at the document in front of me.**
17 Q. We'll pull it up.
18    MR. BARRAS:
19      Can you pinpoint with him the
20    specific document that he's talking
21    about? We can go off and look at that.
22    MR. MEYER:
23      Sure.
24    MR. BARRAS:
25      We'll go off for a second.

Page 26

1      (Off the record.)
2 BY MR. BARRAS:
3 Q. Mr. Wood, the statement that we referenced, I
4 now have in front of me. Thank you for your
5 patience in waiting for me to pull it up.
6    What from this statement was important for
7 your formulation of opinions in the affidavit?
8 **A. This is just one piece of information in the**
9 **puzzle to understand the events of the, again,**
10 **related to this litigation. Sworn testimony,**
11 **we have depositions, we got OSHA violation**
12 **reports, we have photographs, we got a video.**
13    **It's in total, we have a lot of information**
14 **to digest to understand the event.**
15 Q. We're going to get to each of those pieces.
16 The question I'm asking is about this
17 statement. I think you indicated that there
18 was -- you felt that the statement was
19 important.
20 **A. It was important because it spells out Rack**
21 **Master (sic) explanation of the event.**
22    **Mr. Thomas was the foreman in charge of the**
23 **project. He basically spelled out what his**
24 **interpretation of why this rack system failed.**
25 Q. Is what -- I have the report up in front of

Page 27

1 me. Can you point to the specific part of the
2 report that you feel is important?
3 **A. The whole thing is important because he's such**
4 **a crucial player in the accident. In terms of**
5 **exactly pinpointing one particular sentence, I**
6 **really probably can't.**
7    **In totem, his explanation of what occurred,**
8 **and their role in the accident on how they**
9 **understood why they had to do the process of**
10 **disassembling this rack system. It was**
11 **dictated by Iron Mountain and not the way they**
12 **normally would proceed.**
13 Q. So from Glenn Thomas' statement -- I want to
14 get this clear. Is your testimony that Iron
15 Mountain was directing the specifics of how
16 Rack Master disassembled the racks?
17 **A. Yes.**
18 Q. How so?
19 **A. They were instructed to proceed from right to**
20 **left. And their normal procedure with**
21 **disassembling -- that's their experience.**
22 **They're knowledgable. They have been doing**
23 **this for a long time.**
24    **You can look at Mr. Thomas, stating that he**
25 **was a superintendent, working for a number of**

Page 28

1 **years doing this.**
2    **They're highly knowledgable of how to**
3 **assemble and disassemble rack systems or**
4 **shelving systems.**
5    **They were instructed that Iron Mountain**
6 **wanted to keep their pathways opened to their**
7 **particular stairs as they removed the racks**
8 **and shelving from this particular space inside**
9 **the warehouse.**
10    **They were told by Iron Mountain that this**
11 **is how they wanted to it down. Even though**
12 **that's not how they normally proceed on how**
13 **they would normally do it, that's what they**
14 **had to follow.**
15 Q. In that respect, have you identified -- I'll
16 get to that later.
17    So the crucial fact from this is, or the
18 crucial takeaway from you in forming your
19 opinions in the affidavit from this statement,
20 is iron mountain, or Mr. Thomas' statement
21 that Iron Mountain instructed him to remove
22 the racks from left to right or right to left?
23 **A. Right to left.**
24 Q. Right to left.
25    Are you aware of any safety standard code

Page 29

1 or guidance regarding rack removal, requiring
2 racks to be removed from left to right?
3     MR. MEYER:
4       Object to form.
5    THE WITNESS:
6       I don't think there is a particular
7 building code that spells that out.
8       Basically, from the manufacturer's
9 instructions or equipment manuals,
10 there's a certain procedure which
11 obviously Rack Master follows in terms of
12 taking down these very tall shelving
13 systems and how to do it in a very safe
14 manner.
15 BY MR. BARRAS:
16 Q. Let me unpack that a little bit.
17     What manufacturer's instructions are you
18 referencing?
19 **A. Well, obviously the shelving systems are built**
20 **and assembled in a certain manner: The cross**
21 **members, the cross beam, the post columns, the**
22 **support members. All that has to come in a**
23 **certain manner in how it's assembled.**
24     **That's typically, when you buy that**
25 **shelving system, rack system, they spell that**

Page 30

1 **out how you put it together.**
2     **Rack Master, since that's their modus**
3 **operandi. That's what they do for a living.**
4 **That's what their expertise is. That's who**
5 **should understand of how the thing should be**
6 **assembled and disassembled.**
7 Q. Is there any manufacturer's instructions that
8 played into your formulation of your opinions
9 in this affidavit?
10 **A. I didn't, obviously, review any manufacturer's**
11 **instructions. But I understood from reviewing**
12 **his testimony in the case, the issues and**
13 **understanding how this event occurred.**
14     **If you put the elements together, you**
15 **understand why Rack Master proceeds from back**
16 **to front or front to back. When you're taking**
17 **something as large or as complicated as this**
18 **down in a safe manner, this is how you follow**
19 **their instructions.**
20 Q. It's true that nothing in the documents that
21 you reviewed indicated that Rack Masters ever
22 identified any safety issues to Iron Mountain?
23 **A. I don't think I have an answer for that right**
24 **now. I'm not quite clear about the question.**
25 Q. Let me -- did any of the documents that you

Page 31

1 reviewed indicate that prior to this accident,
2 at any time Rack Masters was on site, that
3 they identified to Iron Mountain any issues
4 they felt were safety issues?
5 **A. I don't think I can answer that question right**
6 **now.**
7     **They had been on site for approximately two**
8 **weeks when the accident occurred. I think**
9 **they started May 30th.**
10 Q. Right.
11 **A. The accident occurred June 15th.**
12 Q. But nothing in the documents that you used to
13 form your opinion would indicate that Rack
14 Masters identified any issues they deemed to
15 be safety issues to Iron Mountain?
16 **A. I think, basically, that's a twisting of**
17 **words.**
18     **The safety protocol of disassembly of these**
19 **rack and shelving systems follows a certain**
20 **pattern. And the pattern which is done to**
21 **remove or disassemble these systems is front**
22 **to back, back to front.**
23     **That's the proper method of disassembling**
24 **these units so they're structurally -- it's**
25 **safe. And you're not going to have a**

Page 32

1 **situation where one side of a support wall, in**
2 **this case which is all the post and support**
3 **beams and support members, basically being**
4 **left intact on one side.**
5     **So the proper method, and Rack Masters is**
6 **familiar with that, and they're obviously**
7 **cognizant of how to do this properly. The way**
8 **they normally would take this job and do it or**
9 **proceed with it, they were told to do it**
10 **differently. And that instruction came from**
11 **Iron Mountain and not from them.**
12 Q. You would agree that Iron Mountain isn't in
13 the business of -- same business as Rack
14 Masters. Correct?
15 **A. Iron Mountain is the lessee and the owner of**
16 **the equipment. No, they're two different**
17 **entities, two different functions.**
18 Q. Rack Masters was hired to safely disassemble
19 this racking system?
20 **A. They were hired to disassemble this rack or**
21 **shelving per what they thought would be their**
22 **procedure.**
23     **When they were told to do it differently,**
24 **and that was instructions from Iron Mountain**
25 **itself --**

Page 33

1 Q. We're going to get to the rest of that in a
2 second.
3    MR. MEYER:
4       Can you finish the answer?
5 BY MR. BARRAS:
6 Q. Go ahead. I apologize.
7 **A. When they were instructed to do it**
8 **differently, they verbally told Iron Mountain**
9 **that they had a concern with this. And that**
10 **there would be a safety issue with this. This**
11 **is not the normal procedure for doing this.**
12 Q. Where do you get that they verbally told Iron
13    Mountain there would be a safety issue? Where
14    do you get that from?
15 **A. I don't know if whether it's exactly the words**
16 **I would use. But basically, they said they**
17 **had a concern because this was not what they**
18 **normally proceeded with or did.**
19 Q. That's two different things, you would agree?
20 **A. Well, basically, you stated this earlier in**
21 **the deposition. You said safely disassemble.**
22 **You used that word yourself.**
23 Q. Yes.
24 **A. That's what their job was to do.**
25 **Their function is to take this thing down**

Page 34

1 **in a safe manner. Disassemble it without**
2 **damaging it, without destroying it, removing**
3 **everything so they can reuse it again**
4 **somewhere else.**
5 Q. And that's Rack Masters' job?
6 **A. Rack Masters' job is to disassemble this rack**
7 **or shelving system for the client, Iron**
8 **Mountain, per their instructions.**
9 Q. Just so I'm clear. You have, from Mr. Thomas'
10    statement, that Hammerhead -- excuse me. Rack
11    Masters attempted to go from, we'll just call
12    it front to back. And Iron Mountain, said,
13    according to Mr. Thomas, "No, we would like
14    you to keep these stairwells open, so do it on
15    the way."
16    Is that an accurate understanding? Again,
17    I'm not looking for specific words. Just in
18    general, is that your understanding?
19 **A. The method of removal or disassembling was**
20 **dictated by the client, which was Iron**
21 **Mountain.**
22 Q. Why would they --
23 **A. Exactly what you just said, they wanted to**
24 **keep their stairwells open.**
25 **So there was a logical reason why Iron**

Page 35

1 **Mountain said, "Do it my way, not the normal**
2 **way." The procedure that was normally done --**
3 Q. Right.
4 **A. -- by Rack Masters.**
5 Q. But you would agree, there wasn't an Iron
6    Mountain person on the floor directing Rack
7    Masters' employees what to do?
8 **A. I don't have an answer for that.**
9 Q. Would that be important?
10 **A. Well, they were told, the instructions were**
11 **obviously diametrically different than what**
12 **they would normally proceed.**
13    **Those instructions came from an employee or**
14 **a manager or part of the personnel with Iron**
15 **Mountain. They were told to do it**
16 **differently, which is the crux of what we're**
17 **talking about.**
18 Q. You don't know the reasons for what Rack
19    Masters -- strike that.
20    Your statement earlier that there was a
21    concern raised about safety, is an assumption
22    from the fact that Rack Masters, according to
23    Mr. Thomas, indicated, "This is how we're
24    doing it"?
25 **A. Okay.**

Page 36

1 Q. Do you agree?
2 **A. No.**
3    **Safety is part and parcel of this whole**
4 **issue of how to take down or disassemble the**
5 **rack system. You can't do it in a haphazard**
6 **manner. You have to do it quote/unquote in a**
7 **safe manner.**
8 Q. Rack Master were the pros?
9 **A. Supposedly.**
10    **They wanted it. They did it their way.**
11 **They were the ones that would take responsible**
12 **(sic) and do it correctly, yes.**
13 Q. Did you see anything in the documents that you
14    reviewed to indicate that Rack Masters said,
15    "No, this will be an unsafe way of removing
16    these racks?" Or made some sort of
17    communication to Iron Mountain of that nature?
18 **A. I don't have a specific -- because it was a**
19 **verbal instruction from Iron Mountain to Glenn**
20 **Thomas.**
21    **I don't think there was any quote/unquote**
22 **something I could cite in a report or**
23 **affidavit or anything else.**
24 Q. Generally speaking, if Mr. Thomas had raised
25    this as a safety concern prior to it

Page 37

1 happening, don't you think he would have told
2 OSHA?
3 **A. OSHA doesn't come in till after.**
4 Q. Right.
5    But don't you think he would have told
6 OSHA, if he would have told Iron Mountain
7 beforehand that, "Hey, I said this was going
8 to be a problem, they said no do it"?
9    MR. MEYER:
10        Objection to form.
11    THE WITNESS:
12        I can't answer that.
13 BY MR. BARRAS:
14 Q. Rack Masters was on site for several weeks
15 before, maybe a month before. Within that
16 time they examined the racking system.
17 Correct?
18 **A. What's the question?**
19 Q. Do you understand that Rack Masters examined
20 the racking system before they began work
21 disassembling it?
22 **A. They were given the documents that were**
23 **provided. Obviously, they inspected before**
24 **they provided a bid to the lessee or owner,**
25 **which is Iron Mountain.**

Page 38

1    **Obviously, they provided a bid, said, "This**
2 **is what we think we can do the project for**
3 **within a certain time frame." They were**
4 **instructed by Iron Mountain to have this done**
5 **obviously on a pretty expeditious manner.**
6 **Otherwise, no one makes any money and the**
7 **project doesn't proceed.**
8 Q. You don't know of anything that would have
9 prevented Rack Masters from stopping work or
10 saying, "No, this is too dangerous"?
11 **A. I don't think the level of hazard or danger**
12 **really doesn't come in till the end of the**
13 **project. When you're getting to the last**
14 **final part of the system, or the shelving**
15 **system where it's unsupported at the very end.**
16 **So as you are taking the system apart one**
17 **by one each line, they have some cross member**
18 **supports to keep it from falling over. The**
19 **issue really becomes a danger or hazard to**
20 **employees or anyone working on disassembling**
21 **this, it comes near the very end.**
22    MR. BARRAS:
23        Madam Reporter, can you just repeat
24    back, and you don't have to answer this,
25    just yet, can you repeat back for me the

Page 39

1 question that he just answered?
2    (The following was read back:
3    QUESTION: You don't know of
4    anything that would have prevented
5    Rack Masters from stopping work or
6    saying, "No, this is too
7    dangerous"?)
8 BY MR. BARRAS:
9 Q. So the answer that you just gave me, didn't
10 quite answer that question, so I'm going to
11 ask you again.
12    Is that yes, you know of something, or no,
13 you don't know of something?
14 **A. I haven't -- obviously, again, they had**
15 **already -- they were instructed to follow a**
16 **certain procedure or method by Iron Mountain**
17 **how to disassemble the system.**
18    **My opinion was, they really weren't aware**
19 **how dangerous and hazardous -- they're under**
20 **the assumption that this is something Iron**
21 **Mountain was familiar with. They own**
22 **equipment like this. This is something that**
23 **made sense or didn't pose any risk to them.**
24    **Being the owner of the equipment and the**
25 **lessee, they followed their rule and said,**

Page 40

1 **"Okay, we'll do it your way." Again, they**
2 **didn't really -- they weren't fully cognizant**
3 **of the hazard of the danger until the very**
4 **end.**
5 Q. You just made a statement that I want to
6 explore. You said Rack Masters was under the
7 assumption that -- do you recall what you
8 said?
9 **A. Rack Master was under the assumption this was**
10 **a familiar process undertaken by Iron Mountain**
11 **to disassemble the system. It was not going**
12 **to pose a risk to their employees.**
13 Q. So did you know of anything that would stop
14 Rack Masters from being able to, at any point,
15 observe a situation they felt may have been
16 dangerous and then stop work?
17 **A. Like I said earlier, the risk really didn't --**
18 **of having an unstable rack system or shelving**
19 **that could basically pose an unreasonable risk**
20 **of harm or fall or come loose, doesn't really**
21 **happen until near the very end, till you get**
22 **to the final line of the wall, on the rack**
23 **wall, which is against the left side of the**
24 **building.**
25 Q. What you are saying is that Rack Masters

Page 41

1  couldn't have identified a safety concern
2  until this point that you described at the
3  very end?
4  **A.  No.**
5  **They said this is not -- they earlier**
6  **stated that their normal procedure was safely**
7  **removing or disassembling this equipment was**
8  **front to back or back to front.**
9  **They went under the assumption, since Iron**
10 **Mountain is obviously a large employer and has**
11 **many rack systems all over the country, maybe**
12 **the employer knew more than them how to safely**
13 **disassemble this.**
14 Q.  Let me stop right there.
15 What documents, or what part of the
16 documents that you reviewed led you to that
17 conclusion, that Rack Masters was under the
18 assumption that Iron Mountain had done this
19 before and was guiding them?  I don't want to
20 put the words in your mouth.
21 What part of their materials that you
22 reviewed did that conclusion that you just
23 stated come from?
24 A.  My conclusion from that is that Mr. Thomas,
25 the foreman, figured or determined that, "Hey,

Page 42

1  **this is not how we normally do.  This is not**
2  **how we normally proceed, but the client knows**
3  **better.  We're just going to follow what the**
4  **client instructs us to do."**
5  **In this case, you're talking about one of**
6  **the largest storage companies in the world,**
7  **which is Iron Mountain.  Maybe there was an**
8  **understanding in terms of how Mr. Thomas**
9  **proceeded, that this was -- he had to do it**
10 **per their method.  Otherwise, there was going**
11 **to be a problem, and he had to follow their**
12 **rules.**
13 Q.  What in the materials that -- actually, my
14 question still never got answered.
15 Do you know of anything, that even in the
16 course of that, that if Hammerhead -- not
17 Hammerhead.  If Rack Masters identified
18 something that was a potential or imminent
19 safety concern, that would have prevented them
20 from stopping work?
21 MR. MEYER:
22 Object to the form.  You can answer.
23 THE WITNESS:
24 I don't think they were ever -- a
25 point where they could stop work and say,

Page 43

1  "Hey, this is going to cause unreasonable
2  risk of harm."
3  I don't think they were given that
4  opportunity.  I don't think they
5  understood the potential risk of this
6  thing toppling.
7  They were under the assumption, hey,
8  this is a rack system that was put and
9  installed by a prior company.  This
10 system was going to be a pretty stable
11 and secure rack and it wasn't going to
12 move.
13 They were understanding, "This is
14 Iron Mountain's way of doing it.  We are
15 going to go ahead and proceed.  They're
16 not going to put our men in danger."
17 BY MR. BARRAS:
18 Q.  I understand that.  What I'm asking is, do you
19 know of anything that would have prohibited
20 Rack Masters from stopping and saying, "This
21 poses a safety issue, we're not going to work
22 on it any more"?
23 **A.  I think they were under the assumption the**
24 **final line --**
25 Q.  I apologize to cut you off.  I'm not asking

Page 44

1  about their assumption.
2  I'm asking whether you know of anything
3  that would have prevented them from -- if they
4  were to have identified a safety issue, from
5  stopping work?
6  **A.  As I said, I think they were under the**
7  **assumption that final post wall was secured to**
8  **the adjacent warehouse wall, and that thing**
9  **wasn't going to move.**
10 **Without knowing that or assuming that, they**
11 **had no idea that that thing was insecure and**
12 **would come loose and topple over.**
13 **So the assumption was made by Rack Masters,**
14 **that this was going to be a secured wall and**
15 **it wasn't going to move.**
16 Q.  I'm going to make reference to some documents
17 that were subpoenaed by plaintiff's counsel in
18 this case, the Rack Masters subpoena return.
19 We can email this or print it and attach it
20 to the deposition.  If your attorney can show
21 you.  There are 14 pages in this PDF document,
22 the one that I have.  And I'm going to make
23 reference to the sixth page.
24 It's a printout of a Gmail entitled "Rack
25 Masters accident notes."  I'm going to ask

Page 45

1  you, have you ever seen this document?
2     (Exhibit 2, a Gmail, was marked for
3     identification.)
4     MR. MEYER:
5        You want to show it to him?
6     MR. BARRAS:
7        I'll come hangout over there.
8     THE WITNESS:
9        This is the day after the accident?
10 BY MR. BARRAS:
11 Q.  June 16, 2018.  This is an email from Linda
12 Castanza to Glenn Thomas.  I like you to read
13 through this.  And let me know once you read
14 through it and through.
15    Are you done looking at this?  Or you want
16 to look at it some more?  Please feel free
17 to -- you can use your finger to scroll.
18 **A.  There's just a lot of people involved in this.**
19 **You got Sean Sims, you got Tyree, Martel**
20 **Brignac.**
21 Q.  Right.  Just read through it.  If I need to
22 bring it up to look at it again, we can
23 certainly do that.  Let me know about you're
24 done looking at this document.  I have another
25 one I want to show you.

Page 46

1     If you would like, I can email this to
2  Daniel real quickly.  He can print it out so
3  you can have a copy to look at while I'm
4  asking you questions, if you like.
5  **A.  All right, go ahead.**
6     MR. BARRAS:
7        Off the record.
8        (Off the record.)
9  BY MR. BARRAS:
10 Q.  Counsel graciously printed a copy of the
11 document I was just referring to.  I
12 understand you have the document now in front
13 of you.  Correct?
14 **A.  Yes, sir.**
15 Q.  Have you reviewed the -- I will call it page
16 six of my PDF document, the Gmail entitled
17 "Forward Rack Master accident notes."  Have
18 you reviewed that page?
19 **A.  Yes, briefly.  This is the first time I've**
20 **have seen it.**
21 Q.  If you need more time to look at it, we will
22 be more than happy to accommodate that.
23    Have you also reviewed a handwritten
24 statement that's two pages later by Mark
25 Martinez?

Page 47

1  **A.  Yes.**
2  Q.  We will call this Defense 2.
3     So the first document, the Rack Masters
4  accident notes, there was a portion -- I'll
5  represent to you it was produced to us like
6  this, with the portion of the email circled.
7     There's a statement that, "John," the
8  foreman, "was told by Rack Masters' employees
9  that a beam was rocking from the wall five to
10 ten minutes before it fell.  And then John
11 told them it was fine and to keep working."
12    Regardless of who John is, assuming that he
13 works for Rack Masters, would this information
14 change your opinions?
15 **A.  There's a Jonathan Ramos and there's a John.**
16 **They're spelled quite differently.  Are we**
17 **talking about the same person?**
18 Q.  Regardless.
19 **A.  Who is John the foreman?  Is it Jonathan**
20 **Ramos?**
21 Q.  I believe that's how -- I believe this is
22 Mr. Ramos.
23    Again, it's not -- the nature of the
24 question is, would this information, that is
25 Rack Masters identifying the beam was rocking

Page 48

1  from the wall, and then the Rack Masters'
2  foreman, or Rack Masters' person, saying "Keep
3  working," does that change your opinion in any
4  way?
5  **A.  I'm a little confused.  There's a Jonathan**
6  **Ramos, the gentleman that was up in the lift,**
7  **then there's the foreman named John, two**
8  **different people.  Correct?**
9  Q.  No.
10 **A.  Same person?**
11 Q.  There was only one John on the site.  It was
12 John Ramos.
13 **A.  He was actually the foreman on the job?**
14 Q.  He was described as the foreman of the job.
15 **A.  Is he really the foreman?**
16 Q.  No.
17 **A.  Okay.**
18 Q.  Although he did -- I'm not -- he did describe
19 himself, if I recall correctly, and I don't
20 want to misstate his deposition testimony.  I
21 think he did describe himself as the foreman
22 in his deposition.  But you have a copy of his
23 deposition.
24    Regardless, whether he was the foreman or
25 not, does the fact that someone, assuming the

Page 49

1   fact that someone from Rack Masters identified
2   the beam was rocking from the wall five to ten
3   minutes before it fell, then was told to keep
4   working by someone else from Rack Masters,
5   does that change your opinion in any way?
6   **A. Not really.**
7   Q. Why?
8   **A. In his deposition testimony, Ramos spelled out**
9   **that this was -- that he was concerned, that**
10  **that thing was -- he was concerned it was**
11  **unstable.**
12      **But he didn't state in his deposition**
13  **testimony anything about five or ten minutes**
14  **before it fell. The information there is not**
15  **the same as to what he testified.**
16  Q. Going to the written statement in this
17  Defendant's 2, Mark Martinez's written
18  statement.
19      This statement indicates, it says what it
20  says. I'm going to summarize it. It says
21  that the Rack Masters employees were working
22  in the same area after lunch. They noticed it
23  was getting unstable. Correct?
24  **A. You're saying they came back -- they didn't go**
25  **to the lunch. The accident occurred at 9:50.**

Page 50

1   Q. Got back from a break. Excuse me, it says
2   break.
3   **A. So the break was in the morning. The accident**
4   **happened well before lunch.**
5   Q. Right.
6      Here, the statement said the break was at
7   8:45. I misspoke when I said lunch.
8      They continued working the same area. And
9   they noticed it was getting unstable. That
10  followed the statement --
11  **A. Who signed the statement? It says, "Never**
12  **told the foreman, Glenn." Who is Glenn?**
13  Q. Glenn Thomas.
14  **A. I'm saying -- so the foreman is Glenn Thomas.**
15  **The foreman is not Jonathan Ramos?**
16  Q. Correct.
17  **A. Just looking the way they spelled Thomas.**
18  Q. Next sentence, it said, "Martel warned
19  Jonathan. Jon responded, 'It's anchored to
20  the ground. The column only had one
21  anchored.' Jonathan went back to work
22  confident."
23      MR. MEYER:
24          What was the question?
25      MR. BARRAS:

Page 51

1       I was coming with it.
2   BY MR. BARRAS:
3   Q. How would that be Hammerhead's fault? Not
4   Hammerhead. How would that be Iron Mountains'
5   fault?
6       MR. MEYER:
7           Objection to the form. Do we know
8       who wrote this statement?
9       MR. BARRAS:
10          Mark Martinez.
11      MR. MEYER:
12          I see Mark Martinez's name on the
13      top.
14      MR. BARRAS:
15          Right.
16  BY MR. BARRAS:
17  Q. Let me rephrase that question.
18      If Jonathan was warned by his co-employee
19  that the racking system was getting unstable
20  and then responded, "It's anchored to the
21  ground" and kept working, how would that
22  relate to Iron Mountain in any way?
23  **A. You're trying to do a vis-a-vis situation with**
24  **Iron Mountain related to an event that**
25  **happened -- or a discussion between two**

Page 52

1   **employees happening on an accident that**
2   **occurred maybe 15, maybe five, ten minutes**
3   **later. I don't think there's a direct**
4   **correlation between saying, "Hey, Iron**
5   **Mountain, you're not at fault for this."**
6       **Iron Mountain basically dictated the method**
7   **of removal. You're talking about bringing up**
8   **basically a written little note from one of**
9   **the employees to another without -- I don't**
10  **find the correlation, any means of**
11  **understanding this.**
12  Q. I was posing a hypothetical.
13      If what's written in this statement were
14  true, how would -- let me peel back on that.
15      If Mr. Ramos noticed the racking system was
16  unstable, as has been described in these two
17  documents, and then knowing, or seeing this
18  instability, continued working, would Mr.
19  Ramos be responsible in any way for continuing
20  to work in a --
21  **A. Again, if I had to put myself in the position**
22  **of Mr. Ramos, I don't think he could have**
23  **foreseen this whole thing collapsing as it**
24  **did.**
25      **In his defense, every one of those column**

Page 53

1 posts were pinned to the ground with expansion
2 anchors. They did only have one pin. There
3 weren't two, as they should have been. They
4 put the seats of the posts, the anchors -- his
5 assumption was that these things weren't going
6 to move.
7     As he stated earlier, they were anchored.
8 It was just simple expansion thing or
9 expansion anchor.
10 Q. But assuming they were moving --
11 A. I don't think he ever expected it to move.
12 Q. Assuming that they were moving, and he
13 observed them moving and then continued to
14 work, would he bear any responsibility for
15 continuing to work when the racking system was
16 unstable and moving, for not informing his
17 coworkers, or instructing his coworkers that
18 it was okay to work?
19     I know that was a lot of different
20 questions.
21     MR. MEYER:
22        It was compounded. You had a nice
23     question there.
24 BY MR. BARRAS:
25 Q. Answer the first one.

Page 54

1     MR. MEYER:
2        As long as we understand that on the
3     record.
4     MR. BARRAS:
5        Yep.
6     THE WITNESS:
7        I don't think Mr. Ramos, when he was
8     working up on that lift, ever expected
9     this whole rack to collapse. I don't
10     think he ever experienced anything like
11     that.
12        I think he just never expected the
13     pin posts, that continual 160-foot length
14     of the building, in a single motion, all
15     of a sudden move and collapse and cause
16     both of the lifts to fall.
17 BY MR. BARRAS:
18 Q. Assuming there were several minutes between
19 the time where the rack started initially
20 moving and the collapse, do you think
21 Mr. Ramos should have taken measures to get
22 out of there, or warn his coworkers that the
23 racking system had become unstable?
24 A. I don't think I can answer that.
25     Going back and understanding the events in

Page 55

1 terms of how this was written, and then how he
2 spelled it out in his deposition, two
3 different explanations of what happened.
4 Q. Right.
5     And I'm not asking -- I'm asking you to
6 just focus on these documents for right now.
7 I'm not asking you to say that what Mr. Ramos
8 said in his deposition is false. I'm not
9 asking you to comment on that.
10     I'm asking you to focus on these documents.
11 If what is in these documents were so, were
12 true rather, would Mr. Ramos, or should
13 Mr. Ramos have acted to protect himself and
14 his coworkers within the minutes between the
15 time that the racking system started moving
16 and the collapse?
17     MR. MEYER:
18        With the qualification this is a
19     hypothetical?
20     MR. BARRAS:
21        Right.
22     THE WITNESS:
23        It's a hypothetical analysis. I
24     think you're going to have a little bit
25     of movement when you're talking about 160

Page 56

1 length of cross members, posts, beams.
2     They're going to have some movement.
3 It's not rigidly attached to anything.
4 It's not supported by anything. It's
5 that cross braced.
6     They are expecting a little
7 movement. I don't think he expected the
8 whole thing all of sudden move as one and
9 collapse. I think he thought maybe
10 because all the posts were pinned and
11 there wouldn't be that much movement, or
12 if there was, it wasn't significant.
13 BY MR. BARRAS:
14 Q. And Rack Masters were the pros?
15 A. They're experienced in disassembling and
16 assembling, from my understanding, shelving
17 systems.
18 Q. Going back. We kind of deviated from the path
19 we were on. Going back to the affidavit. We
20 were on paragraph ten, and I was going
21 through. I think I left off at A. That's
22 what we duck-tailed into the conversation we
23 just had. I'm going to pick up on B.
24     So you reviewed video camera footage that
25 capture the accident after the scissor lift

Page 57

1  tipped over and its occupants lying on the
2  concrete floor. That's what the affidavit
3  says. Correct?
4  **A. Yes.**
5  Q. I'm going to ask you to clarify that for me.
6     Did the video footage you looked at capture
7  the accident happening itself or, basically,
8  the aftermath?
9  **A. The aftermath.**
10  Q. Okay. How would the aftermath of the
11  accident -- or how did the aftermath of the
12  accident, as depicted on this video, play into
13  the formation of your opinions in the
14  affidavit?
15  **A. Well, it showed that this was pretty**
16  **catastrophic. Both of the lifts were fully**
17  **extended. The lifts themselves were the only**
18  **means of arresting the collapse of this long**
19  **continuous final part of the rack system in**
20  **the building.**
21     **And then once that wall, or final support**
22  **wall of the shelving started to move and**
23  **collapse, basically, it overwhelmed the -- the**
24  **only thing that was holding it from falling**
25  **over were the scissor lift themselves.**

Page 58

1     **That, of course, was not adequate. That's**
2  **what you saw in the aftermath of the accident.**
3  **The scissor lift had tipped over under the**
4  **weight of the adjacent wall, adjacent shelving**
5  **wall or shelving supports.**
6  Q. The video wasn't of the accident itself?
7  **A. No.**
8  Q. So the takeaway from the video, to your
9  conclusions, as applied to the conclusions in
10  your affidavit, is what?
11  **A. That this was a serious catastrophic accident.**
12  **You're talking about a very tall wall that**
13  **caused two scissor lifts to tip over under**
14  **their weight.**
15  Q. So that opinion is not based on any safety
16  standard or building code. Correct?
17  **A. No.**
18     **Basically, the rack system itself was**
19  **unstable and caused it to topple over on the**
20  **gentlemen that were working in the lifts.**
21  **That's what the accident was related to.**
22  Q. Right, right. And I'm taking this piece by
23  piece here. I'm going with the video camera
24  footage right now.
25     That being -- your takeaway from the video

Page 59

1  camera footage as described just now, was that
2  this was a catastrophic accident. Correct?
3  **A. Yes.**
4  Q. My question to you was, that opinion that it
5  was a catastrophic accident, is not based on
6  any scientific methodology?
7  **A. I'm not understanding your question. I'm not**
8  **a scientist.**
9  Q. On any building code?
10  **A. Again, I never cited any building codes in my**
11  **affidavit.**
12  Q. And I'm looking for the scientific basis for
13  that opinion, if there is one.
14     MR. MEYER:
15        The opinion that it was
16     catastrophic?
17     MR. BARRAS:
18        Right.
19  BY MR. BARRAS:
20  Q. I'm just trying to establish that that's not
21  based on science, it's an opinion.
22  **A. It's my opinion.**
23     MR. MEYER:
24        An observation.
25     THE WITNESS:

Page 60

1     It's and observation. My opinion,
2  this was a very bad accident. The
3  injuries were severe. They were falling
4  from a great height.
5  BY MR. BARRAS:
6  Q. How does the severity of the accident itself
7  play into your conclusions in this affidavit?
8  **A. Conclusions were that this was a bad accident.**
9     **Basically, when you start taking a 30-foot**
10  **or 20-foot or 24 to 30-foot high rack system**
11  **down, and it's unstable, something seriously**
12  **bad could happen. In this particular case,**
13  **this accident occurred in such a manner.**
14  Q. You would agree that Rack Masters was cited by
15  OSHA for -- I don't want to get the specifics
16  of the OSHA citation wrong.
17     In essence, failing to properly inspect
18  the racking system and determining it was unstable
19  before for proceeding.
20  **A. OSHA states their rules for -- basically,**
21  **cites the employers for fault.**
22     **OSHA's purpose is not to cite owners or**
23  **lessees at fault. Basically, to decide who is**
24  **at fault for an accident, and that's usually**
25  **an employer.**

Page 61

1     **Their job is to spell out accident,**
2 **employer/employee analysis at fault for**
3 **injuries.**
4 Q. You would agree that Iron Mountain was not
5 cited by OSHA?
6 **A. The job of OSHA is not to cite the lessee or**
7 **the owner of the equipment. Their job is to,**
8 **basically, determine the employer's role in**
9 **the accident and fine them an amount, or**
10 **whatever they determine is the correct amount**
11 **for this violation of OSHA standards.**
12 Q. But wouldn't Iron Mountain have been the
13 employer if they were directing the work of
14 OSHA? I'm not asking for a legal opinion.
15     MR. MEYER:
16         Objection.
17 BY MR. BARRAS:
18 Q. You can answer.
19 **A. No.**
20     MR. MEYER:
21         If you understand it or know what
22 he's asking.
23     THE WITNESS:
24         The employer of record for the
25 disassembly of the rack system is Rack

Page 62

1 Masters. Those are the ones OSHA is
2 going to cite. That's the entity that's
3 going on be cited for violation.
4         They typically don't cite -- I'm not
5 familiar of them ever citing an owner,
6 unless otherwise.
7 BY MR. BARRAS:
8 Q. You're saying if the facility would have done
9 something that caused the safety hazard that
10 resulted in injuries, that OSHA would not have
11 cited them? Is that your understanding?
12 **A. No. OSHA is going to cite the employer.**
13 **That's their job.**
14    **If I'm on a project and I'm the contractor**
15 **of record, and safety rules aren't followed,**
16 **they are going to cite me as the contractor of**
17 **record.**
18    **So this case, they are going to cite Rack**
19 **Masters as the employer of record for the**
20 **injuries incurred by their employee.**
21 Q. Again, is it your understanding that if OSHA
22 would have determined through their
23 investigation that it wasn't Rack Masters
24 fault, rather it was Iron Mountain's fault,
25 they just would have done nothing?

Page 63

1 A. No.
2    OSHA's role is to cite the employer of
3 record. Who actually is -- men out there
4 working on the job.
5    That's the reason OSHA, it's Occupational
6 Safety and Hazard. Who is actually there
7 employed and who got hurt, that's OSHA's role.
8    Basically, to determined who got hurt on
9 the job and who were they working for. Those
10 persons that were hurt were not directly
11 employed by another entity.
12 Q. So if a subcontractor is working, let's say,
13 at a chemical plant. And the chemical plant
14 has a grading area that was non-compliant with
15 all kinds of safety standards. A
16 subcontractor got hurt on that grading. Are
17 you saying that OSHA would come in and cite
18 the subcontractor's direct employer?
19 **A. No.**
20    **If it was an unsafe work environment, then**
21 **OSHA would cite whatever is at fault.**
22 Q. Isn't that what you're saying here, that this
23 was an unsafe work environment?
24 **A. No.**
25    **I'm basically saying, the violations were**

Page 64

1 determined by OSHA, and they cited Rack
2 Masters.
3 Q. Right.
4 **A. They were the ones that were responsible for**
5 **the work. There was no direct role by the**
6 **lessee or the building equipment supplier in**
7 **this role. They basically weren't directly**
8 **hiring the employees that got hurt.**
9 Q. I guess where I'm coming from that, isn't the
10 whole crux of your opinion that Iron Mountain
11 created an unsafe work environment for Rack
12 Masters' employees?
13 **A. You're trying to cite something there. That's**
14 **completely different than what OSHA is coming**
15 **up with.**
16    **OSHA is basically determining a fault and**
17 **saying that this is a fine, that I decided to**
18 **cite a company for what they did.**
19 Q. I'm asking you about your statement earlier,
20 which was, if the facility owner created an
21 unsafe work environment, than OSHA would cite
22 them?
23 **A. Not normal. But, yes, they do cite owners if**
24 **they provided an unsafe environment, it**
25 **doesn't meet safety codes or requirements.**

Page 65

1    But in this case --
2    Q.  What's the difference between that and here, I
3    guess, in your opinion?
4    A.  The equipment here was responsibly removed or
5    disassembled by an employer, which is Rack
6    Masters.
7        The issue, OSHA -- I'm not an OSHA
8    inspector.  Their choice, when they did this
9    information, when they wrote the report, they
10   chose to cite strictly Rack Masters.  Whatever
11   reason they chose, that was their
12   understanding of the event.  They decided
13   their violations were done by Rack Masters.
14   They didn't, for whatever reason, didn't cite
15   the owner or lessee.
16       I'm not questioning what they did.  That's
17   their understanding of what they felt was a
18   safety issue.
19   Q.  Now, going back to paragraph ten on the
20   affidavit.  Documents that you reviewed that
21   assisted in formulating your opinion.
22   Correct?
23   A.  Yes.
24   Q.  The petition for damages and the amended
25   complaint.  What about those documents

Page 66

1    assisted you in forming the opinions in this
2    affidavit?
3    A.  I have to form an opinion from information
4    provided by counsel.
5        Typically, almost every case I work on, or
6    provided an opinion, that usually comes from
7    petition for damages.  It spells out the
8    litigation.  And usually, an amended petition
9    or an amended complaint also.  So they provide
10   the facts and information that relates to the
11   litigation.
12   Q.  So you've reviewed those -- have you reviewed
13   any filings made by the defendants in this
14   case?
15   A.  Yes.
16   Q.  How come you didn't list those?
17   A.  Again, I'm just basically stating what I
18   reviewed in this particular case.  If I had
19   other information, I would have provided it.
20   But I didn't state it there.
21   Q.  I guess I'm confused.
22       My question was, did you review in this
23   case -- you know what, I wasn't clear enough.
24       Did you review in this case any documents
25   filed by the defendant?

Page 67

1    A.  I'm sure I did.  I didn't spell it out in this
2    paragraph.
3    Q.  Why?
4    A.  I just didn't do it.
5    Q.  You think that would be important?
6    A.  Again, I was basically requested to make an
7    opinion on this.  This is the information I
8    felt was pertinent to the issues.
9    Q.  So you would have felt that the documents
10   filed by the plaintiffs in this case were
11   pertinent?
12   A.  Again, you just gave me a bunch of information
13   related to this case which was not even in the
14   affidavit.
15   Q.  Right.
16       I'm asking you about this paragraph.
17   A.  I'm stating what I was provided.  This is the
18   information that I used.
19   Q.  My question to you is, did you review any
20   documents from the defendants in this
21   litigation?
22       MR. MEYER:
23          If you recall.
24       THE WITNESS:
25          Not that I recall.  Otherwise, I

Page 68

1    would have stated it.
2    BY MR. BARRAS:
3    Q.  Do you think that would be important?
4    A.  It can be.  I can't answer that question
5    because I didn't review it.  Or I didn't spell
6    it out in the paragraph I just stated.
7    Q.  I'm looking.  I don't want to put words in
8    your mouth.
9        From the petition for damages and the
10   amended complaint, factual back drop, is that
11   what you're deriving from this that helps you
12   form your opinion?
13   A.  That's a fair argument.
14   Q.  It's not an argument, it's just a question.
15   A.  As I stated earlier, forming an opinion on a
16   case such as this, I usually require a
17   petition for damages or any amended complaints
18   that relate to that petition for damages to
19   help me form my opinion.
20   Q.  Last, E, there's a letter from Hammerhead
21   dated May 21, 2018.  I have that.
22       How did that -- what about that letter,
23   what information from it assisted you or did
24   you use in formulating your opinions in this
25   affidavit?

1  **A. Basically, it's contract documents related to**
2  **the work. It spells out the amount, the scope**
3  **of work. Basically, documentation related to**
4  **this project.**
5  Q. How would that documentation relate to the
6  opinions that you rendered in the affidavit?
7  **A. It spells out the roles of the particular**
8  **authority, parties involved, Hammerhead, and**
9  **the work involved. Spells out what they were**
10 **going to do.**
11 Q. So background information?
12 **A. Well, it's contract documents of the parties**
13 **involved, the scope of work, what exactly they**
14 **were asked to do.**
15 Q. Did any information in that letter -- strike
16 that. I'm going to move on.
17     Moving on to paragraph 11. It recites when
18 Mr. Ramos started working on site. And that
19 Mr. Ramos and another employee were struck by
20 unsecured support beams, which are shown in
21 OSHA report photographs. Correct?
22 **A. Yes.**
23 Q. So you looked at the OSHA report, and I'm
24 guessing the petition for damages, to come up
25 with this paragraph. Correct?

1  **A. Yes.**
2  Q. Number 12 talks about the force of falling
3  support beams resulted in the scissor lift
4  toppling over and Mr. Ramos falling to the
5  ground.
6      You didn't perform any calculations on your
7  own to come up with the conclusion in this
8  paragraph. Correct?
9  **A. What is there to calculate?**
10 Q. Force.
11 **A. No.**
12 Q. This is just a repetition of information from
13 the OSHA report and the petition for damages.
14 Correct?
15 **A. Correct.**
16 Q. Next is paragraph 13. You mention how the
17 OSHA report describes the support beams. The
18 second sentence indicates, "Their uprights or
19 rack columns were bolted to the floor.
20 However, the series of racks were not secured
21 to the adjacent walls of the building. A lack
22 of bracing was the prima facie caused these
23 support beams and piece of rack toppled over
24 and struck the lift."
25     That seems to be more of an opinion, or one

1  of your opinions. Correct?
2  **A. I basically reviewed the photographs and the**
3  **information provided. To me, that's exactly**
4  **what occurred.**
5  Q. That comes directly from the documents that
6  were provided?
7  **A. Information provided by counsel. And what I**
8  **was able to conclude from seeing the**
9  **photographs and the information that was given**
10 **to me, and the deposition of the plaintiff.**
11 **In totem, basically, that opinion of the**
12 **accident, I don't think it was any question**
13 **that this related to the fall.**
14 Q. Last sentence indicates that, according to the
15 complaint in Mr. Ramos' deposition, there was
16 no warning prior to the wire rack shifting and
17 basically collapsing. Correct?
18 **A. Yes.**
19 Q. The documents that I just showed you, however,
20 contain information that would contradict this
21 statement of there being no warning?
22 **A. As I stated earlier, what Mr. Ramos stated in**
23 **his deposition is not the same. It's quite**
24 **different than what was stated in those memos.**
25 Q. Paragraph 14, you reference a statement from

1  the OSHA 89 report. Then you indicate, "The
2  safety issue is why this long series of
3  uprights and support beams were left unsecured
4  and subject to falling."
5      I'm not quite clear. Can you expound on
6  that sentence? I'm not quite clear what you
7  mean by that sentence.
8  **A. The only thing that's securing all that**
9  **shelving system, basically final line of**
10 **structure, is anchors in the floor.**
11     **Otherwise, there's nothing to keep that**
12 **thing from moving or toppling over. It really**
13 **wasn't attached. Or as OSHA noted, it wasn't**
14 **attached to the adjacent wall.**
15     **So if you go right to left, or if you don't**
16 **go from front to back, you're leaving a**
17 **bracing or a whole series of wall unsecured.**
18 **And basically, that would cause it to move or**
19 **potentially -- or in this case, actually,**
20 **cause it to fall over.**
21 Q. Help me to understand. If the braces
22 weren't -- if the vertical braces, let's just
23 say weren't bolted to the walls. I'm using
24 crude terms. If they weren't -- strike that.
25     If there were only these attachments to the

Page 73

1   floor, as you talked about, throughout the
2   racking system, how would disassembling it
3   from one direction to another matter?
4   **A. That's a very straightforward answer.**
5   **You're leaving a series of very long -- in**
6   **this case, almost 160 feet of wall left, and**
7   **that's unsupported. The only thing it's**
8   **anchoring from any way of moving is leaving**
9   **pins into the ground at the very bottom of**
10  **each post. The posts are 24 to 30 feet long.**
11  **If you go front to back, you actually don't**
12  **have that issue. You don't have a single wall**
13  **left. You have it much stronger. It's more**
14  **secured. It won't be unstable. It won't**
15  **topple over.**
16  **The procedure of disassembly if you go**
17  **front to back, would never expose the men in**
18  **this case to such a fall.**
19  Q. Do you think Rack Masters would have started a
20  job if they didn't believe they could safely
21  perform it?
22  **A. That's a difficult one to answer. I don't**
23  **think I can answer that.**
24  Q. Moving on to paragraph 15. Talking about
25  Mr. Thomas' signed statement in the OSHA

Page 74

1   report, which we reviewed earlier on. It's
2   the same statement that you're referencing
3   here, the one that we reviewed earlier in the
4   deposition?
5   **A. I believe so.**
6   Q. We can agree that there's nothing in
7   Mr. Thomas' statement to indicate that he
8   raised safety as an issue to Iron Mountain?
9   MR. MEYER:
10  Objection. There was quite a bit of
11  colloquy back and forth about this very
12  subject earlier.
13  MR. BARRAS:
14  Right. I was just circling back to
15  confirm it.
16  THE WITNESS:
17  I think it was answered already.
18  BY MR. BARRAS:
19  Q. Are you refusing to answer?
20  **A. I'm refusing to answer.**
21  MR. MEYER:
22  I was just saying, he answered it
23  already.
24  THE WITNESS:
25  I've answered it already. It's the

Page 75

1   same question.
2   BY MR. BARRAS:
3   Q. I think it's a different question.
4   MR. MEYER:
5   Let's give it a shot.
6   BY MR. BARRAS:
7   Q. You would agree that there's nothing in
8   Mr. Thomas' statement -- strike it. Let me
9   rephrase it as I just asked it to you a little
10  while ago.
11  MR. MEYER:
12  I believe the testimony was, that if
13  there is a method of tearing down that is
14  proposed, it is part and parcel with the
15  safety of tearing it down safely.
16  MR. BARRAS:
17  Right.
18  MR. MEYER:
19  You're asking a slightly different
20  question. Was the term safety, or was a
21  specific decision about safety had?
22  MR. BARRAS:
23  Yes.
24  MR. MEYER:
25  Or more specifically, contained in

Page 76

1   the actual language of that statement?
2   MR. BARRAS:
3   Yes, that is my question.
4   MR. MEYER:
5   The four corners of that statement
6   speak for themselves.
7   MR. BARRAS:
8   Okay.
9   BY MR. BARRAS:
10  Q. You would agree with that, sir?
11  **A. With what?**
12  Q. What your lawyer just said.
13  **A. Yes.**
14  MR. MEYER:
15  I just tried to paraphrase what he
16  said. It was an hour or so ago. She
17  wrote it down, so.
18  BY MR. BARRAS:
19  Q. Number 16, you referenced some of Mr. Ramos'
20  deposition testimony.
21  Same question, that you would confirm that
22  his statement, to the effect that, "We usually
23  clear out a building from front to back. So
24  we had to work for the right side of the
25  building to left to leave the stairs open for

Page 77

1    them."
2       He doesn't mention that he raised safety as
3    an issue to Iron Mountain?
4    **A.  The underlying element is -- the exact word**
5    **may not have been stated.  But the underlying**
6    **element is how to do this properly without**
7    **people getting hurt, or creating a situation**
8    **that would be hazardous.**
9    Q.  An employer creating a hazardous work
10   environment?
11   **A.  In terms of the lessee and owner.  Employer**
12   **here is -- the nomenclature is -- the owner is**
13   **Iron Mountain and the lessee is Iron Mountain.**
14   **But the employee or employer is still Rack**
15   **Masters.**
16   Q.  A facility creating a hazardous work
17   environment?
18   **A.  That's correct.**
19   Q.  Seventeen references testimony, Mr. Ramos'
20   statement, that statement made by Mr. Thomas
21   that we referenced, that we discussed earlier
22   in this deposition; is that correct?
23   **A.  Yes, sir.**
24   Q.  Eighteen references deposition testimony of
25   Mr. Ramos?

Page 78

1    **A.  Yes.**
2    Q.  Second sentence in paragraph 19, it says,
3    "Iron Mountain, acting as the employer and
4    manager of the project."
5    **A.  That's probably a caveat.  It should be the**
6    **owner and manager of the project.**
7    Q.  Is that a caveat or an inaccurate statement?
8       We talked extensively about what is -- Iron
9    Mountain wasn't Ramos' employer, Mr. Ramos'
10   employer.  But here, it's stated that they
11   are.
12   **A.  That's correct.  I basically was saying the**
13   **employer or -- again, as I stated earlier,**
14   **that should be -- probably rephrase it and say**
15   **the owner and manager of the project.**
16   Q.  That's an accurate statement?
17   **A.  Correct.**
18      **The only thing that's accurate is the fact**
19   **that Rack Masters was hired by Hammerhead,**
20   **which works for Iron Mountain.**
21   Q.  Paragraph 20, you indicate, "The hazardous
22   conditions which resulted in the injuries to
23   Mr. Ramos, would not have occurred except,"
24   all caps, "for Iron Mountain's management
25   requirement the stairways remain in place."

Page 79

1       You've gone through that opinion pretty
2    well throughout this deposition.  But I'm
3    going to ask you one more question about it.
4       Did you see any information that would lead
5    you to believe that Iron Mountain perceived of
6    the existence of a hazard?
7    **A.  Talking about prior knowledge?**
8    Q.  Yeah.
9    **A.  Based on my opinion, is that Iron Mountain did**
10   **not follow the methodology that was**
11   **recommended by Rack Masters for disassembling**
12   **of their shelving system.  And that's what was**
13   **the direct issue of this accident.**
14   Q.  So Iron Mountain instructed Rack Masters --
15   again, as was represented by Mr. Thomas in his
16   statement, and Mr. Ramos, Iron Mountain
17   instructed Rack Masters to do the work in a
18   particular way.  Correct?
19   **A.  Yes.  Particular manner or procedure.**
20   Q.  But Iron Mountain, at the end of the day,
21   can't force Rack Masters to do anything.
22   Correct?
23   **A.  I don't agree with that.**
24   Q.  Why?
25   **A.  Because Rack Masters dictated -- I mean, Rack**

Page 80

1    **Masters, by Iron Mountain, they had to keep**
2    **the pathways open for their employees to go**
3    **between the stairwells.**
4       **That was the only way they were going to do**
5    **it, if they proceeded from right to left or**
6    **left to right in terms of disassembling, so**
7    **they were told.  Rack Masters had no choice.**
8    **This is the procedure that was dictated to**
9    **them.**
10   Q.  No choice?
11   **A.  I don't think they were given a choice.**
12   Q.  Do you think if Rack Masters would have
13   inspected the site, as OSHA suggested they
14   should have in the citation?
15   **A.  I don't agree with that.**
16      **Basically, Rack Masters went inside the**
17   **facility, looked at the racks.  The racks were**
18   **in very good condition.  I don't think there**
19   **were any issues of failure or hazardous**
20   **conditions, or that something they were**
21   **working on that would have caused it to be**
22   **defective.**
23      **But we're focusing on the issue of the**
24   **procedure or protocol of how this was**
25   **disassembled, is the issue.  Not exactly that**

1  the issue is the premises being defective.
2  Q.  And do you have any knowledge -- excuse me.
3      Is there any documents that you reviewed
4  that would indicate Iron Mountain had any
5  knowledge of this, of the condition cited as a
6  safety issue in your affidavit, prior to the
7  accident?
8  A.  I don't think Iron Mountain was cited by any
9      authority.
10 Q.  Bad question.
11     Do the documents that you reviewed, any of
12 the documents that you reviewed in forming
13 your opinions in this affidavit, indicate Iron
14 Mountain knew of the condition of the rack
15 that you've identified as a safety hazard
16 prior to --
17 A.  As I stated earlier, the rack system was
18     perfectly safe and in good condition prior to
19     the job being done.  So there was no prior
20     knowledge that there was a defective
21     condition.
22     Iron Mountain owned the equipment, owned
23     the lease, owned the -- were the lessee and
24     also owned the shelving system.  They were
25     aware that their own shelving system, they are

1  aware of its condition.
2  Q.  Do you know if the shelving system was
3  installed already in the building when it was
4  purchased by Iron Mountain?
5  A.  I don't have an answer to that.
6  Q.  I'm going to ask you to assume that it was.
7  I'm asking you to also assume that records had
8  been stored there for upwards of ten years
9  without incident prior to Hammerhead, prior to
10 Hammerhead and Rack Masters being contracted.
11 Okay?
12     Under those assumptions, you would agree
13 that Iron Mountain would have no reason to
14 believe that their racking system posed any
15 type of safety issue?
16 A.  The issue is the procedure of removing or
17     disassembling their rack system.  That was the
18     argument in this case, posing a risk.
19     The disassembly of the units themselves, I
20     don't think there was any issue that it was
21     defective.
22     The only question I have when I observed
23     the photographs, was the bottom of the pin,
24     final wall that was there, instead of having a
25     place where they had two pins to hold the post

1  down into the floor, most of them were just a
2  single pin.
3  Q.  You don't think Rack Masters had any
4  responsibility to notice these issues before
5  or during their time on site before the
6  accident?
7  A.  I don't think they understood the -- or aware
8      that this was unstable.
9  Q.  But they're the pros?
10 A.  They're cognizant of how to disassemble and
11     assemble shelving or rack systems.  I'm aware
12     they're experienced in doing that.
13     I can't make a conclusion whether they are
14     the pros.  I'm just assuming it's their
15     business and what they do for a living.
16     They're experienced, and based on what I
17     saw from the contract with Hammerhead, they
18     are fully knowledgable of how to disassemble
19     and assemble rack and shelving.
20 Q.  So also in paragraph 20, the last sentence
21 right before the semicolon, I'm going to read
22 the part up until the semicolon, "Iron
23 Mountain's management failed in their duty to
24 properly protect the contractor and their
25 employees working inside their facility."

1  A.  I didn't say anything about --
2  Q.  Is that what the affidavit says?
3  A.  That's correct.
4  Q.  I'm not sure if you answered this earlier
5  directly.
6      But under the assumptions that the racking
7  system was there when Iron Mountain purchased
8  the building, and that it had stored records
9  without incident for upwards of ten years,
10 would you agree that Iron Mountain had no
11 reason to believe that the racking system
12 posed a safety hazard?
13 A.  Well, dictating the method of disassembly,
14     that was their responsibility and created the
15     environment that posed a risk to the employees
16     of Rack Masters.
17 Q.  That wasn't my question.
18 A.  That's my answer.
19 Q.  It's not -- you're not answering it.
20 A.  I'm saying --
21 Q.  You're evasively --
22     MR. MEYER:
23        Let's give it another shot.
24     THE WITNESS:
25        All right, go ahead.

Page 85

BY MR. BARRAS:

Q. Sure.

Assuming that the racking system was installed in the facility prior to Iron Mountain purchasing it. Two, it had stored records for upwards of ten years. Would you agree that Iron Mountain had no reason to believe that the racking system posed any type of safety threat?

A. While it was fully assembled, it posed no safety threat.

Q. So the sole crux of your opinion here, that Iron Mountain is -- I'm referring to paragraph 20, "Iron Mountain's management failed in their duty to properly protect their contractor and their employees working inside the facility."

The sole action on behalf of Iron Mountain, the sole alleged action on behalf of Iron Mountain that this is based on, this opinion is based on, is the alleged instruction to Rack Masters regarding keeping the stairwells open?

MR. MEYER:

Object to form.

Page 86

THE WITNESS:

They wanted to maintain their stairwells. The issue is, in terms of there are pathways between the two stairwells. They instructed Rack Masters to follow a disassembly procedure that they were not normally using, or not normally would have employed.

BY MR. BARRAS:

Q. Do you know if they instructed them to follow a procedure? Or if they just said, "We want these stairwells clear"?

A. They wanted the stairwells clear. They wanted to be able to use them. It's for their employees.

So they're actually keeping them open while this disassembly work is going on.

Q. The instruction was pertaining to the stairwells?

A. The instructions -- the reason why they wanted to proceed with this disassembly method of going from left to right or right to left, is the reason or the argument was, Iron Mountain had to keep the stairwells open.

Q. Iron Mountain, even according to this, didn't

Page 87

tell them they had to do it any particular way. Correct?

A. They instructed them, they wanted this procedure, where they left the place open for their employees. And the only way they could do that, they instructed them they had to go from left to right or right to left. They could not go from back to front as they normally would.

Q. I'm talking about the instruction from Iron Mountain, as you understand it, from the documents that we have been discussing in this deposition.

It seems that Iron Mountain's alleged instruction pertaining to keeping the stairwells open, not necessarily to how Rack Masters finish their job. Fair?

A. No.

Q. No?

Point me to -- let me short circuit this. Is the statement of Glenn Thomas the only evidence that you've looked at that would -- that you're basing that denial on?

A. Primarily that, yes.

Q. Anything else?

Page 88

A. That was the instructions that were told to their employees, which includes John Ramos. This is the reason, logic, why they would not normally proceed in terms of removing or disassembling the system from front to back.

Q. What is the logic?

A. The logic was, Iron Mountain insisted on keeping their stairwells open.

Q. The last sentence in paragraph 20, it says, "Iron Mountain failed to address the risk exposure of a serious workplace injury due to their negligence." Is that what it says?

A. Yes.

Q. If Iron Mountain had no reason to perceive the racking system posed some sort of safety threat, how could they have created a risk exposure?

A. I think it's fairly clear that they are dictating to the, as you quote, professionals, how they should disassemble their rack or shelving systems, the onus is now on the owner or lessee saying, "This is how I want it done."

They're negligent by not understanding that when they do it differently and not following

Page 89

1  the, quote, pros, they are now creating a
2  hazard or a different issue completely.
3      They're taking responsible (sic) for saying
4  this is what they want to keep open, or how
5  they want these stairwells addressed.
6      If they are not going to follow the
7  recommended procedure or methods that Rack
8  Masters normally employ, they're negligent for
9  not further understanding what this -- well,
10 you're obviously creating an issue,
11 potentially, or a hazard where their
12 employees, in this case Iron Mountain -- not
13 Iron Mountain, Rack Masters employees could be
14 at risk.
15 Q.  Is there anything in the documents that you
16 reviewed that helped you form the opinion that
17 you just articulated, that would indicate
18 that -- again, assuming for the purposes of
19 this question, there was an instruction, which
20 is denied in this litigation.
21     But assuming there was for the purposes of
22 this question.  Is there anything in the
23 documents that you reviewed that helped to
24 form your opinions that would indicate Iron
25 Mountain had any knowledge of any safety

Page 90

1  concern with removing a racking system from
2  left to right, as opposed to front and back,
3  in the way that we're talking about here?
4  A.  Whether a particular person that was involved
5  or directly related to this project at Iron
6  Mountain, and that requested that something, a
7  method or a procedure was dictated to Rack
8  Masters by him or that person, and stating,
9  "This is how I want it done."  He's ignoring
10 what the professionals, as you've said,
11 normally would do in terms of disassembling
12 shelving.
13     And they understood that if you're not
14 going to follow their recommendations, that's
15 a concern that you might have to think, are
16 you posing a risk or potential cause of an
17 accident?
18 Q.  There's nothing you looked at to indicate that
19 in giving -- that Iron Mountain, in giving
20 this instruction, was in any way cognizable
21 that it carried a safety risk?
22 A.  I think if you don't follow your
23 instructions -- you decide -- in this case,
24 Iron Mountain ignored the method or procedures
25 that is normal to disassemble their racking

Page 91

1  system, and chose to use a different method,
2  the onus lies on the owner for saying, "Hey,
3  we're not doing it your way, we're going to do
4  it our way. This is how we want it."
5      If they're going to ignore the instructions
6  or ignore the recommendation of a professional
7  disassembler, the burden lies on the owner in
8  this case, or the lessee of the equipment, to
9  explain this is not going to cause undue risk.
10 Q.  Shouldn't it be the other way around?
11 Shouldn't the professional, when posed with an
12 instruction from the person who is hiring
13 them, say, "Wait.  Stop.  This is going to be
14 dangerous.  No, don't do this."
15 A.  I think they inherently said that.  They said,
16 "This is how we normally do it.  If you want
17 to do it differently, it's going to be" -- I
18 don't think they were fully cognizant the
19 whole system or shelving would collapse such
20 as it is.  I don't think anybody predicted
21 something like that.
22 Q.  That's what we're all boiling this -- circling
23 this back to.
24     Iron Mountain had no reason to believe that
25 the racking system created a hazard.  Correct?

Page 92

1  A.  No.
2  Q.  Iron Mountain -- correct?  No?  Are you
3  agreeing with me or disagreeing with me?
4  A.  Disagreeing.
5  Q.  Why?
6  A.  I don't think the issue is the rack itself.
7  It's the procedure for disassembling is the
8  issue.
9  Q.  We're going with this problem.  I'm going to
10 get to that next.
11     Iron Mountain had no reason to believe the
12 racking system in and of itself created a
13 hazard.  Correct?
14 A.  In the condition when it was maintained fully
15 assembled?  No.
16 Q.  Iron Mountain had no reason to believe that --
17 assuming this instruction was made for the
18 purpose of this question.
19     Iron Mountain had no reason to believe that
20 instructing Rack Masters to perform their
21 removal in a way to keep the stairwells open
22 carried a hazard?
23 A.  I don't have the, an answer to that.
24 Q.  That's important.
25 A.  I don't have any deposition.  I don't have any

Page 93

1  **testimony from any of the employees of Iron**
2  **Mountain to look at, or reviewed, not look.**
3  Q.  Isn't that determination what would be the
4  crux of your opinion, then?
5  A.  **My opinion or crux -- my opinion of this case**
6  **is that Iron Mountain's instructions to Rack**
7  **Masters to disassemble, posed and unreasonable**
8  **risk of harm to their employees.**
9  Q.  Even if they didn't know it could or should
10  pose an unreasonable risk of harm?
11  A.  **I think by dictating, Iron Mountain dictating**
12  **how to disassemble a rack system, there is an**
13  **assumption -- I think Rack Master made the**
14  **assumption this is how Iron Mountain was**
15  **familiar with this, and that's how they wanted**
16  **it done, and they didn't question it.**
17  **I don't want to use the term Father Knows**
18  **Best, but this is an assumption that this is**
19  **how Iron Mountain wanted it done.**
20  Q.  You can't point to any document that you
21  reviewed that would show or even suggest that
22  Rack Masters made such an assumption, or
23  anyone with Rack Masters made such an
24  assumption.  Correct?
25  A.  **I think I stated that in my affidavit.**

Page 94

1  **Basically, how they wanted to proceed or how**
2  **they wanted to disassemble was dictated to**
3  **Glenn Thomas.**
4  Q.  Right.  From Iron Mountain's instruction that,
5  this instruction we've been talking about, to
6  proceed in a way to not obstruct the
7  stairwells, you've extrapolated this
8  assumption by Rack Masters that you just
9  discussed.
10  A.  **What's the question?**
11  Q.  Correct?
12  A.  **No.  The understanding that I have, by the**
13  **instructions that were given to Rack Masters**
14  **by Iron Mountain in terms of how they would**
15  **disassemble their rack system, that exposed**
16  **them to unreasonable risk of harm.  That's**
17  **basically the argument.**
18  Q.  An unreasonable risk of harm that they didn't
19  know about, that Iron Mountain didn't know
20  about?
21  A.  **Iron Mountain didn't state in written form**
22  **that this would be hazardous to their**
23  **employees.**
24  **But I think the understanding is, that if**
25  **you ask them to perform a different method**

Page 95

1  **than what they are comfortable with, and**
2  **really not give them much choice, and say,**
3  **"This is how it has to be done."**
4  **The project had a certain timeline, they**
5  **had to complete by July 1st.  The instructions**
6  **to this had to be followed to the letter and**
7  **complete per the rules, or how Iron Mountain**
8  **dictated to Rack Masters.**
9  Q.  Where are these rules to the letter that
10  you're talking about?
11  A.  **They wanted this method of disassembly done**
12  **their way, which is left to right or right to**
13  **left.  They told Rack Masters, "That's how we**
14  **want it done."  There was not going to be an**
15  **issue with that.**
16  Q.  I'm going to give you a hypothetical.  You
17  know what, I'll skip that one.
18  Paragraph 21, you indicated Jonathan Ramos
19  was injured due to the building, and I suppose
20  that means Iron Mountain.  Correct?
21  A.  **Building owner, yes, or facility owner.**
22  Q.  Not permitting the recommended disassembly
23  method used by his company and recommended by
24  Mr. Thomas.
25  There's no evidence that there was more

Page 96

1  than just one conversation about this.
2  Correct?  "About this," keeping the stairwells
3  clear.
4  A.  **I think there was just one conversation**
5  **between -- that was the reason why this**
6  **procedure was done, it was dictated by Iron**
7  **Mountain.  I don't have exactly the name of**
8  **the person.**
9  Q.  One conversation?
10  A.  **Maybe it was written.  From what I understand,**
11  **one conversation.**
12  Q.  Run down a couple of sentences.  "Safety rules
13  would dictate no allowable movement of these
14  beams and their columns."  That's in your --
15  that's what the affidavit states.  Correct?
16  A.  **Yes.**
17  Q.  What safety rules?
18  A.  **Obviously, it's going to be movement.**
19  **Basically, that's part of this structure of**
20  **what you're working from that can't move at**
21  **all.  You're trying to disassemble it.  In**
22  **terms of being safely disassembling it, it**
23  **can't be moving or wavering or potentially**
24  **falling.**
25  Q.  That would be dangerous?

Page 97

1 **A. That would be hazardous, yes.**

2 Q. If someone was working on a racking system and

3 they saw that it was moving or wavering, they

4 should know it was dangerous?

5 **A. There was not enough time. Or in this case,**

6 **Mr. Ramos said he didn't really recognize that**

7 **this thing would fall over.**

8 Q. My question was someone in general, just

9 someone working on a racking system of the

10 nature, the one here. While that person would

11 have been working on it, it started moving --

12 **A. Once it moved --**

13 Q. Should a person have realized that, "Hey, this

14 is a dangerous situation?"

15 **A. Again, the events of the accident, it happened**

16 **rather quickly. Then when one of the columns**

17 **fell -- they were all linked together. The**

18 **long line of the wall that's holding up that**

19 **rack system, this is -- when one moved, I**

20 **think they all moved.**

21 **A case of once -- if they were all linked**

22 **together or bolted together, that created a**

23 **condition where it could fall over and hurt**

24 **somebody.**

25 Q. Safety rules, are we talking about any

Page 98

1 specific safety rules?

2 **A. Just my knowledge of safety.**

3 **You want a stable platform. Whether it's**

4 **working on an elevated height, you got to make**

5 **sure that whatever you're working with or on**

6 **is not going to move, and potentially be**

7 **hazardous to your position where you are.**

8 Q. There's no specific document or rule you're

9 citing here when you say "safety rules?"

10 **A. If you're working from a lift, I'm sure**

11 **there's something in OSHA that tells you, "Hey**

12 **you really should be careful if something is**

13 **moving on your -- you're working with it or**

14 **you're holding onto it, that potentially could**

15 **harm or hurt your position working in a lift."**

16 **I didn't cite any particular section. It's**

17 **just common sense will tell you it needs to be**

18 **secured and strong.**

19 Q. It's not really an accurate statement, safety

20 rules. Would it be more like "my opinion

21 would dictate"? You being "my."

22 **A. I would probably rephrase it to say job site**

23 **safety would dictate no allowable movement of**

24 **these beams and their columns.**

25 Q. This statement, "safety," referring to safety

Page 99

1 rules would be inaccurate?

2 **A. Paraphase it and say job site safety.**

3 Q. Is that a yes, this is inaccurate, safety

4 rules?

5 **A. Like I said, I could paraphrase and say job**

6 **site safety.**

7 Q. There are no specific safety rules that you're

8 talking about, just so we're clear?

9 **A. Not that I can cite with specificity.**

10 Q. Thank you for your time. Those are all the

11 questions that I have for today. Thank you.

12 EXAMINATION BY MR. MEYER:

13 Q. Mr. Wood, in connection with your opinions

14 that you testified today, we did not

15 discuss -- I want to state for the record, you

16 also looked at a set of photos produced by

17 Iron Mountain that were labeled IM-1 through

18 35, that depict the accident scene; is that

19 the fair?

20 **A. Yes.**

21 Q. You testified earlier that you're aware that

22 there was a citation given to Rack Masters.

23 And I believe it was for a failure to perform

24 an engineering survey to determine that the

25 work would be done safely. You're familiar

Page 100

1 with that citation. Right?

2 **A. Yes.**

3 Q. Iron Mountain could have done that same survey

4 as well. Right?

5 **A. That's my argument.**

6 Q. In fact, is it your opinion that Iron Mountain

7 would be in a better position than Rack

8 Masters, given the fact that they have owned

9 or operated this facility for a decade plus,

10 that they would be in a better position than

11 Rack Masters to conduct that survey?

12 **A. Like I said, going out on a limb and telling**

13 **the disassembler to follow a different**

14 **procedure, I think the onus lies with the**

15 **owner or the lessee, in this case Iron**

16 **Mountain, to provide an engineering report or**

17 **an engineering evaluation to make sure they're**

18 **not posing undue risk to its employees that**

19 **are working on this disassembly.**

20 Q. You're also aware, based on the Hammerhead

21 letter that we testified about earlier, that

22 there was certain conditions and a schedule

23 that were placed on this project. Right?

24 **A. Correct.**

25 Q. You mentioned, for example, one of them was

Page 101

1  conclusion of the project by July 1st?
2  A. Yes.
3  Q. Are there any practical considerations that
4  would prevent or make more difficult the type
5  of engineering survey that OSHA cited Rack
6  Masters for not conducting under the
7  circumstances of this case?
8  **A. Well, as I said earlier, OSHA is basically**
9  **going to target the employer of the gentleman**
10 **that fell. So they're going to state the**
11 **engineering survey should have been done by**
12 **the party involved.**
13 Q. I'm not asking you about what OSHA concluded.
14    I'm asking, are there any practical
15 considerations that you are aware of, as an
16 expert in construction, for example, that
17 would make more difficult Rack Masters
18 performing this type of inspection that was
19 called for by the OSHA citation?
20 **A. That's a difficult question. Say it again.**
21 Q. You understand that Rack Masters was cited for
22 failure to conduct an engineering survey.
23 Right?
24 **A. Correct.**
25 Q. You also understand that this project was on a

Page 102

1  budget and on a deadline?
2  **A. Yes.**
3  Q. Are there any practical considerations you can
4  think of that would make the type of survey
5  that OSHA cited Rack Masters for not doing
6  more difficult, or difficult in the first
7  place?
8  **A. They did require an engineering survey. Their**
9  **opinion, that an engineering survey or**
10 **evaluation to be done, obviously has a large**
11 **impact on time and completion of this project.**
12 **In other words, they would have to put it**
13 **back and delay it until that report had been**
14 **completed.**
15 Q. In your opinion, was it reasonable for Rack
16 Masters to rely on Iron Mountain's expertise
17 in operating or disassembling storage
18 facilities when they gave them the instruction
19 that we discussed in this case, to preserve
20 the stairwells?
21    MR. BARRAS:
22       Object to the form.
23    THE WITNESS:
24       I think they made the assumption
25    that whatever method -- the method they

Page 103

1     chose to do and was ignored by Iron
2     Mountain, that they were not going to be
3     exposed to unreasonable risk.
4  BY MR. MEYER:
5  Q. Based on the scope of work contained in the
6     Hammerhead letter, is disassembly of the
7     stairways, the ones that were called for to be
8     preserved till the end of the project, was
9     that ultimately within the scope of the
10    disassembly?
11       MR. BARRAS:
12          Object to the form.
13 BY MR. MEYER:
14 Q. Do you know?
15 **A. I don't know that answer.**
16 Q. Look at the scope of work and see if you can
17    familiarize yourself.
18 **A. The stairways are part of the scope of work in**
19    **the original contract. The stairways removal**
20    **were part of the scope of the work in the**
21    **contract, basically Rack Masters would have to**
22    **address.**
23 Q. Is it fair to say that as Rack Masters arrived
24    on the site, prior to them receiving the
25    instruction to preserve the stairs to the end

Page 104

1  of the project, that Rack Masters knew and
2  understood that demolition of the stairs was
3  part of the scope of their work?
4  **A. Based on the document, yes.**
5  Q. Thank you. I have no other questions.
6  EXAMINATION BY MR. BARRAS:
7  Q. A couple of follow-ups, definitely not going
8     to be as long as the rest of it.
9        Do you know when this alleged instruction
10    to not tear down the stairwells was given?
11 **A. In other words, that was going to be done**
12    **last.**
13 Q. Do you know when the instruction was allegedly
14    given to Rack Masters?
15 **A. I don't have a specific date or time.**
16 Q. Projects are often subject, in general, to
17    change orders. Correct?
18 **A. Yes.**
19 Q. It's not uncommon for the scope of a project
20    to be changed, or discussions regarding the
21    scope of a project to be changed, occurring
22    during the course of a project?
23 **A. If happens.**
24 Q. Nothing further.
25       (Conclusion at 1:20 p.m.)

Page 105

1    Deposition of MITCHELL A. WOOD

2         taken on June 25, 2021

3

4

5         WITNESS' CERTIFICATE

6

7

8    I have read or have had the foregoing

9  testimony read to me and hereby certify that it is

10  a true and correct transcription of my testimony,

11  with the exception of any attached corrections or

12  changes.

13

14

15

16

17    _____

18         MITCHELL A. WOOD

19

20

21

22

23

24

25

Page 106

1    REPORTER'S CERTIFICATE

2

3    This certification is valid only for a
   transcript accompanied by my original signature
4  and original required seal on this page

5

6

7    I, THERESA MATHERNE, Certified Court Reporter,
   in and for the State of Louisiana, as the officer
8  before whom this testimony was taken, do hereby
   certify that MITCHELL A. WOOD, after having been
   duly sworn by me upon authority of R.S. 37:2554,
9  did testify as hereinbefore set forth in the
   foregoing 104 pages; that this testimony was
10  reported by me in stenotype reporting method, was
   prepared and transcribed by me or under my
11  personal direction and supervision, and is a true
   and correct transcript to the best of my ability
12  and understanding, that the transcript has been
   prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
   board, that I have acted in compliance with the
14  prohibition on contractual relationships, as
   defined by Louisiana Code of Civil Procedure
15  Article 1434 and in rules and advisory opinions of
   the board, that I am not related to counsel or to
16  the parties herein, nor am I otherwise interested
17  in the outcome of this matter.

18

19

20

21

22  _____

23  THERESA (TERRI) MATHERNE
   CERTIFIED COURT REPORTER

24

25