UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JONATHAN RAMOS | * | CIVIL ACTION NO. 2:19-CV-11202 |
| | * | |
| Plaintiff . | * | SECTION: "F" (4) |
| | * | |
| VERSUS | * | DISTRICT JUDGE: |
| | * |    ELDON E. FALLON |
| IRON MOUNTAIN SECURE SHREDDING | * | |
| INC., ET AL. | * | MAGISTRATE JUDGE: |
| | * |    KAREN WELLS ROBY |
| Defendants . | * | |
| * * * * * * * * * * * * * * * * * * * * * * | * | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**MAY IT PLEASE THE COURT**, Defendant, Iron Mountain Information Management

L.L.C. ("Iron Mountain"), respectfully submits this Memorandum in Support of its Motion for

Summary Judgment.

**I.      FACTUAL BACKGROUND**

Iron Mountain operated a business located at 6200 Humphreys Street in Harahan,

Louisiana.  The Harahan facility had an open file and box storage rivet style catwalk system,

including 1,161 units of shelving that was 23 feet tall, all bar-grating aisles, stairways, and a

sprinkler system (collectively, "rack system").[10]  The rack system was used to store customer

information and assets.  Iron Mountain was in the process of moving out of the Harahan facility

when events relevant to this lawsuit occurred.  Iron Mountain, pursuant to a Master Sale of Goods

Agreement, contracted with Hammerhead, L.L.C. to disassemble the rack system.[11]  Hammerhead

is a nationwide safety expert for rack remediation and repair.[12]  Hammerhead subcontracted with

---

[10] See, Ex. "J," Hammerhead Correspondence to Iron Mountain dated May 21, 2018.
[11] See, Ex. "I," Master Sale of Goods Agreement between Hammerhead, L.L.C. and Iron Mountain.
[12] See, Ex. "J."

7

Rackmasters, Inc. to disassemble the rack system at the Harahan facility.[13]  Rackmasters, Inc. is an expert in the field of disassembling rack systems.

Rackmasters employed plaintiff Jonathan Ramos and others to dismantle the rack system. Rackmasters started the job at the Harahan facility on May 30, 2018.  Rackmasters employees, including Ramos, worked for about two weeks at the Harahan facility dismantling the rack system. Rackmasters had almost completed the job when Ramos was injured on June 15, 2018.  Ramos was working from a scissor lift unbolting the last remaining shelves of the rack system when the shelves collapsed and toppled the scissor lift on which Ramos was standing.  OSHA was notified, and an investigation ensued.  OSHA cited Rackmasters for serious violations because it failed to perform an engineering survey to determine the conditions of the framing floors and walls and the possibility of unplanned collapse of any portion of the structure prior to permitting its employees to start demolition operations.[14]

Ramos filed a worker's compensation claim against Rackmasters and its compensation insurer, Markel Insurance Company.  Ramos also sued Iron Mountain in this lawsuit under concepts of premises liability, negligence, and *res ipsa loquitor*.[15]  Rackmasters and Markel intervened in this lawsuit, claiming entitlement to reimbursement from Iron Mountain for all compensation and expenses they paid to or on behalf of Ramos.[16]

---

[13] See, Ex. "H," Hammerhead, LLC Installer/Vendor Agreement with Rackmasters, Inc.
[14] See, Ex. "E," OSHA Citation and Notification of Penalty.
[15] See. Ex. "A," at ¶ 11 (Ramos alleged in his Complaint that Iron Mountain is liable to him for damages under the following theories: (1) premises liability under La. Civil Code, art. 2317, and 2317.1; (2) failure to provide a safe building upon which to Mr. Ramos could perform his tasks; (3) failure to provide safety railings or scaffolding; (4) vice, ruin, or defect of the subject building; (5) vice, ruin, or defect of the subject racks, bolts connecting the racks to the concrete floor, and the concrete floor; (6) failure to exercise reasonable care to correct the ruin, vice, or defect which caused Mr. Ramos' damages; (7) failure to provide any warning of the vice, ruin, or defect of the subject racks, bolts connecting the racks to the concrete floor, and the concrete floor; (8) failure to warn Mr. Ramos that the subject racks, bolts connecting the racks to the concrete floor, and the concrete floor were unsafe and could not be demolished or removed safely; (9) *Res ipsa loquitor*; and (10) other acts of negligence to be discovered.)
[16] Ramos, Rackmasters, and Markel are collectively referred to as "Plaintiffs" in this Memorandum.

II.        **LAW AND ARGUMENT**

A.  **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "When assessing whether a dispute to any material fact exists, [courts] consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

A party seeking summary judgment is not required to negate elements of the nonmovant's claim, only show that there is no genuine dispute as to any material fact. *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003).  Genuine issues of material fact exist when ". . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). All reasonable factual inferences are drawn in favor of the nonmoving party. *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. *Id.*

If the movant meets this burden by demonstrating the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th

Cir. 2004). Summary judgment should be granted if the critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). Where the parties dispute the facts, one party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario. *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Trust*, 2013 WL 5530539, p. *447 (5th Cir. 2013), *citing Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004).

In sum, the motion for summary judgment "should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).

### B. Ramos's Theory Against Iron Mountain

Ramos had no communications with anyone from Iron Mountain.  His supervisor and Rackmasters's project foreman, Glen Thomas, recalls having a single conversation with someone from Iron Mountain before Rackmasters began its work.[17]  This conversation, according to Mr. Thomas, involved nothing more than someone from Iron Mountain wanting the stairs to remain intact until the end of the rack system disassembly.[18] Mr. Thomas told the Iron Mountain employee that this was not a problem.[19]

Ramos, however, claims that this single request by Iron Mountain resulted in Rackmasters changing its usual method of disassembling rack systems.  The usual method, according to Ramos, involved disassembling the rack system from the front of the building and working towards the

---

[17] Deposition of Glen Thomas, attached hereto as Exhibit "B," at p. 22.
[18] Exhibit B, at 22.
[19] Exhibit B, at 22.

back of the building.  Ramos believes Rackmasters's usual method of disassembly eliminated the possibility that the last remaining columns in the rack system would fall over.[20]

Ramos claims, in this case, that Rackmasters disassembled the rack system from the right side of the building to the left side of the building.[21]  Ramos argues that this method exposed him to risk because the last remaining row of unsupported columns might collapse at the end of the disassembly process.[22]  Ramos retained an expert witness named Mitchell Wood who will opine that the cause of this accident was the method used to disassemble the rack system.  Mr. Wood argues that Iron Mountain – not Rackmasters – was legally responsible for the method of disassembly because Iron Mountain requested the stairs remain intact.[23]

### C.  Issues for Summary Judgment

1. Iron Mountain is not liable under La. C.C. art. 2317, 2317.1, or 2322 because the rack system and building did not have any known "ruin, vice, or defect."

2. Iron Mountain did not owe Jonathan Ramos a duty to protect Ramos from the inherent risks of Ramos's job.[24] Iron Mountain had no knowledge that the method in which Ramos and Rackmasters proceeded to deconstruct the rack system was unsafe or created an unreasonable risk of harm.

3. Iron Mountain is not liable for Rackmasters's actions or inactions because Iron Mountain did not exercise operational control over the methods or details of Rackmasters's work.  Iron Mountain's single request that the stairways remain intact does not equate to operational control.

    **1. Ramos cannot support a premises liability claims against Iron Mountain. Ramos's expert, Mitchell Wood, does not opine that the rack system was defective.  Nor does Mr. Wood think that Iron Mountain had any reason to believe the fully assembled rack system created a hazard.[25]**

---

[20] Deposition of Jonathan Ramos, attached hereto as Exhibit "D," at p. 52-53.
[21] Exhibit D, at p. 68-69.
[22] Exhibit D, at p. 53.
[23] See, Exhibit "C" at p. 93.
[24] *Perkins v. Gregory Mfg. Co.*, 671 So. 2d 1036, 1039 (La. Ct. App. 3 Cir. 1996), writ denied, 673 So. 2d 1039 (La. 1996).
[25] Exhibit C, at p. 82.

Ramos sued Iron Mountain under concepts of premises liability, i.e., "vice, ruin, or defect" of the building and the rack system.[26]  Ramos retained Mitchell Wood to render an expert opinion regarding Iron Mountain's liability for a "dangerous premises."[27]  Mr. Wood is a purported expert witness in various fields including construction, inspection, project management, site safety, etc.[28]  Mr. Wood was deposed on June 25, 2021.  Mr. Wood's testimony is fatal to Ramos's premises liability claims against Iron Mountain for two reasons: (1) Mr. Wood does not think there was any issue with the fully assembled rack system being defective,[29] and (2) Mr. Wood testified that Iron Mountain had no reason to believe the fully assembled racking system created a hazard.[30]  This testimony is contrary the necessary elements needed for Ramos to maintain a custodial/premises liability claim against Iron Mountain.

La. Civ. Code art. 2317 provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things we have in our custody." The principle, "however, is to be understood with the following modifications." *Id.* Louisiana Civil Code Article 2317.1 thereafter provides that:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.  Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

Thus, a plaintiff seeking premises recovery under La. Civ. Code art. 2317.1 must prove:

---

[26] See, Exhibit "A," at ¶11.
[27] *See,* Pl.'s Opp. To Def. Mot. To Exclude Mitchell A. Wood (5/31/22) (Doc. 96 at pp. 1; 8).
[28] *Id.*
[29] Exhibit C, at p. 82.
[30] Exhibit C, at p. 92.

(1) that the thing which caused the damage was in the defendant's custody or control, (2) that it had a vice or defect that presented an unreasonable risk of harm, (3) that the defendant knew or should have known of the vice or defect, (4) that the damage could have been prevented by the exercise of reasonable care, and (5) that the defendant failed to exercise such reasonable care.

La. Civ. Code art. 2322 specifically addresses damage caused by ruin of building, in which case, a plaintiff must prove:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

A plaintiff's failure to provide proof of any one of the elements is fatal to his or her claim. *Owens v. McIlhenny Co.*, 18-754, p. 3 (La. Ct. App. 3 Cir. 3/27/19), 269 So.3d 839.

Mr. Wood believes the issue in this case concerns the procedure of removing or disassembling the rack system.[31]  The issue *does not* involve the premises being defective.[32]  The rack system, according to Mr. Wood, was "perfectly safe," "in very good condition" and "posed no safety threat" *prior to the job being done*.[33]  The alleged hazard in this case did not arise until *after* Rackmasters had substantially disassembled the rack system.[34]  Iron Mountain, according to Mr. Wood, had no prior knowledge of a defective condition.[35]  And Iron Mountain had no reason to believe that the fully assembled rack system created a hazard.[36]  Plaintiffs' claims against Iron

---

[31] Exhibit C, at p. 82.
[32] Exhibit C, at p. 80-81.
[33] Exhibit C, at p. 80-81; 85.
[34] Exhibit C, at p. 38-40.
[35] Exhibit C, at p. 80-81.
[36] Exhibit C, at p. 92.

Mountain for premises liability under La. Civil Code, art. 2317, 2317.1, and 2322 should be dismissed, with prejudice.

> **2. Louisiana law does not recognize a duty of Iron Mountain to explain to Rackmasters and Ramos the risks that are intrinsic to the job they were contracted to perform.[37] Iron Mountain had no knowledge that the method in which Ramos and Rackmasters proceeded to deconstruct the rack system was unsafe or created an unreasonable risk of harm.**

The remainder of Ramos's claims against Iron Mountain generally involve allegations that Iron Mountain failed to provide a safe work environment.[38]  To prevail on such a claim under Louisiana law, Ramos must prove the familiar elements of duty, breach, causation, and damages. *Bass v. Daves,* 753 So.2d 991, 993 (La. App. 2d Cir.), *writ not considered,* 762 So.2d 1094 (La.2000).  Louisiana law provides that the "owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm." *Manning v. Dillard Dep't. Stores, Inc.*, 753 So. 2d 163, 165 (La. 1999).  More specifically, in the principal-independent-contractor context, the principal need not "take affirmative steps to ensure the safety of a contractor's employees, but it may assume such a duty by contract or by later going beyond the contract and voluntarily policing the worksite for safety problems."  *See Ukudi v. McMoran Oil & Gas, L.L.C.*, 587 F. App'x 119, 122–23 (5th Cir. 2015) (per curiam). Courts also consider whether the hazard was created by the principal or the independent contractor. *Thomas v. Burlington Res. Oil and Gas Co.*, No. Civ. A. 99-3904, 2000 WL 1528082, at *2 (E.D.

---

[37] Iron Mountain submits that the rule of *res ipsa loquitur* does not apply in this case because the alleged negligence of the defendant must fall within the scope of his duty to the plaintiff.  See, *Linnear v. CenterPoint Energy Entex/Reliant Energy,* 06–3030 (La.9/5/07), 966 So.2d 36, 45.
[38] See. Ex. "A," at ¶ 11 (2) failure to provide a safe building upon which to Mr. Ramos could perform his tasks; (3) failure to provide safety railings or scaffolding; and (10) other acts of negligence to be discovered.

La. 2000).  The existence of a duty is a legal determination to be made by the trial judge.  *Taylor v. Voigtlander,* 36,670 (La.App.2d Cir.12/11/02), 833 So.2d 1204

Ramos has not identified any basis for finding that Iron Mountain owed him a duty to ensure his safety.  No such duty was assumed by contract.  There was no contract between Iron Mountain and Rackmasters.  The vendor agreement for disassembly of the rack system was between Rackmasters and Hammerhead.[39]  The vendor agreement specifically instructed Rackmasters to "not disassemble any racking or shelving per anyone's instruction other than Hammerhead."[40]  The vendor agreement also instructed that "if anything appears unsafe, [then Rackmasters should] contact Hammerhead to review with an engineer before proceeding."[41]  The vendor agreement further required that Rackmasters "should not take any direction from the customer [Iron Mountain] without Hammerhead approval."[42] There is no evidence that Iron Mountain contractually assumed any duty to ensure the safety of Ramos.

Ramos's injury was the result of shelves collapsing during the final stage of the disassembly process.  This is an inherent when working in the field of rack system disassembly.  Iron Mountain did not owe a duty to protect Ramos from risks inherent to his job.  In *Perkins v. Gregory Manufacturing Co.*, the Louisiana Third Circuit upheld a grant of summary judgment in a case with facts analogous to what is alleged here. *Perkins v. Gregory Mfg. Co.*, 671 So. 2d 1036, 1037 (La. Ct.  App. 3 Cir. 1996),  writ denied, 673  So.  2d  1039  (La.  1996).  In *Perkins*, a property owner hired an independent contractor to harvest timber on its land. This independent contractor—through an intermediary—hired Perkins as a tree trimmer. *Id.* A few hours into the job a tree—felled as part of logging operation—injured Perkins. *Id.* Perkins argued

---

[39] See, Exhibit "H."
[40] *Id.*
[41] *Id.* (emphasis added).
[42] *Id.* (emphasis added).

that the landowner was independently negligent for its own failure to provide a safe place work environment. *Id.* at 1037-38. The court rejected this argument. *Id.* at 1040. The Third Circuit found that while an owner does have a duty to provide a safe work environment, that duty only extends to risks that are "extrinsic" from the job contracted to be performed. *Id.* For example, a construction company owes a duty of safe passage to its contractors as they travel from the company parking lot to the work site. *See Donavan v. Jones*, 658 So. 2d 755, 767 (La. Ct. App. 2d Cir. 1995). On the other hand, the harm of a tree falling was "a danger inherent with the job of a tree trimmer and a risk associated with a logging operation." *Perkins*, 671 So. 2d at 1040. Thus, because the owner "does not owe a duty to protect the contractor's employees from risks inherent to the job," the court upheld the district court's decision granting summary judgment against Perkins. *Id.*

Mr. Wood testified that common sense dictates that rack systems need to be secured and strong during disassembly.[43]  A person disassembling a rack system must make sure that whatever they are working on is not going to move and potentially be hazardous to their position.[44] Jobsite safety would dictate no allowable movement of the beams and columns of the rack system.[45] If you start deconstructing a 24-foot to 30-foot high rack system and it's unstable, then something seriously bad could happen.[46]  The issue really becomes a danger or hazard to anyone working on disassembling the final part of the shelving system — where it is unsupported at the very end.[47] The unstable rack system does not pose an unreasonable risk of harm (or fall or come loose) until the final line of the wall which is against the left side of the building.[48]

---

[43] Exhibit C, at p. 98.
[44] Exhibit C, at p. 98.
[45] Exhibit C, at p. 98.
[46] Exhibit C, at p. 60.
[47] Exhibit C, at p. 38.
[48] Exhibit C, at p. 40.

Mr. Thomas was asked during his deposition how the columns and beams were secured along the final wall.  Mr. Thomas testified that he initially received a paper copy of the rack system before starting the job.[49]  The paper plans did not specify anything about the beams, columns, or back stairways.  This was not atypical.

> Q.   Did the absence on the plans of the beams or columns or back stairwell effect this job in any way?
>
> A.   No.
>
> Q.   Why is that?
>
> A.   Because, unfortunately, when you work with rack systems nothing is ever accurate. So you are always adjusting and always just trying to figure it out as you are going through it.[50]

Mr. Thomas therefore did his own assessment of the racking system and how it was supported before starting work.[51]  This was a self-supporting rack system.[52]  Because it was self-supporting, Mr. Thomas chose to approach demolition differently.[53]  Rackmasters started by removing each section of the rack system in a way to allow the next section to still be supported by itself.[54]  The rack system must keep supporting itself as it is torn down.[55]

Mr. Thomas agreed that it is important to know whether the columns along the final wall were effectively mounted and how they were mounted to the drywall when this stage of work was being done.[56]  It was initially unknown how the columns were braced to the last wall because this was not apparent until Rackmasters got in there and ripped it down.[57]  The bracing along the final

---

[49] Exhibit B, at p. 32.
[50] Exhibit B, at p. 33.
[51] Exhibit B, at p. 16.
[52] Exhibit B, at p. 34.
[53] Exhibit B, at p. 35.
[54] Exhibit B, at p. 35.
[55] Exhibit B, at p. 35.
[56] Exhibit B, at p. 38.
[57] Exhibit B, at p. 51.

wall was visible once most of the rack system had been deconstructed.   Mr. Thomas testified that the columns were anchored to the ground and again at the top where the grating meets the wall.[58] There was no bracing in the middle.[59]  Mr. Thomas believed there was sufficient bracing of the overall system to safely disassemble.[60]   If there was any obvious condition that made it unsafe, then Mr. Thomas would have said something.[61]

Mr. Thomas would *not* have expected Iron Mountain to know how the columns were supported.[62]

> Q:   Is that something you would have expected the custodian of the building to communicate to you about this project?
>
> MS. KRAMAR: Object to form.
>
> THE WITNESS: No.
>
> BY MR. MEYER:
>
> Q:  Sir?
>
> A:  No.
>
> Q:  You wouldn't have expected Iron Mountain to tell you that?
>
> A:  No.  Typically not, no.[63]

Ramos believes the final part of the shelving system fell because the columns were not properly anchored to the ground.[64]  The columns were anchored to the ground.[65]  Mr. Wood confirmed that every column was pinned to the ground with expansion anchors.[66]  Ramos,

---

[58] Exhibit B, at p. 38.
[59] Exhibit B, at p. 38.
[60] Exhibit B, at p. 49.
[61] Exhibit B, at p. 51.
[62] Exhibit B, at p. 39.
[63] Exhibit B, at p.39.
[64] Exhibit D, at p. 50.
[65] Exhibit B, at p.38.
[66] Exhibit C, at p. 52-53.

however, believes they are "supposed to be anchored down to a certain degree" with a "set number" of anchors.[67] Ramos does not recall the required number of anchors,[68] but he believes there is a regulation in *California* requiring a "set number" of anchors.[69] Mr. Wood volunteered that there should have been two anchors per column,[70] but again, he provides no supporting manufacturer specification, design requirement, or industry standard for this statement. There is no support for application of *California* regulations in this case. But, for informational purposes, *California* enforces additional seismic anchoring requirements for rack systems because California is in a high seismic zone of the United States.[71] Louisiana is not.[72]

In any event, Ramos admits that the presence of anchors (or alleged lack thereof) is visible and obvious to the person disassembling the rack system.[73]

> Q.   Okay. How would you be able to tell if something was anchored or just not anchored at all?
>
> A.   They're visible. The anchors are on the outside.
>
> Q.   So you could look at it and see, this is anchored or this has no anchor?
>
> A.   Yeah.
>
> Q.   Did you do that?
>
> A.   No. I didn't do any inspection of the rack.
>
> Q.   Do you think it would be kind of common – common practice?
>
> A.   No. We never really inspected it for a teardown
>
> Q.   But just from your own personal knowledge and experience, you didn't think to look and see if the anchor – if it was anchored?

---

[67] Exhibit D, at pp. 50-51.
[68] *Id.*
[69] Exhibit D, at p. 51.
[70] Exhibit C, at p. 52-53.
[71] https://www.usgs.gov/programs/earthquake-hazards/science/introduction-national-seismic-hazard-maps
[72] *Id.*
[73] Exhibit D, at p. 51.

A.   No. No.[74]

* * *

Q.   Okay. So don't you think it would be even more important to see if those columns were anchored?

A.   Yeah. But in that job I was just a worker. I didn't -- I wasn't -- I really didn't have a say.  I mean, it wasn't my job to inspect them.

Q.   Not even to just look and see if "Hey, I'm about to go get up on this -- remove this column" just looking down to see, "Hey, is it secured to the floor or not"?

A.   No. I was just doing what I was told. Just doing my job.

Q.   Okay. And what you were told? That would be what Rack Masters told you?

A.   Yeah.[75]

Mr. Thomas testified that Ramos had the ability to alert his supervisors if he felt that something had become unsafe.[76]  Ramos did not.  Ramos also offered the following testimony about Iron Mountain:

Q.   Okay. Do you have any knowledge that Iron Mountain knew the column, as you've described it, was not anchored to the ground?

A.   I wouldn't know because I never had any contact with any Iron Mountain employee.[77]

* * *

Q.   Okay. So I want to understand some more. My question was what did Iron Mountain do to cause this incident? And your answer was that they wanted the stairs -- some stairs to remain up. And please stop me if I'm wrong. You know, interrupt me, please. They wanted some stairs in the facility to remain up; correct?

---

[74] Exhibit D, at p. 51-52.
[75] Exhibit D, at p. 53.
[76] Deposition of Glen Thomas, attached hereto as Exhibit "B," at p. 50-51.
[77] Exhibit D, at p. 56.

A. Yes.[78]

Iron Mountain did not have a duty to prevent harm to Ramos because his injury resulted from an inherent risk in Rackmasters's work (dismantling the final part of an industrial rack system). The alleged hazard in this case did not exist until Rackmasters created the hazard on June 15, 2018 when it proceeded to disassemble the final line of shelving without first making sure it was safe to do so. The final disassembly of the rack system was an activity conducted solely by and under the exclusive control of Rackmasters. Rackmasters and Ramos knew the importance of inspecting the columns to confirm they were effectively mounted prior to the final disassembly.[79] Although Mr. Thomas claims he inspected the bracing,[80] Ramos knowingly chose not to inspect the bracing because it was not *his* job. Ramos proceeded despite the inherent risk of collapse because Ramos claims he was told to do so by *Rackmasters*.[81] Iron Mountain was not negligent for allegedly asking Rackmasters two weeks earlier to leave a stairway intact. Summary judgment should be granted.

3. **Mr. Wood attributes the cause of this accident to the method used to disassemble the rack system. There is no dispute that Rackmasters was the only company that disassembled the rack system. Iron Mountain had no "operational control" over Rackmasters's method of disassembly.**

Applying Louisiana law, the Fifth Circuit has consistently held that a principal is not liable for the actions of its independent contractor unless (1) the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or (2) the principal retained "operational control" over the contractor's work or expressly or impliedly approved its unsafe work practice that led to an injury. *Fruge ex rel. Fruge v. Parker Drilling Co.,* 337 F.3d 558 (5th

---

[78] Exhibit D, at p. 53-54.
[79] Exhibit B, at p. 38; Exhibit D, at p. 53.
[80] Exhibit B, at p. 49.
[81] Exhibit D, at p. 51.

Cir.2003), citing *Coulter v. Texaco, Inc.,* 117 F.3d 909 (5th Cir.1997). The issue in this case concerns the "operational control" avenue of potential principal liability.

The first inquiry is whether, and to what extent, Iron Mountain contractually reserved the right to control the work. *Klein v. Cisco-Eagle, Inc.*, 37,398 (La. App. 2 Cir. 9/24/03), 855 So. 2d 844. Here, control and supervision of the work site was expressly assumed by Hammerhead in its contract with Iron Mountain. In addition, the subcontract between Hammerhead and Rackmasters specifically imposed all safety-related responsibilities concerning disassembly of the rack system on Hammerhead and Rackmasters. "When the contract assigns the independent contractor responsibility for its own activities, the principal does not retain operational control." *Fruge, supra.* Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way. *Id.* Most applicable to this case is the decision by the *Klein* court, which held that mere suggestions or instructions to an independent contractor does not equate to control over the methods or details of a contractor's work. *Klein v. Cisco-Eagle, Inc.*, 37,398 (La. App. 2 Cir. 9/24/03), 855 So. 2d 844.

In *Klein,* plaintiff was the employee of an electrical subcontractor who contracted with the general contract to install third-floor ceiling lights when plaintiff fell through an opening in the metal grate flooring on the second level of the parts storage system. .*Klein v. Cisco-Eagle, Inc.*, 855 So. 2d at 850-851. Plaintiff argued that the premises owner was liable to him because the owner retained control over the "methods or details of the contractor's work" by virtue of the owner's visits to the job site and because the owner "involved" himself in a decision as to when to hang the lighting above the parts storage system mezzanine. *Id.* Specifically, plaintiff testified that the owner's representative told him that the arrangement or positioning of the shelving unit

was going to be decided when the units were moved into the space.  *Id.*  Plaintiff then testified that

it was his suggestion was to wait until the shelves were in place before installing the lighting.  *Id.*

The court found that such evidence does not equate to operational control on the part of the owner.

*Id.*  The court reasoned that even if the owner's representative had suggested or instructed plaintiff

to delay installation of the lights until the mezzanine was complete, this does not equate to control

over the "methods or details of the contractor's work."  *Id.*

Mr. Wood claims that he was retained to determine *who was responsible* for developing

the procedure for disassembling the rack system.[82]  It is unclear how Mr. Wood qualifies as an

expert in this area, but he at least agrees Rack Masters "obviously had a role in this accident and

injuries related to the plaintiff."[83]  After all, the procedure for taking down these very tall shelving

systems and how to do it in a "very safe manner"[84] is Rackmasters's "modus operandi."[85]  Ramos

equally agreed that Rackmasters is hired to safely remove shelving from facilities.[86]

The following points are not disputed by Mr. Wood: (1) Rackmasters is an expert in rack

system disassembly;[87] (2) Rackmasters is highly knowledgeable in disassembling rack systems;[88]

(3) Rackmasters is experienced in disassembling rack systems;[89] (4) Rackmasters was specifically

hired to disassemble the rack system in this case;[90] (5) Rackmasters is familiar with the proper

---

[82] Exhibit C, at p. 6.
[83] Exhibit C, at p. 24; Iron Mountain submits that this testimony by Mitchell Wood establishes that the rule of *res ipsa loquitur* does not apply in this case because plaintiff cannot sufficiently eliminate other possible causes of the injury, such as the plaintiff's own responsibility or the responsibility of others.  See, *Linnear v. CenterPoint Energy Entex/Reliant Energy,* 06–3030 (La.9/5/07), 966 So.2d 36, 45.
[84] Exhibit C, at p. 29.
[85] Exhibit C, at p. 30.
[86] Exhibit D, at p. 56.
[87] Exhibit C, at p. 30.
[88] Exhibit C, at p.83.
[89] Exhibit C, at p. 83.
[90] Exhibit C, at p. 32.

method of removal;[91] (6) Rackmasters function was to take the rack system down in a safe manner,[92] (7) Rackmasters inspected the rack system in this case before proceeding with the job.[93]

Mr. Wood attempts to limit Rackmasters's responsibility by speculating that Rackmasters was "under the assumption" that Iron Mountain was familiar with the disassembly method[94] and knew more than Rackmasters on how to safely disassemble the rack system.[95] There is no evidence supporting either of these statements. They are ipse dixit. Mr. Wood also attempts to minimize the OSHA findings by imposing his own belief that "the onus lies with the owner or the lessee" – not the expert in rack system disassembly – to provide an engineering report to make sure there was no undue risk to those working on disassembly.[96] Mr. Wood, again, makes this statement without referencing any industry standard, legal support, testimony, or evidence. Mr. Wood's unsupported beliefs largely rely on what he considers to be "one of the key pieces of the puzzle" in understanding how this accident happened.[97] This key piece of the puzzle, according to Mr. Wood, is the handwritten statement of Glen Thomas in connection with the OSHA investigation.[98]

Mr. Thomas's written statement to OSHA, in relevant part, reads: "needed to tear down the stairwell, but Iron Mountain wanted the stairs to remain until the very end."[99] Mr. Wood, without ever speaking to Glen Thomas or anyone with Iron Mountain, made the following interpretations about this statement: (1) Iron Mountain "instructed" Glen Thomas to remove the racks from right to left,[100] as opposed to front to back,[101] (2) Iron Mountain was directing the

---

[91] Exhibit C, at p. 32.
[92] Exhibit C, at p. 33-34.
[93] Exhibit C, at p. 37.
[94] Exhibit C, at p. 39.
[95] Exhibit C, at p. 41.
[96] Exhibit C, at p. 100.
[97] Exhibit C, at p. 25.
[98] Exhibit C, at p. 27.
[99] Exhibit B, at p. 18.
[100] Exhibit C, at p. 28.
[101] Exhibit C, at p. 31.

specifics of how Rackmasters disassembled the racks,[102] and (3) Iron Mountain did not follow the methodology recommended by Rackmasters for disassembling the shelving system.[103]

Mr. Wood's interpretation of Glen Thomas's statement is wrong.  Glen Thomas was deposed on May 9, 2022.  Mr. Thomas testified about his written statement to OSHA.  Mr. Thomas made clear that an Iron Mountain employee made a single request that the stairway not be disassembled until the end of the project.[104]

> Q:   Did you have any discussion beyond her simply telling you this is -- these stairs need to stay up, about that instruction?
>
> A:   No, I said: You got it, ma'am. Not a problem. We'll work around it.  Like I always do.[105]

Mr. Thomas had no problem with the stairways remaining intact.  Mr. Thomas testified that Rackmasters's general practice is to accommodate customer requests,[106] unless the customer's request makes the job unsafe, in which case, Rackmasters would not proceed with the job and would explain to the customer why it was an unsafe condition.[107]  Rackmasters proceeded with this job without further discussion.[108]  Also, pursuant to its contract with Hammerhead, Rackmasters was obligated to contact Hammerhead if anything appeared unsafe so that it could be reviewed an engineer.  Hammerhead was never contacted.  There was no engineering review.

Mr. Wood was also wrong about Iron Mountain instructing Mr. Thomas about the disassembling the racks from right to left.  Mr. Thomas testified that Iron Mountain did not instruct Rackmasters to remove the racks from right to left, as opposed to front to back.[109]

---

[102] Exhibit C, at p. 27.
[103] Exhibit C, at p. 79.
[104] Exhibit C, at p. 22.
[105] Exhibit C, at p. 22.
[106] Exhibit C, at p. 22.
[107] Exhibit C, at p. 49.
[108] Exhibit B, at p. 45.
[109] Exhibit B, at p. 45.

Q:   Okay. I'm going to ask you one more time about tearing down the staircase.  Was there ever any discussion that you could recall of breaking down this room from the front staircase side to the back staircase side, as opposed to from the right side of the room away from the staircase and then towards the staircase?

[Attorney Objection]

A.  No, I don't recall there being much more of a conversation than just talking about it the one time and not tearing it down.[110]

Mr. Thomas had no discussions with Iron Mountain about the recommended methods of disassembly.  This is a false claim by Mr. Woods.  Mr. Thomas explained that there is only one way to tear the rack system down – you just go section by section, back and forth, all the way until you get to the back.[111]  Mr. Thomas testified that he would have torn down the stairway first and worked towards the back of the building had there been no request to leave the stairs intact.  But he was clear that no phase of the rack system disassembly was affected by the stairway remaining in place.[112]

Q:   Did retaining the -- the front staircase necessitate this job being done from left to right instead of from front to back?

A:   No. No, it didn't.

Q:   Explain that to me.

A.   It just -- the staircase was just in the way. ·We still were going to tear it down the exact same way, anyways, because there's only one way to tear it down. You just go section by section, back and forth, all the way until you get to the back.

Q.   Did you have any reason to believe that doing the job from right to left would have made this deconstruction or dismantling dangerous?

A.   No.

---

[110] Exhibit B, at p. 45.
[111] Exhibit B, at p. 22-23.
[112] Exhibit B, at p. 23-24; 27.

02602674-1

Q.  At any point during those approximately 11 days, did you have any reason to believe that the work being done was dangerous?

A.  No.

Q:  At the time -- at the time depicted in this statement, which is June 15, around 9:50, did you have any reason to believe that the work being done was dangerous?

A.  No, I did not.

Q:  All right.  Was the work being done at this time effected in any way by the staircase remaining in place?

A:  No.[113]

Simply stated, Iron Mountain did not develop the procedure for disassembling the rack system.  It is difficult to explain why or how Mitchell Wood misinterpreted Glen Thomas's written statement to OSHA.  Regardless, the evidence in this case does not equate to Iron Mountain exercising operational control over the methods or details of Rackmasters's work.  Summary judgment in favor of Iron Mountain is appropriate on all claims asserted against it by plaintiffs.

## III.    CONCLUSION

Iron Mountain hired an expert to safely disassemble the rack system.  A single customer request that stairs remain intact was "not a problem."  Rackmasters disassembled the rack system without first obtaining an engineering survey.  Upon reaching the final stage of disassembly, Rackmasters and Ramos proceeded to disassemble the rack system despite claims of visibly insufficient bracing and anchors.  Iron Mountain did not owe a duty to warn Ramos of risks "intrinsic" to disassembling the rack system.  Nor did Iron Mountain exercise direct supervision over the step-by-step process of Rackmasters's work.  Summary Judgment should be granted.

---

[113] Exhibit B, at p. 27.

Respectfully Submitted,

**DUPLASS, ZWAIN, BOURGEOIS, PFISTER, WEINSTOCK & BOGART**

*/s/ Ryan M. Malone*

_____
**ANDREW D. WEINSTOCK (#18495)**
**CHRISTIAN B. BOGART (#22954)**
**JOSEPH G. GLASS (#25397)**
**RYAN M. MALONE (#30607)**
**LAURA L. POUSSON (#38871)**
3838 N. Causeway Blvd., Suite 2900
Metairie, Louisiana 70002
andreww@duplass.com
cbogart@duplass.com
jglass@duplass.com
rmalone@duplass.com
lpousson@duplass.com
Telephone: (504) 832-3700
Facsimile: (504) 837-3119
**Counsel for Defendant, Iron Mountain**
**Information Management LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2022, a copy of the foregoing pleading was filed electronically with the Clerk of Court. Notice of this filing will be sent to all known counsel of record by operation of the Court's electronic filing system.

*/s/ Ryan M. Malone*

_____
**RYAN M. MALONE**

02602674-1                                    28