Videotaped Deposition of

# Glen A. Thomas

May 09, 2022

Ramos

vs.

Iron Mountain Secure Shredding, Inc.



www.aptusCR.com | 866.99

EXHIBIT

B

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF LOUISIANA

3                    ---o0o---

4

5   JONATHAN RAMOS,

6            Plaintiff,                    Civil Action No.
    vs.                                    2:19-CV-11202
7
    IRON MOUNTAIN SECURE SHREDDING,
8   INC., et al.

9
             Defendants._____/
10

11

12

13

14

15    REMOTE VIDEOTAPED and VIDEOCONFERENCED DEPOSITION OF

16                    GLEN A. THOMAS

17                 SACRAMENTO, CALIFORNIA

18                       VIA ZOOM

19               MONDAY, MAY 9th, 2022

20

21

22

23   Reported by:

24   Tamra Elaine Keen, RPR, CLR, CCRR, CSR No. 5404

25   Job No.: 10100409

**Glen A. Thomas**

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF LOUISIANA

 3                    ---oOo---

 4

 5   JONATHAN RAMOS,

 6            Plaintiff,
     vs.                              Civil Action No.
 7                                    2:19-CV-11202
     IRON MOUNTAIN SECURE SHREDDING,
 8   INC., et al.

 9
             Defendants._____/
10

11

12

13
             BE IT REMEMBERED that, pursuant to
14   Subpoena to Testify at a Deposition in a Civil Action, and
     on Monday, May 9th, 2022, commencing at the hour of
15   10:10 a.m. PDT, and ending at the hour of 11:08 a.m. PDT,
     before me, TAMRA ELAINE KEEN, a Certified Shorthand Reporter
16   of the State of California, at 235 Montgomery Street,
     Suite 870, San Francisco, California, 94104, appeared via
17   videoconference

18                    GLEN A. THOMAS,

19   produced as a witness in said action, who, being first
     duly sworn by the Certified Shorthand Reporter, via
20   videoconference, was thereupon examined as a witness in
     said cause.

21

22   TAMRA ELAINE KEEN, Registered Professional Reporter
     Certified LiveNote Reporter
23   California Certified Realtime Reporter
     California Certified Shorthand Reporter No. 5404
24

25
```

```
 1                  A P P E A R A N C E S

 2                     (Remotely via Zoom)

 3     For Plaintiff:

 4            VAN BLOIS LAW
              7677 Oakport Street, Suite 565
 5            Oakland, California 94621
              (510) 635-1284
 6            BY:  R. LEWIS Van Blois, Attorney at Law
                   main@vanbloislaw.com
 7
              OF COUNSEL
 8            LAW OFFICE of MICHAEL E. GATTO, PC
              2540 Camino Diablo, Suite 200
 9            Walnut Creek, California 94597
              (925) 278-1705
10            BY:  MICHAEL GATTO, Attorney at Law
                   mgatto@gattopc.com
11

12            BRUNO & BRUNO
              855 Baronne Street
13            New Orleans, Louisiana 70113
              (504) 564-7366
14            BY:  DANIEL A. MEYER, Attorney at Law
                   dmeyer@brunobrunolaw.com
15

16

17     For Defendant Iron Mountain Secure Shredding, Inc.:

18            LEWIS BRISBOIS
              400 Poydras Street, Suite 1300
19            New Orleans, Louisiana 70130
              (504) 272-2782
20            BY:  RACHAL CHANCE KRAMAR, Attorney at Law
                   Rachal.Kramar@lewisbrisbois.com
21

22

23     Also Present:  Jason Butko, Videographer

24                     ---o0o---

25
```

```
1                   INDEX TO EXAMINATION

2    WITNESS                               EXAMINATION

3    GLEN A. THOMAS

4            BY MR. MEYER                        7

5            BY MS. KRAMAR                       48

6            BY MR. MEYER                        50

7

8                    ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Glen A. Thomas**

**Ramos vs.**
**Iron Mountain Secure Shredding, Inc.**

```
 1                    INDEX TO EXHIBITS

 2    Exhibit No.            Description              Page

 3
      Exhibit 1         Thomas/OSHA Statement           10
 4                      dated 6/19/18 (four pages)

 5    Exhibit 2         Photo Front Staircase           20

 6    Exhibit 3         Photo Back Staircase            20

 7    Exhibit 4         Thomas Hand-drawn Diagram       36
                        dated 2 PM 6/19
 8                      Bates No. IM 358

 9    Exhibit 5         Photo Iron Mountain Warehouse   41
                        Scissor Lift
10                      Bates No. IM 33

11    Exhibit 6         Photo Scissor Lift              42
                        Bates No. IM 16
12
      Exhibit 7         Photo Scissor Lift w/           42
13                      Angle Iron
                        Bates No. IM 32
14

15                          ---o0o---

16

17

18

19

20

21

22

23

24

25
```

**www.aptusCR.com**

1              MAY 9th, 2022

2              ---o0o---

3         MR. BUTKO:  Good morning we are on the video

4   record at 10:10 a.m. on May 9th, 2022.  My name is Jason

5   Butko of Aptus Court Reporting.  The court reporter is

6   Tamra Keen of Aptus Court Reporters located at 600 West

7   Broadway in San Diego, California.

8            This is the deposition of Glen A. Thomas

9   testifying in the matter of Jonathan Ramos versus Iron

10  Mountain Secure Shredding, Inc., et al. pending in the

11  United States District Court for the District of

12  Louisiana, Case No. 2:19-CV-11202.

13           The deposition is being taken at 770 L Street

14  in Sacramento, California.

15           Counsel, can you please identify yourself and

16  who you represent, starting with the questioning

17  attorney.

18           MR. MEYER:  Good morning, Mr. Thomas.

19           My name is Daniel Meyer.  I represent Jonathan

20  Ramos.

21           MR. VAN BLOIS:  And I'm Lou Van Blois, and I

22  also represent Jonathan Ramos.

23           MR. GATTO:  Good morning.

24           Michael Gatto, also representing Plaintiff

25  Jonathan Ramos.

```
 1              MS. KRAMAR:  Rachal Kramar on behalf of Iron
 2   Mountain Information Management, LLC.
 3              MR. BUTKO:  Okay.  Can the court reporter
 4   please swear the witness.
 5                    GLEN A. THOMAS,
 6       having been duly sworn, testified as follows:
 7                    EXAMINATION
 8   BY MR. MEYER:
 9       Q.   Good morning, Mr. Thomas.
10            Can you please identify yourself?
11       A.   Yeah, Glen Thomas.
12       Q.   Mr. Thomas, you understand the court reporter
13   just swore you in to tell the truth.  So even though we
14   are talking to each other through a television screen,
15   do you understand you have a legal responsibility to
16   tell the truth in your answers today?
17       A.   Yes, I do.
18       Q.   Now you are appearing here today because you
19   were subpoenaed to appear, correct?
20       A.   Yes.
21       Q.   All right.
22            Now just to address an issue right up top.  Is
23   it fair to say that if you could be somewhere else right
24   now, you would choose not to be here?
25       A.   Absolutely.
```

1    Q.   Okay.

2         Are you upset that you have to be here today?

3    A.   No, not upset about it.

4    Q.   Okay.

5         Does your desire not to be here, do you

6    believe that's going to effect your ability to tell the

7    truth?

8    A.   Nope.  Not at all.

9    Q.   Okay.  Did you have any discussion with the

10   process server when he or she served you with the

11   subpoena to appear last week?

12   A.   I just said this is annoying, I guess.  I was

13   irritated that she rolled up on my property and

14   basically handed me a subpoena.

15   Q.   All right.

16        Do you hold that annoyance personally against

17   Jonathan Ramos?

18   A.   No, I don't even know Jonathan anymore.

19   Q.   Okay.  All right.

20        So just so I can ask.  Are you upset at

21   Mr. Ramos personally that you have to be here answering

22   these questions?

23   A.   Nope.  I don't know him, so I can't be upset

24   with him.

25   Q.   Okay.

1            You understand you are here testifying about

2      an incident that occurred with Mr. Ramos in Louisiana

3      during the summer of 2018, right?

4         A.   Yes.

5         Q.   Okay.

6            Let's just say, from between late May and

7      early June 2018, who were you working for?

8         A.   RackMasters.

9         Q.   And what was your job at RackMasters?

10        A.   I was foreman slash part owner.

11        Q.   Are you still a part owner of RackMasters?

12        A.   No.

13        Q.   When did you stop being a part owner of

14     RackMasters?

15        A.   Probably a month, maybe two months, after we

16     got back from Louisiana.

17        Q.   Why was that?

18        A.   I didn't feel like I was being compensated

19     correctly for the work I was putting in.

20        Q.   Understood.

21            Do you have any family members that were also

22     owners of RackMasters?

23        A.   The other owner was my father-in-law, my

24     wife's dad.

25        Q.   From late May to early June 2018, was Jonathan

1  Ramos also working for RackMasters?

2       A.   Yes, I believe he was still working there.

3       Q.   I understand you don't know Jonathan now, but

4  how long did you know Mr. Ramos?

5       A.   As long as I worked for RackMasters.  About a

6  year and a half, maybe two years.  I can't remember

7  exactly how long I worked there for.

8       Q.   All right.

9            As you sit here today, do you remember the

10  incident where Mr. Ramos fell and injured himself in

11  Louisiana?

12       A.   I do.

13            MS. KRAMAR:  Object to form.

14  BY MR. MEYER:

15       Q.   Do you recall after the incident with

16  Mr. Ramos giving a statement to somebody from OSHA?

17       A.   Yes, I believe we all did.  We all wrote down.

18            MR. MEYER:  I'm going to show you what I'm

19  marking as Exhibit 1.  This is what I understand to be

20  your statement to OSHA.

21            If you could have a look at it, please.

22            (Exhibit 1 is marked for identification.)

23  BY MR. MEYER:

24       Q.   Now this is a four-page document.  I will

25  invite you, if you want, to read the entire thing first

1    or I can skip to the end and ask you some questions?

2         A.   I mean, I don't really remember a whole lot of

3    what I wrote down.  About four years ago, so I don't

4    know if I should read it first if you want more

5    information.

6         Q.   Why don't I do it this way.

7              Let's go to page -- the bottom of page 3 on

8    Exhibit 4.  There's an X and then what appears to be a

9    GT and some scribble after that.

10             Are those your initials?

11        A.   Yes, that's my signature.

12        Q.   Is that signature done in your own

13   handwriting?

14        A.   It sure looks like it, yeah.

15        Q.   Okay.

16             The remainder of this document at the body

17   where there's several paragraphs of writing, is that

18   your handwriting or somebody else's?

19        A.   That looks like somebody else's.  I don't

20   really write like that.

21        Q.   Okay.

22             I'm going to the bottom now of page 4 of

23   Exhibit 1, the section where it says:  Interviewee

24   signature.

25             Whose signature is at the bottom of this?

1      A.    That is mine.

2      Q.    All right.  It's dated 6/19/2018 at 2:10 p.m.

3            Is that also in your handwriting?

4      A.    Yes, that looks like my handwriting.

5      Q.    Okay.

6            Do you recall giving a statement that was

7    transcribed or, I guess, dictated to a investigator from

8    OSHA that you then signed at the bottom?

9      A.    I -- you know, I don't recall.  I don't

10   remember how it happened.  I thought we all just wrote

11   down on a piece of paper, gave it to the owner, and he

12   gave it to the insurance company and OSHA.  That's what

13   I -- that's what I remember.

14     Q.    Do you remember signing this document at page

15   4 with your name, and the date and the time?

16     A.    No, I don't really remember it.  That is my

17   signature, so it had to have been me.

18     Q.    All right.

19           Do you believe that you signed this statement

20   after giving it to an OSHA investigator?

21     A.    I'm sorry, repeat that again?  Do I believe

22   what, now?

23     Q.    Do you believe that you gave the statement in

24   Exhibit 1 to an OSHA investigator and then signed it?

25     A.    Yeah.  That must have been what happened,

```
 1    yeah.

 2          Q.   All right.

 3               When you gave a statement to an OSHA

 4    investigator, did you do your best to tell the truth?

 5          A.   Absolutely, yes.

 6          Q.   All right.  Now you just told me earlier that

 7    it's been four years, and I grant you that your memory

 8    may not be as good as it was then.

 9               Is it fair to say that the statement that you

10    gave to OSHA four days after Mr. Ramos' fall was -- that

11    your memory was fresher at that time than it is right

12    now?

13          A.   Yes, absolutely.  I would definitely have had

14    better memory then.

15          Q.   Okay.

16               At the bottom of page 4 there's a statement

17    that says:  I have read and had the opportunity to

18    correct this statement consisting of blank handwritten

19    pages, and these facts are true and correct to the best

20    of my knowledge and belief.

21               Do you recall whether or not that is, in fact,

22    true, that you had the opportunity to read and correct

23    these -- this statement?

24          A.   I don't recall.

25          Q.   Okay.
```

1          Would you have signed below as Interviewee if

2    that statement was not true?

3          A.    No, I would not have signed.

4          Q.    Is it fair to say that looking at this

5    statement, and understanding how you would comport

6    yourself, that is more likely than not that you had the

7    opportunity to read and correct this statement before

8    signing it?

9          A.    Yeah, most likely.

10         Q.    I'm going to go through this statement, if you

11   don't mind.

12         I understand this is not in your handwriting.

13   There are some redactions.  I'm going to have a series

14   of questions about this.

15         At the top it says:  RackMasters was assigned

16   the contract around 5/14/18 and I arrived at the site

17   around 5/30 -- I believe it should be 18 -- with three

18   employees.

19         Do you recall whether that statement is, in

20   fact, true?

21         A.    Yeah, I mean, it was with three employees.  I

22   don't remember the exact dates.

23         Q.    Was one of the employees that you went out

24   first to the -- to wherever you arrived, Mr. Ramos?

25         A.    Yes.

1    Q.   What was Mr. Ramos' job at the Iron Mountain

2    job in Louisiana?

3    A.   He was the installer and a foreman, as well,

4    for us.  He had ran a few jobs as well.  We just brought

5    everybody out to this job.

6    Q.   The bottom of page 1 of Exhibit 1 is the

7    sentence:  We were contracted to dismantle the shelving.

8         Do you see that?

9    A.   Um-hmm.

10   Q.   Is that true?  Is that what your role was

11   there?

12   A.   Yes.

13   Q.   Starting at page 2, you say:  I have 2.5 years

14   experience in doing this.

15   A.   Yes.

16   Q.   Does that refresh your memory as to how long

17   you had been working with Mr. Ramos at the time of this

18   accident?

19   A.   Probably about 2.5 years.  He had worked there

20   before I had.

21   Q.   Moving on.

22        The writing says:  I spent the first full day

23   assessing the job.  That is, what and how it was to be

24   done.

25        Is that statement true?

1     A.    Yeah, I guess, to the best of my knowledge.

2     **Q.    Do you recall what you did in order to**

3  **determine or assess what and how it was to be done?**

4     A.    I don't recall.

5     **Q.    What do you typically do to determine what and**

6  **how the job needs to be done when you were working for**

7  **RackMasters?**

8     A.    I would determine what -- what section needs

9  to come down first to just verify that we are just

10  slowly working in a, you know, pattern to go back and

11  forth on the rack.  And that would be I would just have

12  to figure out what's the best way to get that down.

13     **Q.    While conducting your assessment, were you**

14  **accompanied by anyone from Iron Mountain?**

15     A.    Yeah, I think I remembered -- like, are you

16  talking about with me, walking the aisles?

17     **Q.    Either with you or some other point that you**

18  **were just about to testify?**

19     A.    There's just -- there was just two, maybe

20  three other people that were working in the warehouse.

21  They were on the other side of the building, and they

22  were doing whatever Iron Mountain does with their files.

23  They were over there.  We were working on the other

24  side.

25          We had very little contact with each other.

1    Just when we needed to open the doors, because they

2    didn't let us open the door when we wanted to.

3         Q.   Okay.

4              Did an operations manager accompany you at any

5    point during your assessment?

6              MS. KRAMAR:  Object to form.  Manager for

7    whom?

8              MR. MEYER:  I'm sorry.  That's a well-taken

9    objection.

10         Q.   Did an operations manager from Iron Mountain

11   accompany you while you were making your conducting your

12   assessment?

13         A.   Just the two to three people I was talking

14   about.

15         Q.   Okay.

16              Do you specifically recall as you sit here

17   today somebody from Iron Mountain accompanied you while

18   you were conducting your assessment?

19              MS. KRAMAR:  Objection.

20              MR. MEYER:  I didn't hear the answer.

21              THE WITNESS:  No.  No, I don't remember

22   anybody walking with me.

23              MR. MEYER:  Okay.

24         Q.   What about Mr. Ramos?  Was Mr. Ramos involved

25   in this assessment, at all?

Glen A. Thomas

```
1          A.    I don't recall.

2          Q.    Okay.

3                Starting about six lines down where I am

4    blocking out, can you see this -- this section on your

5    screen in front of you?

6          A.    Yeah.

7          Q.    All right.

8                It looks to me like it says:  I told Riley

9    that I needed to tear down the stairwells, open

10   parenthesis 2, but Iron Mountain wanted the stairs to

11   remain until the very end.

12               And then period.

13               Do you -- does that name say "Riley" to you,

14   or do you recall somebody who you told that you needed

15   to tear the stairwells down?

16         A.    No, I don't know who -- who that would be.

17   Riley, Randy.  I don't know.  It looks like "Riley",

18   you're right.

19         Q.    It could be Ricky.  Unfortunately, the

20   handwriting is a little tricky?

21         A.    Yeah.

22         Q.    Well, Mr. Thomas, what do you recall about the

23   need to tear the stairwells down?

24         A.    Um, I recall there was a stairwell in the

25   front and the back.  I believe they wanted to keep the
```

1   one in the front up because they needed to go up and

2   down it still.  They didn't want to use the back stairs.

3   I just remember it being in the front.

4          I would have -- typically, you would tear that

5   down first, because it's the first thing in line, you

6   know, it clears -- it gets an open space for you so you

7   have more space to work, and then you can slowly work

8   into the rack as you go.

9       Q.   Okay.

10      A.   I do remember them saying, yeah, they needed

11  it up.  So we worked around it the whole time.

12      Q.   Okay.

13          Now the part where it says:  Stairwells 2.  Do

14  you recall specifically that you needed to tear down two

15  stairwells at the start of the project?

16      A.   Just the one that I can recall, the one in the

17  front.  The one in the back wouldn't have mattered until

18  the very end.

19      Q.   Okay.  I'm going to -- I'm going to show you

20  photos of two staircases, and I'm going to ask you which

21  one is the front and the back you are talking about.

22          All right.  Do you see a photo of what appears

23  to be a staircase with an iron racking system around it?

24      A.   Yes.

25          MR. MEYER:  Okay.  I'm marking this as Exhibit

```
 1    2.
 2              (Exhibit 2 is marked for identification.)
 3    BY MR. MEYER:
 4         Q.   Is that the staircase you were referring to as
 5    the front or the back?
 6         A.   Yeah, I believe that would be the front.
 7              MR. MEYER:  Okay.
 8              Now -- now I'm showing you Exhibit 3.  This is
 9    a different staircase.
10              (Exhibit 3 is marked for identification.)
11    BY MR. MEYER:
12         Q.   Is this the yellow staircase that you referred
13    to as the one in the back?
14         A.   Yes.
15         Q.   Okay.
16              So Exhibit 3 depicts the staircase that would
17    not have mattered until the end whether it stayed up or
18    down, right?
19         A.   Yes.
20         Q.   Just so I'm clear, the staircase that's
21    depicted in Exhibit 2 that you called the front
22    staircase, this staircase would, if you had your way,
23    have come down first?
24              MS. KRAMAR:  Object to form.
25              THE WITNESS:  Yes.
```

1          MR. MEYER:  Is that true?

2          All right going back to your statement, sir.

3          Let's talk about the language here:  But Iron

4     Mountain wanted the stairs to remain until the very end.

5     **Q.   Do you recall that instruction or condition**

6     **being communicated to you?**

7          A.   Yes.

8          MS. KRAMAR:  Object to form.

9          THE WITNESS:  I do remember.

10    BY MR. MEYER:

11    **Q.   How was that communicated?**

12         A.   I just remember the lady that was working on

13    the other side there saying:  No, I need that staircase

14    to stay up.

15    **Q.   Do you recall who the lady on the other side**

16    **was?**

17         A.   I do not recall her name, no.

18    **Q.   Do you recall her being somebody from Iron**

19    **Mountain?**

20         A.   She was an employee, yes, of Iron Mountain.

21    **Q.   All right.**

22    **This was -- was this woman giving the**

23    **instruction, did you understand her to be somebody with**

24    **authority for Iron Mountain?**

25         A.   I assumed she was some kind of a manager.

1      Q.   Did you have any discussion beyond her simply

2   telling you this is -- these stairs need to stay up,

3   about that instruction?

4      A.   No, I said:  You got it, ma'am.  Not a

5   problem.  We'll work around it.

6           Like I always do.

7      Q.   So it is your general practice that if a

8   customer gives you a condition you understand that you

9   are to accommodate that condition, right?

10     A.   Yes, that's typically what we would do.

11     Q.   Okay.

12          How did that condition change the way you

13   planned the job?

14     A.   It just allowed us to -- we basically had to

15   use another section of the warehouse to store the

16   material that we were tearing down.  Everything wanted

17   to be stored and kept.  They were going to move it to

18   another location, sell it, I don't know what they do

19   with it after.  Our job was to tear it down and put it

20   in piles for them.  But that takes place -- takes space

21   so we needed another section of their warehouse.

22     Q.   Did retaining the -- the front staircase

23   necessitate this job being done from left to right

24   instead of from front to back?

25     A.   No.  No, it didn't.

Glen A. Thomas

1    Q.    Explain that to me.

2    A.    It just -- the staircase was just in the way.

3  We still were going to tear it down the exact same way,

4  anyways, because there's only one way to tear it down.

5  You just go section by section, back and forth, all the

6  way until you get to the back.

7    Q.    Did you have any reason to believe that doing

8  the job from right to left would have made this

9  deconstruction or dismantling dangerous?

10   A.    No.

11   Q.    Okay.

12         Starting at the fourth line -- sorry.

13  Starting after this work at the very end there's a

14  redaction and it says:  Blank verbally said I could

15  proceed.

16         Do you remember who gave you an instruction or

17  gave you a verbal statement that you could proceed?

18   A.    I do not recall.

19   Q.    Do you recall if it was somebody from Iron

20  Mountain?

21   A.    I -- I have no idea.  I just figured, if they

22  would probably be the lady in the back saying keep it

23  up, so just keep on working.  That's what I would

24  assume, but I don't fully remember.

25   Q.    Okay.  Let's go through your recitation of

Glen A. Thomas

```
1    what happened.
2            Starting after this part that's scratched out:
3    The first phase of the job we moved wood on the shelves
4    at the beginning of the job.  I hired a company --
5    sorry.  I hired temporary workers, laborers from ADDECO.
6            Is that statement true?
7        A.   Yes.
8        Q.   Was Mr. Ramos involved in that phase?
9        A.   Yes.
10       Q.   Was this phase anyway effected by the
11   requirement that the front staircase remain in place?
12       A.   No.
13       Q.   Continuing on in what appears to be the same
14   sentence, it says:  Going left to right and front to
15   back second level -- I think it's -- standing on the
16   fully intact platform or catwalk the first week.
17           Does that statement represent the work that
18   took place, to the best of your recollection, during the
19   first week?
20       A.   Yeah.  Yeah.
21       Q.   Okay.  Moving down a bit.
22           Your statement says:  The next phase consisted
23   of removing the first two bays on the S dot E side of
24   the building to allow for the use of a rented scissor
25   lift.  Each square on the map is a bay.
```

Glen A. Thomas

1          Does that sentence accurately reflect the

2     second phase of the work that was done at the Iron

3     Mountain facility in Louisiana?

4          A.    Yeah, that sounds about right.

5          Q.    Was Mr. Ramos involved in working for that

6     phase?

7          A.    I don't recall.  I remember there was

8     something about sprinkler pipes we had to take down.  I

9     -- I think I remember him being a part of that, but I

10    don't fully remember.  So he could have been a part of

11    that and the sprinklers.  I just don't remember.

12         Q.    Do you know if this phase was in any way

13    effected by your requirement that the -- or the

14    condition that the front staircase remain in place?

15         A.    No.  No, it was fine.

16         Q.    Moving on.

17              Your statement says:  Once the first two bays

18    were removed we then dismantled each row up to the last

19    two bays, starting at the south -- S dot W corner.  This

20    phase started 6/4 and all the way up to 6/14/18.

21              Does this statement accurately reflect your

22    recollection of what happened on site from June 4 until

23    June 14, 2018?

24         A.    Yeah.

25         Q.    At any point during those approximately 11

Glen A. Thomas

1  days, did you have any reason to believe that the work

2  being done was dangerous?

3      A.   No.

4      Q.   When you say the bays were removed "up to the

5  last two bays", what do you -- what are you talking

6  about?  What does those "last two bays" mean?

7      A.   I believe the last two bays were the two bays

8  that were up against the catwalk, which were up against

9  the wall.  We left two extra bays there so it supported

10  the catwalk.  So it continued to further support the

11  catwalk, so we could still use the catwalk up top if we

12  needed to.

13      Q.   Okay.  Showing you Exhibit 8 again.

14          Are either of the two bays that remained in

15  place depicted on Exhibit 2?

16      A.   No.

17      Q.   Are they in a different part of this facility?

18      A.   They would be back there, like back where that

19  little stepladder kind of is, but they wouldn't have

20  been there anymore.  We would have had to have taken

21  them down by now.

22      Q.   So by the time this photo was taken, which was

23  after the fall occurs, the last two bays would have

24  already been removed?

25      A.   Yes.

1    Q.   Okay.  Let's talk about your description of

2    the incident.

3              On Exhibit 1, you write -- or somebody writes

4    that you signed off on -- your statement saying:  On

5    6/15/18 around 9:50 a.m. the accident happened.  I

6    instructed my crew to first remove the bar grating or

7    flooring on the second level.  I had Antonio Cruz

8    debolting the bar grating from the support strut while

9    standing on the scissor lift.

10             First, is that statement true and correct to

11   the best of your knowledge what was going on the morning

12   of the incident with Mr. Ramos?

13   A.   Yes, to the best of my knowledge.

14   Q.   At this time, did you or anybody on site have

15   any reason -- strike that.

16             At the time -- at the time depicted in this

17   statement, which is June 15, around 9:50, did you have

18   any reason to believe that the work being done was

19   dangerous?

20   A.   No, I did not.

21   Q.   All right.

22             Was the work being done at this time effected

23   in any way by the staircase remaining in place?

24   A.   No.

25   Q.   Do you have any reason to believe that the

Glen A. Thomas

```
 1   columns were insufficiently fastened to the wall at this
 2   time?
 3        A.   No.  I did not believe they were.
 4        Q.   All right.
 5             The next approximately two paragraphs is your
 6   recitation of what happened.  Before I get into that,
 7   why don't I just ask you?
 8             What do you recall -- how do you recall the
 9   fall happened?
10        A.   Um, I was -- I was moving material, so I
11   wasn't always in that room.  I was moving it from one
12   side to the other side of the warehouse.
13             What I recall is the scissor lifts were up
14   against the wall.  They were taking the beams out.  And
15   then, I guess they were struggling taking a beam out,
16   and he started wobbling it.  The wall started to wobble
17   a little, and that's what caused the wall to come down.
18             That's kind of to the best of my knowledge of
19   what I remembered watching.
20        Q.   While you were disassembling the staircase --
21   sorry.
22             While you were disassembling the racking
23   system, were the staircases in use, both the front and
24   back?
25        A.   The back was not in use.  I believe they were
```

```
 1   still using the front.
 2        Q.   Who is "they" that was "still using the
 3   front"?
 4        A.   The Iron Mountain people.
 5        Q.   All right.
 6             Was that also true on the 15th, the day of the
 7   injury?
 8             MS. KRAMAR:  Object to form.
 9             THE WITNESS:  I believe they were using it.  I
10   don't fully remember if they actually went up and down
11   it all the time, but that was the point of leaving the
12   staircases, so they could use it.
13   BY MR. MEYER:
14        Q.   Do you recall, one way or the other, whether
15   there were Iron Mountain people using the staircase on
16   the day of the injury?
17        A.   I do not recall.
18        Q.   What about the day before the injury?  Do you
19   recall people at Iron Mountain using the staircase?
20        A.   I don't recall if they were.  I was just told
21   to leave it up so they could.
22        Q.   All right.  Let's go to your statement.
23             Starting at page 3, Exhibit 1, the statement
24   says:  I used the fork truck forks to lift the grating
25   and bring to the floor.  I was the only fork operator.
```

1    And then I had blank and blank -- redacted -- on one of

2    the scissor lifts to remove the angle iron from the

3    frame and the support strut, the two employees injured.

4            Do you recall which two employees you had on

5    the scissor lift removing the angle iron?

6        A.   No, I don't recall.

7        Q.   Do you recall if one of them was Mr. Ramos?

8        A.   I mean, if it was the two that were injured,

9    then yeah, it would have been -- one of them would have

10   been Jon, yeah.

11       Q.   Do you recall who the second person injured

12   was?

13       A.   He was one of the temp employees.  I can't

14   remember his name.  Ty, I think.  Something like that.

15       Q.   Tyri [phonetic] or Tyreece [phonetic]?

16       A.   Yeah, that sounds about right.

17       Q.   So does that refresh your memory, given the

18   context of your statement that Mr. Ramos and Mr. Tyreece

19   were the people on the scissor lifts removing the angle

20   iron?

21       A.   Yeah, that's probably who it would have been.

22   They were the only two that were injured.

23       Q.   At any point during the removal of the angle

24   iron did you have reason to believe this work was

25   dangerous?

1      A.   No.

2      Q.   Now you have a discussion about what a number

3   of other employees were doing, and you then state --

4   I'll block it out for you:  I heard a popping sound and

5   I yelled "run" and I did observe the scissor lift and

6   racks come down.

7           Do you recall seeing the scissor lift and

8   racks come down as you sit here today?

9      A.   Yes.

10      Q.   What happened?

11      A.   I don't know why they went down.  I just --

12   like I said, I remember hearing it popping, like metal

13   was popping out of the upright, and the wall was waving

14   back and forth, and then it started to come down.

15      Q.   You say "the wall".  Are you talking about the

16   actual drywall?

17      A.   No.

18      Q.   Or the support system?

19      A.   The metal rack wall.

20      Q.   Okay.

21           What happened after the metal rack came down?

22      A.   I immediately ran over to Jon and Tyreece and

23   observed that they were definitely injured, and I then

24   picked up my phone and called 911.

25      Q.   All right.

1           Looking at your statement there's a section

2    that says:  I only saw -- redacted -- jump from the left

3    about three or four feet above the floor.

4           Do you recall if it was Mr. Ramos or

5    Mr. Tyreece who jumped from the lift?

6        A.   I don't really remember.  I thought they both

7    jumped from the lift.

8        Q.   Okay.

9           Let's cover the rest of your statement here.

10           You say, if you can see the part I'm blocking

11   out right now:  The week before I arrived my boss Brian

12   Maclean gave me a paper copy of the rack system, and the

13   copy did not specify the beams or columns or the back

14   stairwell.

15           First, who is Brian Maclean?

16       A.   He was the other owner.

17       Q.   That's your father-in-law?

18       A.   Yes.

19       Q.   Do you know where Brian Maclean got the paper

20   copy of the rack system?

21       A.   I do not know.

22       Q.   Do you know if he got it from Iron Mountain?

23       A.   I do not know that.

24       Q.   Is it typical of your work in doing a

25   dismantling job to get plans in advance?

1        A.    Yes.

2        Q.    Is it important that those plans are accurate?

3        A.    Yes, very important.

4        Q.    Did the absence on the plans of the beams or

5   columns or back stairwell effect this job in any way?

6        A.    No.

7        Q.    Why is that?

8        A.    Because, unfortunately, when you work with the

9   rack system nothing is ever accurate.  So you are always

10  adjusting and always just trying to figure it out as you

11  are going through it.

12       Q.    All right.

13             When you say didn't specify the "back

14  stairwell", that's the yellow one that we look at,

15  right?

16       A.    Yes.

17       Q.    Okay.

18             But the racks, according to your statement, it

19  did show the front stairwell?

20       A.    Yes.

21       Q.    Moving on in your statement you say:

22  Generally I do my own assessment as to the racking

23  system -- sorry -- how the racking system is supported.

24             Period.

25             Did you do your own assessment of the racking

1  system and how it was supported in this case?

2      A.    Yes.

3      Q.    Do you recall what you determined about this

4  system?

5      A.    No, not really.  It was pretty standard the

6  way it was put together.

7      Q.    All right.  Looking at your statement, and

8  I'll block out that section, it says:  The rack system

9  was a self-supporting system.  The columns and beams

10 were to stop any carts crashing into the drywall.

11          Is a self-supporting -- first off, is

12 that consistent with your recollection as true of the system

13 you evaluated in the Louisiana Iron Mountain job?

14     A.    Yeah, I remember that.  Yeah.

15     Q.    What do you mean when you say the columns and

16 beams were there to stop the carts from "crashing into

17 the drywall"?

18     A.    Well, the beams were right up against the

19 drywall.  So when they run the cart through down the

20 aisle, if the cart decides to get wobbly and go into the

21 drywall, instead of taking a big gouge or a big hole in

22 the drywall, it would just run into the beams and slide

23 along the wall.  Like along the beam instead of the

24 drywall, so there would be less damage.

25     Q.    Are you suggesting by this statement that the

1  **columns and beams are not there for structural purposes?**

2       A.   I have no idea if they were there for

3  structural.

4       **Q.   Well, I'm -- in fairness, I'm asking about**

5  **what you meant by this sentence, not necessarily what**

6  **they were there for.**

7       A.   Um, I don't really recall.  From what I can

8  remember, the beams and the columns were all attached to

9  the racking system that was on the other side of the

10 wall, also.  So the grates are what was attaching

11 everything to other side of the wall.

12          That's all I can really recall from the beams

13 and the columns.

14      **Q.   So the fact that this was a self-supporting**

15 **system change the way that you approach the demolition?**

16      A.   Yes, absolutely.

17      **Q.   How so?**

18      A.   We would then be working the way we did work

19 it, which is you have to take each section down and

20 allow the next section to still be supported by itself.

21 You can't take something down in the middle.  If you do

22 that, then everything will -- everything off to the side

23 of that will fall over.

24          So because it is self-supporting, it has to

25 keep supporting itself as you tear down.

1       Q.   Okay.  All right.

2            The next sentence of this statement is:  The

3    columns and beams were connected with a cross strut to

4    the frame the entire length of the catwalk.

5            Do you recall that to be true?

6       A.   Yes.

7            MR. MEYER:  Okay.

8            Very quickly, I'm going to show you something

9    that was included with your statement.

10           I have marked this Exhibit 4.

11           (Exhibit 4 is marked for identification.)

12           MR. MEYER:  Okay.

13      Q.   Do you see a drawing labeled IM 358 at the

14   bottom?

15      A.   Yeah.

16      Q.   I'm marking this as Exhibit 4.

17           There's a statement at the bottom that says,

18   Drawn by Glen Thomas 2 PM 6/19 -- which is about ten

19   minutes of when you signed Exhibit 1.

20      A.   Um-hmm.

21      Q.   Do you recall giving the drawing here and the

22   statement Exhibit 1 approximately the same time?

23      A.   I don't recall the exact time.

24      Q.   Do you recall doing a -- drawing this diagram,

25   Exhibit 4, for an OSHA investigator?

1      A.    I do recall the drawing, yes.

2      Q.    Okay.  Let me ask you a couple of questions

3  real quick then about Exhibit 4.

4            What is the perspective here that I am looking

5  at?  Am I looking straight at a wall or am I looking

6  down?

7      A.    You're looking to the side of it.  So if you

8  were standing right where that front stairwell was

9  looking into the building, what you're seeing is those

10 are the two bays where it says "Frame" and then the next

11 one over.  Those are those two extra bays I told you

12 that we left up while we took the rest of the racking

13 system down.  Then we tore those two bays down.

14           And the catwalk is the part on the very top

15 where it says "Floor" and "Grating".  That's where the

16 catwalk was.

17     Q.    Okay.

18           So am I -- this paper, my perspective looking

19 at the long side of the room or am I looking sideways to

20 the short side of the room?

21     A.    You are looking down the long side of the

22 room.

23     Q.    So here where it says "Wall", that would be

24 that long wall where all of the racking system fell off

25 of the columns?

Glen A. Thomas

```
 1        A.    Yes.
 2        Q.    Now you mentioned the work being done at the
 3   time the scissor lift fell was removal of angle iron
 4   from the frame and the support strut.  So that would be
 5   -- there's a part of your drawing that says "Angle
 6   Iron", and then pointed towards, I guess, just inside of
 7   the frame.
 8             That the section that was being removed by
 9   Mr. Ramos and Mr. Tyreece?
10        A.    Yes.
11        Q.    Would it have been important to know whether
12   the columns along the drywall were -- were effectively
13   mounted or how they were mounted to the drywall when
14   this work was being done?
15             MS. KRAMAR:  Object to form.
16             THE WITNESS:  Yeah.  I mean, the way they were
17   mounted, it is all done by that grating up on the top.
18   Everything was connected to the wall from there.  And
19   then the columns were anchored to the ground.
20             MR. MEYER:  Okay.
21        Q.    So the columns were anchored to the ground and
22   then again to the top at the grating, but not in
23   between?
24        A.    No.  No.
25        Q.    All right.
```

Glen A. Thomas

```
1              Is that something you would have been able to
2    tell before disassembling the shelving system?
3         A.   I don't know.  I don't understand the
4    question.
5         Q.   Okay.
6              Is that something you would have wanted to
7    know before determining how the shelving system should
8    be disassembled?
9         A.   Yeah, I definitely would have wanted to know
10   how that was done.  From my knowledge, I definitely
11   would have looked and seen how it was connected before
12   we started tearing anything down.
13        Q.   Is that something you would have expected the
14   custodian of the building to communicate to you about
15   this project?
16             MS. KRAMAR:  Object to form.
17             THE WITNESS:  No.
18   BY MR. MEYER:
19        Q.   Sir?
20        A.   No.
21        Q.   You wouldn't have expected Iron Mountain to
22   tell you that?
23        A.   No.  Typically not, no.
24        Q.   Why is that?
25        A.   Typically, Iron Mountain hires what we call
```

```
 1   was a salesperson.  They were just a person that deals
 2   with racking systems and tearing them down, and that's
 3   how we got the job.
 4            So I would assume Rack -- or Iron Mountain
 5   would have talked to the salesperson.  So whatever their
 6   conversations were, were whatever.  And then the
 7   salesperson then contacts us and say:  Hey, we have got
 8   a job for you.  Do you want it?
 9            We take it, we go out and tear it down or we
10   build it.
11       Q.   Now going back to your statement.  The section
12   that we read a few minutes ago about the events that
13   took place the time period shortly before the fall, to
14   me it seems fairly comprehensive, like at the time you
15   had a good recollection about what was going on that
16   whole morning.
17            So the question is:  Were you present in the
18   Iron Mountain facility during that whole morning when
19   the fall happened?
20       A.   Yes, I was -- yes, I was present the whole
21   time.
22       Q.   Now -- and you were the foreman, so you were
23   basically in charge of the job at that time, right?
24       A.   Yes.
25       Q.   Okay.
```

1      Do you do you recall any indication before the

2  rack actually fell that there was a risk that this rack

3  was going to fall?

4      A.   No, I did not have any indication.

5      Q.   It was a surprise when it happened?

6      A.   Yes, absolutely.

7      Q.   Obviously, if you knew about the rack being

8  about to fall, you would have done something different?

9      A.   Yes.

10          MS. KRAMAR:  Object to form.

11          MR. MEYER:  All right.

12          Mr. Thomas, I'm going to show you a couple of

13  photographs and ask you if you recognize the area.

14          Do you see the photograph labeled IM 33 on the

15  screen in front of you?

16          THE WITNESS:  Yes.

17          MR. MEYER:  All right.  I'm marking the as

18  Exhibit 5.

19          (Exhibit 5 is marked for identification.)

20  BY MR. MEYER:

21      Q.   Does this Exhibit 5 accurately represent the

22  room -- the Iron Mountain warehouse room the immediate

23  aftermath of the scissor lift falling?

24      A.   Yes.

25      Q.   Okay.  Now just so I can orient myself in the

1   room.

2          At the far end of the photograph we are

3   looking at what we refer to as the front staircase,

4   right?

5       A.   Yes.

6       Q.   So we can't see this picture, but the yellow

7   staircase would be behind this?

8       A.   Yes.

9            MR. MEYER:  Okay.

10           Marking IM 16 as Exhibit 6.

11           (Exhibit 6 is marked for identification.)

12   BY MR. MEYER:

13      Q.   Does Exhibit 6 fairly and accurately represent

14   the forklift -- sorry, the scissor lift after it fell?

15      A.   Yes.

16           MR. MEYER:  All right.  I'm showing you

17   Exhibit 7.

18           (Exhibit 7 is marked for identification.)

19           MR. MEYER:  This is IM 32.  There is a section

20   of angled metal at the bottom of the screen.

21      Q.   Do you see two pieces of yellow metal at the

22   bottom?

23      A.   Yes.

24      Q.   Are those the angle iron that were being

25   removed?

1     A.   That's what it looks like, yes.

2     **Q.   Does Exhibit 7 fairly and accurately represent**

3  **the angle iron against the forklift -- sorry, the**

4  **scissor lift after it fell?**

5     A.   Yes.

6     **Q.   Does this appear to be to you one in the same**

7  **scissor lift that Mr. Ramos and Mr. Tyreece fell off of?**

8     A.   Yes.

9          MS. KRAMAR:  Object to form.

10         MR. MEYER:  Okay.  At this time I would offer

11 to file and introduce Exhibit 1 through 8.

12         MS. KRAMAR:  No objections.

13         MR. MEYER:  Mr. Thomas, I understand shortly

14 after this fall you stopped working for RackMasters.

15    **Q.   Do you have any involvement in RackMasters as**

16 **of this day?**

17    A.   No.

18    **Q.   Do you hold it against Mr. Ramos that he had a**

19 **Workers' Compensation claim against your father-in-law's**

20 **company?**

21    A.   No, not at all.

22    **Q.   Do you think it was unfair anything that he**

23 **did?**

24    A.   No.  I don't understand the question.  What do

25 you mean what "he did"?

Glen A. Thomas

1          Q.   Filing a Workers' Compensation claim for his

2    injury against your father-in-law's company?

3          A.   No, absolutely not.  It's his right.  I

4    encourage it, if anyone gets hurt at work.

5          Q.   You told me earlier you don't know Mr. Ramos

6    anymore.  Obviously, at some point in time you did?

7          A.   Yes.

8          Q.   At the time that you knew him, did you guys

9    get along?

10         A.   Yes, we did.

11         Q.   All right.

12              Was he a hard worker?

13         A.   Yes, I thought he was a very hard worker.

14         Q.   Do you feel like he listened to you and

15   followed your instructions?

16         A.   Yeah.  Yeah, I do.

17         Q.   Did you find him to be careless or a

18   risk-taker?

19         A.   Not typically.  There were definitely times I

20   can vaguely remember, but I mean that is with every

21   single person on my crew.  I couldn't blame him for

22   anything being a risk-taker, like typically.

23         Q.   You said earlier that at some point Mr. Ramos

24   would have actually run jobs, right?

25         A.   Yes.

1       Q.   So he had a position of some authority within

2   RackMasters?

3       A.   Yes, he did.

4       Q.   He had gained some trust within the company?

5       A.   Yes, he did.

6       Q.   All right.  Do you feel like he had earned

7   that through doing quality work over time?

8       A.   Yes, absolutely.  Very -- very well, yeah.

9       Q.   Okay.  I'm going to ask you one more time

10  about tearing down the staircase.

11           Was there ever any discussion that you could

12  recall of breaking down this room from the front

13  staircase side to the back staircase side, as opposed to

14  from the right side of the room away from the staircase

15  and then towards the staircase?

16           MS. KRAMAR:  Object to form.

17           MR. MEYER:  What I would call right to left.

18           MS. KRAMAR:  Object to form.

19           THE WITNESS:  No, I don't recall there being

20  much more of a conversation than just talking about it

21  the one time and not tearing it down.

22           MR. MEYER:  Okay.

23       Q.   Would your original recommendation, but for

24  the condition that the staircase remain in place, have

25  been to break down the racks moving from the front to

Glen A. Thomas

```
 1   the back?

 2        A.   I'm sorry, I don't understand the question.

 3        Q.   Maybe I show you a photograph.  It might be

 4   helpful to have some sense of the room.

 5             Okay, I'm back at Exhibit 5.  Now I'm looking

 6   at what I would say back to front of the room.

 7             Is that a fair description?

 8        A.   Yes.

 9        Q.   So was -- you just told me you don't recall

10   any specific instruction, but if you -- or any specific

11   conversation about it, but if you had your way you could

12   do this demolition in any way you chose, would you have

13   done it from what was actually done, which I understand

14   to be the left side of this picture to the right side of

15   the picture, finishing where the columns would have been

16   before they fell on the right side of the wall?

17             MS. KRAMAR:  Object to form.

18             THE WITNESS:  Yeah, I mean, only the one time

19   we had that conversation.  I mean, yeah, I would have

20   torn the stairwell down first.  That just would have

21   been the way I would have done this.  But again, we were

22   asked not to, so we did it a different way.  So we left

23   the catwalk up to the very end.

24   BY MR. MEYER:

25        Q.   So just to qualify that.  You would have
```

1   started here in the front of the room, which is the far

2   end of Exhibit 5, and then worked your way to the back,

3   periodically tearing down sections of the column as you

4   advance to the back of the room?

5        A.   Yes, that is how I would have done it.

6        Q.   And the reason you did not do it that way is

7   because there was a condition that the stairs had to

8   remain up?

9        A.   Yes.

10            MS. KRAMAR:   Object to form.

11   BY MR. MEYER:

12        Q.   And you did not know in advance that the

13   columns were not braced in the middle, but only at the

14   top and at the bottom?

15        A.   Yeah.

16            MS. KRAMAR:   Object to form.

17   BY MR. MEYER:

18        Q.   And that is information that, had you known

19   that, you would have been able to do this job

20   differently?

21        A.   Yes.

22            MR. MEYER:   Mr. Thomas, thank you for your

23   time.   I have no other questions.   I'll reserve the

24   right to redirect.

25   ///

Glen A. Thomas

```
 1                        EXAMINATION
 2              MS. KRAMAR:  Mr. Thomas, my name is Rachal
 3   Kramar.  I'm not sure what you can or can't see there on
 4   the computer.  I do appreciate you joining us today for
 5   the deposition.
 6              I just have a few follow-up questions.
 7              Earlier, my understanding was that you said
 8   when you made your assessment at this job that you
 9   understood that the rack was self-supporting.
10        Q.   Is that correct?
11        A.   Yes.
12        Q.   And is it typical for a self-supporting rack
13   system to be braced against a neighboring wall?
14        A.   Yes, it should always be braced on any
15   supporting wall.
16        Q.   When you made your assessment before you
17   started work on the job, did you look for bracing?
18        A.   Yes, I did.
19        Q.   And did you find that there was some bracing
20   in place for the system?
21        A.   Yes.
22        Q.   As part of the dismantling, did RackMasters
23   remove certain bracing to be able to start taking down
24   parts of the rack system?
25        A.   No.  That's why we left those two extra bays
```

1    out there, so that they could then support on those two

2    extra bays.

3        Q.    So at the time you were working, you felt

4    there was sufficient bracing of the overall system that

5    it was a safe job?

6        A.    Yes.

7        Q.    You talked about arriving at a customer site

8    and them possibly presenting you with conditions for the

9    job.

10           Even though you said it was your typical

11   practice for RackMasters to try to accommodate the

12   customer's request, if you found that the condition you

13   were asked to meet was unsafe, is it correct that

14   RackMasters would not proceed with the job and would

15   explain to the customer why that was an unsafe

16   condition?

17       A.    Yes, that is exactly what we would do.

18       Q.    An employee in Mr. Ramos' position,

19   specifically one who had also worked as a foreman or had

20   some experience with RackMasters, if an employee felt

21   something had become unsafe, would they have the ability

22   to alert you or whomever the supervisor was on the job

23   and say:  We may need to pause or we may need to

24   reassess something?

25           Is that something that they could do?

1      A.   Yes, absolutely.

2      Q.   I understand Mr. Ramos isn't here today to

3  join us with this discussion, but if we assumed that he

4  felt or he observed any kind of wobble in the racking

5  system before this incident happened, would it have been

6  best practice for Mr. Ramos to notify you or the other

7  crew that this movement was observed in the rack?

8      A.   Yes.

9      Q.   Prior to your deposition today, have you met

10  any of the other attorneys involved in this case?

11      A.   Nope, I have never met anybody.

12      Q.   Okay.

13          And I said "other attorneys", but we have not

14  met, correct?

15      A.   No.

16          MS. KRAMAR:  I believe that's all the

17  questions I have at this time, thank you.

18          MR. MEYER:  Brief redirect.

19                         EXAMINATION

20  BY MR. MEYER:

21      Q.   Mr. Thomas, at the time that you received the

22  condition from Iron Mountain not to tear down the

23  staircase first, is it fair to say to you that you did

24  not know that that condition would make this demolition

25  or dismantling unsafe, right?

1       A.   Yes.

2            MS. KRAMAR:  Object to form.

3   BY MR. MEYER:

4       Q.   It wasn't obvious to you that that was a

5   condition that would make this unsafe?

6       A.   Yes, absolutely.  If it was obvious, I would

7   have been -- said something.  We would have had a longer

8   discussion.

9       Q.   Because the ways that the columns were mounted

10  was not apparent until you actually got in there and

11  ripped it down?

12      A.   Yes.

13      Q.   Now you were asked to make an assumption about

14  a hypothetical Mr. Ramos had heard or said something

15  earlier by opposing counsel.

16           Now you were with Mr. Ramos all morning when

17  the fall happened, right?

18      A.   Right in the building, yes.

19           MS. KRAMAR:  Object to form.

20  BY MR. MEYER:

21      Q.   Now did you hear or see anything like what you

22  were asked to assume?

23      A.   No.

24           MR. MEYER:  Okay.  No other questions.

25           Mr. Thomas, thank you for your time.  You are

1    free to go.

2              MS. KRAMAR:   Thank you.

3              MR. BUTKO:   This ends the deposition on

4    May 9th, 2022.   We are off the record at 11:08 a.m.

5              Media will be held by Aptus Court Reporting.

6              (Proceedings concluded at 11:08 a.m.)

7                        ---o0o---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE of REPORTER

 2         I, the undersigned, a Certified Shorthand

 3    Reporter of the State of California, do hereby certify:

 4            That the foregoing proceedings were taken before

 5    me via videoconference at the time and herein set forth;

 6    that any witness in the foregoing proceedings, prior to

 7    testifying, were duly sworn; that a record of the

 8    proceedings was made by me using machine shorthand,

 9    which was thereafter transcribed under my direction;

10    that the foregoing transcript is a true record of the

11    testimony given.

12            Further, that if the foregoing pertains to the

13    original transcript of a deposition in a federal case,

14    before completion of the proceedings, review of the

15    transcript [ X ] was [  ] was not requested.

16

17            I further certify I am neither financially

18    interested in the action nor a relative or employee of any

19    attorney or party to this action.

20            IN WITNESS WHEREOF, I have this date subscribed

21    my name.

22    Dated:  May 9th, 2022

23                               _____

24                                    Tamra Elaine Keen

25                               RPR, CLR, CCRR, CSR No. 5404
```

```
1              DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Ramos vs. Iron Mountain Secure Shredding, Inc.

3    Date of Deposition: 05/09/2022

4    Job No.: 10100409

5

6              I, GLEN A. THOMAS, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9              Executed this _____ day of

10   _____, 2022, at _____.

11

12

13              _____

14                   GLEN A. THOMAS

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,   proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25
```

**Glen A. Thomas**

```
1    DEPOSITION ERRATA SHEET

2    Case Name: Ramos vs. Iron Mountain Secure Shredding, Inc.
     Name of Witness: Glen A. Thomas
3    Date of Deposition: 05/09/2022
     Job No.: 10100409
4    Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
5                   3. To correct transcription errors.

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____
```

**Page 55**

```
 1    DEPOSITION ERRATA SHEET

 2    Page _____ Line _____ Reason _____

 3    From _____ to _____

 4    Page _____ Line _____ Reason _____

 5    From _____ to _____

 6    Page _____ Line _____ Reason _____

 7    From _____ to _____

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    _____ Subject to the above changes, I certify that the
              transcript is true and correct

23    _____ No changes have been made. I certify that the
              transcript  is true and correct.

24

25              _____
                      GLEN A. THOMAS
```

**-**

---o0o--- 6:2 52:7

**1**

**1** 10:19,22 11:23
12:24 15:6 27:3
29:23 36:19,22
43:11

**10:10** 6:4

**11** 25:25

**11:08** 52:4,6

**14** 25:23

**15** 27:17

**15th** 29:6

**16** 42:10

**18** 14:17

**2**

**2** 15:13 18:10 19:13
20:1,2,21 26:15
36:18

**2.5** 15:13,19

**2018** 9:3,7,25 25:23

**2022** 6:1,4 52:4

**2:10** 12:2

**2:19-CV-11202** 6:12

**3**

**3** 11:7 20:8,10,16
29:23

**32** 42:19

**33** 41:14

**358** 36:13

**4**

**4** 11:8,22 12:15 13:16
25:22 36:10,11,16,
25 37:3

**5**

**5** 41:18,19,21 46:5
47:2

**5/14/18** 14:16

**5/30** 14:17

**6**

**6** 42:10,11,13

**6/14/18** 25:20

**6/15/18** 27:5

**6/19** 36:18

**6/19/2018** 12:2

**6/4** 25:20

**600** 6:6

**7**

**7** 42:17,18 43:2

**770** 6:13

**8**

**8** 26:13 43:11

**9**

**911** 31:24

**9:50** 27:5,17

**9th** 6:1,4 52:4

**A**

**a.m.** 6:4 27:5 52:4,6

**ability** 8:6 49:21

**able** 39:1 47:19 48:23

**absence** 33:4

**absolutely** 7:25 13:5,
13 35:16 41:6 44:3
45:8 50:1 51:6

**accident** 15:18 27:5

**accommodate** 22:9
49:11

**accompanied** 16:14
17:17

**accompany** 17:4,11

**accurate** 33:2,9

**accurately** 25:1,21
41:21 42:13 43:2

**actual** 31:16

**ADDECO** 24:5

**address** 7:22

**adjusting** 33:10

**advance** 32:25 47:4,
12

**aftermath** 41:23

**ago** 11:3 40:12

**aisle** 34:20

**aisles** 16:16

**alert** 49:22

**allow** 24:24 35:20

**allowed** 22:14

**anchored** 38:19,21

**angle** 30:2,5,19,23

38:3,5 42:24 43:3

**angled** 42:20

**annoyance** 8:16

**annoying** 8:12

**answer** 17:20

**answering** 8:21

**answers** 7:16

**Antonio** 27:7

**anybody** 17:22 27:14
50:11

**anymore** 8:18 26:20
44:6

**anyway** 24:10

**anyways** 23:4

**apparent** 51:10

**appear** 7:19 8:11 43:6

**appearing** 7:18

**appears** 11:8 19:22
24:13

**appreciate** 48:4

**approach** 35:15

**approximately** 25:25
28:5 36:22

**Aptus** 6:5,6 52:5

**area** 41:13

**arrived** 14:16,24
32:11

**arriving** 49:7

**asked** 46:22 49:13
51:13,22

**asking** 35:4

**assess** 16:3

**assessing** 15:23

**assessment** 16:13
17:5,12,18,25 33:22,

Glen A. Thomas

25 48:8,16

**assigned** 14:15

**assume** 23:24 40:4 51:22

**assumed** 21:25 50:3

**assumption** 51:13

**attached** 35:8

**attaching** 35:10

**attorney** 6:17

**attorneys** 50:10,13

**authority** 21:24 45:1

---

**B**

**back** 9:16 16:10 18:25 19:2,17,21 20:5,13 21:2 22:24 23:5,6,22 24:15 26:18 28:24,25 31:14 32:13 33:5,13 40:11 45:13 46:1,5,6 47:2,4

**bar** 27:6,8

**basically** 8:14 22:14 40:23

**bay** 24:25

**bays** 24:23 25:17,19 26:4,5,6,7,9,14,23 37:10,11,13 48:25 49:2

**beam** 28:15 34:23

**beams** 28:14 32:13 33:4 34:9,16,18,22 35:1,8,12 36:3

**beginning** 24:4

**behalf** 7:1

**belief** 13:20

**believe** 8:6 10:2,17 12:19,21,23 14:17 18:25 20:6 23:7 26:1,7 27:18,25 28:3,25 29:9 30:24 50:16

**best** 13:4,19 16:1,12 24:18 27:11,13 28:18 50:6

**better** 13:14

**beyond** 22:1

**big** 34:21

**bit** 24:21

**blame** 44:21

**blank** 13:18 23:14 30:1

**block** 31:4 34:8

**blocking** 18:4 32:10

**Blois** 6:21

**body** 11:16

**boss** 32:11

**bottom** 11:7,22,25 12:8 13:16 15:6 36:14,17 42:20,22 47:14

**braced** 47:13 48:13, 14

**bracing** 48:17,19,23 49:4

**break** 45:25

**breaking** 45:12

**Brian** 32:11,15,19

**Brief** 50:18

**bring** 29:25

**Broadway** 6:7

**brought** 15:4

**build** 40:10

**building** 16:21 24:24 37:9 39:14 51:18

**Butko** 6:3,5 7:3 52:3

---

**C**

**California** 6:7,14

**call** 39:25 45:17

**called** 20:21 31:24

**careless** 44:17

**cart** 34:19,20

**carts** 34:10,16

**case** 6:12 34:1 50:10

**catwalk** 24:16 26:8, 10,11 36:4 37:14,16 46:23

**caused** 28:17

**certain** 48:23

**change** 22:12 35:15

**charge** 40:23

**choose** 7:24

**chose** 46:12

**claim** 43:19 44:1

**clear** 20:20

**clears** 19:6

**column** 47:3

**columns** 28:1 32:13 33:5 34:9,15 35:1,8, 13 36:3 37:25 38:12, 19,21 46:15 47:13 51:9

**come** 16:9 20:23 28:17 31:6,8,14

**communicate** 39:14

**communicated** 21:6, 11

**company** 12:12 24:4 43:20 44:2 45:4

**compensated** 9:18

**Compensation** 43:19 44:1

**comport** 14:5

**comprehensive** 40:14

**computer** 48:4

**concluded** 52:6

**condition** 21:5 22:8, 9,12 25:14 45:24 47:7 49:12,16 50:22, 24 51:5

**conditions** 49:8

**conducting** 16:13 17:11,18

**connected** 36:3 38:18 39:11

**consisted** 24:22

**consistent** 34:12

**consisting** 13:18

**contact** 16:25

**contacts** 40:7

**context** 30:18

**continued** 26:10

**Continuing** 24:13

**contract** 14:16

**contracted** 15:7

**conversation** 45:20 46:11,19

**conversations** 40:6

**copy** 32:12,13,20

---

Index: assigned–copy

corner 25:19

correct 7:19 13:18,
19,22 14:7 27:10
48:1 49:13 50:14

correctly 9:19

counsel 6:15 51:15

couple 37:2 41:12

court 6:5,6,11 7:3,12
52:5

cover 32:9

crashing 34:10,16

crew 27:6 44:21 50:7

cross 36:3

Cruz 27:7

custodian 39:14

customer 22:8 49:7,
15

customer's 49:12

**D**

dad 9:24

damage 34:24

dangerous 23:9 26:2
27:19 30:25

Daniel 6:19

date 12:15

dated 12:2

dates 14:22

day 15:22 29:6,16,18
43:16

days 13:10 26:1

deals 40:1

debolting 27:8

decides 34:20

deconstruction 23:9

definitely 13:13 31:23
39:9,10 44:19

demolition 35:15
46:12 50:24

depicted 20:21 26:15
27:16

depicts 20:16

deposition 6:8,13
48:5 50:9 52:3

description 27:1 46:7

desire 8:5

determine 16:3,5,8

determined 34:3

determining 39:7

diagram 36:24

dictated 12:7

Diego 6:7

different 20:9 26:17
41:8 46:22

differently 47:20

disassembled 39:8

disassembling
28:20,22 39:2

discussion 8:9 22:1
31:2 45:11 50:3 51:8

dismantle 15:7

dismantled 25:18

dismantling 23:9
32:25 48:22 50:25

District 6:11

document 10:24
11:16 12:14

doing 15:14 16:22
23:7 31:3 32:24
36:24 45:7

door 17:2

doors 17:1

dot 24:23 25:19

drawing 36:13,21,24
37:1 38:5

Drawn 36:18

drywall 31:16 34:10,
17,19,21,22,24
38:12,13

duly 7:6

**E**

earlier 13:6 44:5,23
48:7 51:15

early 9:7,25

earned 45:6

effect 8:6 33:5

effected 24:10 25:13
27:22

effectively 38:12

either 16:17 26:14

else's 11:18,19

employee 21:20
49:18,20

employees 14:18,21,
23 30:3,4,13 31:3

encourage 44:4

ends 52:3

entire 10:25 36:4

et al 6:10

evaluated 34:13

events 40:12

everybody 15:5

exact 14:22 23:3
36:23

exactly 10:7 49:17

EXAMINATION 7:7
48:1 50:19

exhibit 10:19,22 11:8,
23 12:24 15:6 19:25
20:2,8,10,16,21
26:13,15 27:3 29:23
36:10,11,16,19,22,
25 37:3 41:18,19,21
42:10,11,13,17,18
43:2,11 46:5 47:2

expected 39:13,21

experience 15:14
49:20

explain 23:1 49:15

extra 26:9 37:11
48:25 49:2

**F**

facility 25:3 26:17
40:18

fact 13:21 14:20
35:14

facts 13:19

fair 7:23 13:9 14:4
46:7 50:23

fairly 40:14 42:13
43:2

fairness 35:4

fall 13:10 26:23 28:9
35:23 40:13,19 41:3,
8 43:14 51:17

falling 41:23

family 9:21

far 42:2 47:1

fastened 28:1

father-in-law 9:23

32:17

**father-in-law's** 43:19
44:2

**feel** 9:18 44:14 45:6

**feet** 32:3

**fell** 10:10 37:24 38:3
41:2 42:14 43:4,7
46:16

**felt** 49:3,20 50:4

**figure** 16:12 33:10

**figured** 23:21

**file** 43:11

**files** 16:22

**Filing** 44:1

**find** 44:17 48:19

**fine** 25:15

**finishing** 46:15

**first** 10:25 11:4 14:24
15:22 16:9 19:5
20:23 24:3,16,19,23
25:17 27:6,10 32:15
34:11 46:20 50:23

**floor** 29:25 32:3
37:15

**flooring** 27:7

**follow-up** 48:6

**followed** 44:15

**follows** 7:6

**foreman** 9:10 15:3
40:22 49:19

**fork** 29:24,25

**forklift** 42:14 43:3

**forks** 29:24

**form** 10:13 17:6
20:24 21:8 29:8
38:15 39:16 41:10

43:9 45:16,18 46:17
47:10,16 51:2,19

**forth** 16:11 23:5
31:14

**found** 49:12

**four** 11:3 13:7,10
32:3

**four-page** 10:24

**fourth** 23:12

**frame** 30:3 36:4 37:10
38:4,7

**free** 52:1

**fresher** 13:11

**front** 18:5,25 19:1,3,
17,21 20:5,6,21
22:22,24 24:11,14
25:14 28:23 29:1,3
33:19 37:8 41:15
42:3 45:12,25 46:6
47:1

**full** 15:22

**fully** 23:24 24:16
25:10 29:10

**further** 26:10

---

**G**

**gained** 45:4

**Gatto** 6:23,24

**general** 22:7

**Generally** 33:22

**get along** 44:9

**given** 30:17

**gives** 22:8

**giving** 10:16 12:6,20
21:22 36:21

**Glen** 6:8 7:5,11 36:18

**go** 11:7 14:10 16:10
19:1,8 23:5,25 29:22
34:20 40:9 52:1

**going** 8:6 10:18 11:22
14:10,13 19:19,20
21:2 22:17 23:3
24:14 27:11 33:11
36:8 40:11,15 41:3,
12 45:9

**good** 6:3,18,23 7:9
13:8 40:15

**gouge** 34:21

**grant** 13:7

**grates** 35:10

**grating** 27:6,8 29:24
37:15 38:17,22

**ground** 38:19,21

**GT** 11:9

**guess** 8:12 12:7 16:1
28:15 38:6

**guys** 44:8

---

**H**

**half** 10:6

**handed** 8:14

**handwriting** 11:13,18
12:3,4 14:12 18:20

**handwritten** 13:18

**happened** 12:10,25
24:1 25:22 27:5
28:6,9 31:10,21
40:19 41:5 50:5
51:17

**hard** 44:12,13

**hear** 17:20 51:21

**heard** 31:4 51:14

**hearing** 31:12

**held** 52:5

**helpful** 46:4

**Hey** 40:7

**hired** 24:4,5

**hires** 39:25

**hold** 8:16 43:18

**hole** 34:21

**hurt** 44:4

**hypothetical** 51:14

---

**I**

**idea** 23:21 35:2

**identification** 10:22
20:2,10 36:11 41:19
42:11,18

**identify** 6:15 7:10

**IM** 36:13 41:14 42:10,
19

**immediate** 41:22

**immediately** 31:22

**important** 33:2,3
38:11

**incident** 9:2 10:10,15
27:2,10 50:5

**included** 36:9

**indication** 41:1,4

**information** 7:2 11:5
47:18

**initials** 11:10

**injured** 10:10 30:3,8,
11,22 31:23

**injury** 29:7,16,18 44:2

inside 38:6

installer 15:3

instructed 27:6

instruction 21:5,23 22:3 23:16 46:10

instructions 44:15

insufficiently 28:1

insurance 12:12

intact 24:16

Interviewee 11:23 14:1

introduce 43:11

investigator 12:7,20, 24 13:4 36:25

invite 10:25

involved 17:24 24:8 25:5 50:10

involvement 43:15

iron 6:9 7:1 15:1 16:14,22 17:10,17 18:10 19:23 21:3,18, 20,24 23:19 25:2 29:4,15,19 30:2,5, 20,24 32:22 34:13 38:3,6 39:21,25 40:4,18 41:22 42:24 43:3 50:22

irritated 8:13

issue 7:22

**J**

Jason 6:4

job 9:9 15:1,2,5,23 16:6 22:13,19,23 23:8 24:3,4 32:25 33:5 34:13 40:3,8,23 47:19 48:8,17 49:5,

9,14,22

jobs 15:4 44:24

join 50:3

joining 48:4

Jon 30:10 31:22

Jonathan 6:9,19,22, 25 8:17,18 9:25 10:3

jump 32:2

jumped 32:5,7

June 9:7,25 25:22,23 27:17

**K**

Keen 6:6

keep 18:25 23:22,23 35:25

kept 22:17

kind 21:25 26:19 28:18 50:4

knew 41:7 44:8

know 8:18,23 10:3,4 11:4 12:9 16:10 18:16,17 19:6 22:18 25:12 31:11 32:19, 21,22,23 38:11 39:3, 7,9 44:5 47:12 50:24

knowledge 13:20 16:1 27:11,13 28:18 39:10

known 47:18

Kramar 7:1 10:13 17:6,19 20:24 21:8 29:8 38:15 39:16 41:10 43:9,12 45:16, 18 46:17 47:10,16 48:2,3 50:16 51:2,19 52:2

**L**

labeled 36:13 41:14

laborers 24:5

lady 21:12,15 23:22

language 21:3

late 9:6,25

leave 29:21

leaving 29:11

left 22:23 23:8 24:14 26:9 32:2 37:12 45:17 46:14,22 48:25

legal 7:15

length 36:4

Let's 9:6 11:7 21:3 23:25 27:1 29:22 32:9

level 24:15 27:7

lift 24:25 27:9 29:24 30:5 31:5,7 32:5,7 38:3 41:23 42:14 43:4,7

lifts 28:13 30:2,19

line 19:5 23:12

lines 18:3

listened 44:14

little 16:25 18:20 26:19 28:17

LLC 7:2

located 6:6

location 22:18

long 10:4,5,7 15:16 37:19,21,24

longer 51:7

look 10:21 33:14 48:17

looked 39:11

looking 14:4 32:1 34:7 37:4,5,7,9,18, 19,21 42:3 46:5

looks 11:14,19 12:4 18:8,17 43:1

lot 11:2

Lou 6:21

Louisiana 6:12 9:2,16 10:11 15:2 25:3 34:13

**M**

ma'am 22:4

Maclean 32:12,15,19

making 17:11

Management 7:2

manager 17:4,6,10 21:25

map 24:25

marked 10:22 20:2,10 36:10,11 41:19 42:11,18

marking 10:19 19:25 36:16 41:17 42:10

material 22:16 28:10

matter 6:9

mattered 19:17 20:17

mean 11:2 14:21 26:6 30:8 34:15 38:16 43:25 44:20 46:18, 19

meant 35:5

Media 52:5

meet 49:13

members 9:21

memory 13:7,11,14
15:16 30:17

mentioned 38:2

met 50:9,11,14

metal 31:12,19,21
42:20,21

Meyer 6:18,19 7:8
10:14,18,23 17:8,20,
23 19:25 20:3,7,11
21:1,10 29:13 36:7,
12 38:20 39:18
41:11,17,20 42:9,12,
16,19 43:10,13
45:17,22 46:24
47:11,17,22 50:18,
20 51:3,20,24

Michael 6:24

middle 35:21 47:13

mind 14:11

mine 12:1

minutes 36:19 40:12

month 9:15

months 9:15

morning 6:3,18,23
7:9 27:11 40:16,18
51:16

Mountain 6:10 7:2
15:1 16:14,22 17:10,
17 18:10 21:4,19,20,
24 23:20 25:3 29:4,
15,19 32:22 34:13
39:21,25 40:4,18
41:22 50:22

mounted 38:13,17
51:9

move 22:17

moved 24:3

movement 50:7

moving 15:21 24:21
25:16 28:10,11
33:21 45:25

---

**N**

name 6:4,19 12:15
18:13 21:17 30:14
48:2

necessarily 35:5

necessitate 22:23

need 18:23 21:13
22:2 49:23

needed 17:1 18:9,14
19:1,10,14 22:21
26:12

needs 16:6,8

neighboring 48:13

never 50:11

Nope 8:8,23 50:11

notify 50:6

number 31:2

---

**O**

Object 10:13 17:6
20:24 21:8 29:8
38:15 39:16 41:10
43:9 45:16,18 46:17
47:10,16 51:2,19

objection 17:9,19

objections 43:12

observe 31:5

observed 31:23 50:4,
7

obvious 51:4,6

Obviously 41:7 44:6

occurred 9:2

occurs 26:23

offer 43:10

Okay 7:3 8:1,4,9,19,
25 9:5 11:15,21 12:5
13:15,25 17:3,15,23
18:2 19:9,12,19,25
20:7,15 22:11 23:11,
25 24:21 26:13 27:1
31:20 32:8 33:17
36:1,7,12 37:2,17
38:20 39:5 40:25
41:25 42:9 43:10
45:9,22 46:5 50:12
51:24

Once 25:17

open 17:1,2 18:9 19:6

operations 17:4,10

operator 29:25

opportunity 13:17,22
14:7

opposed 45:13

opposing 51:15

order 16:2

orient 41:25

original 45:23

OSHA 10:16,20 12:8,
12,20,24 13:3,10
36:25

overall 49:4

owner 9:10,11,13,23
12:11 32:16

owners 9:22

---

**P**

p.m. 12:2

page 11:7,22 12:14
13:16 15:6,13 29:23

pages 13:19

paper 12:11 32:12,19
37:18

paragraphs 11:17
28:5

parenthesis 18:10

part 9:10,11,13 19:13
24:2 25:9,10 26:17
32:10 37:14 38:5
48:22

parts 48:24

pattern 16:10

pause 49:23

pending 6:10

people 16:20 17:13
29:4,15,19 30:19

period 18:12 33:24
40:13

periodically 47:3

person 30:11 40:1
44:21

personally 8:16,21

perspective 37:4,18

phase 24:3,8,10,22
25:2,6,12,20

phone 31:24

phonetic 30:15

photo 19:22 26:22

photograph 41:14
42:2 46:3

photographs 41:13

photos 19:20

picked 31:24

picture 42:6 46:14,15

piece 12:11

pieces 42:21

piles 22:20

pipes 25:8

place 22:20 24:11,18 25:14 26:15 27:23 40:13 45:24 48:20

Plaintiff 6:24

planned 22:13

plans 32:25 33:2,4

platform 24:16

please 6:15 7:4,10 10:21

PM 36:18

point 16:17 17:5 25:25 29:11 30:23 44:6,23

pointed 38:6

popping 31:4,12,13

position 45:1 49:18

possibly 49:8

practice 22:7 49:11 50:6

present 40:17,20

presenting 49:8

pretty 34:5

Prior 50:9

probably 9:15 15:19 23:22 30:21

problem 22:5

proceed 23:15,17 49:14

proceedings 52:6

process 8:10

project 19:15 39:15

property 8:13

purposes 35:1

put 22:19 34:6

putting 9:19

—————

Q

qualify 46:25

quality 45:7

question 39:4 40:17 43:24 46:2

questioning 6:16

questions 8:22 11:1 14:14 37:2 47:23 48:6 50:17 51:24

quick 37:3

quickly 36:8

—————

R

Rachal 7:1 48:2

rack 16:11 19:8 31:19,21 32:12,20 33:9 34:8 40:4 41:2, 7 48:9,12,24 50:7

racking 19:23 28:22 33:22,23,25 35:9 37:12,24 40:2 50:4

Rackmasters 9:8,9, 11,14,22 10:1,5 14:15 16:7 43:14,15 45:2 48:22 49:11,14, 20

racks 31:6,8 33:18 45:25

Ramos 6:9,20,22,25 8:17,21 9:2 10:1,4, 10,16 14:24 15:17 17:24 24:8 25:5 27:12 30:7,18 32:4 38:9 43:7,18 44:5,23 50:2,6 51:14,16

Ramos' 13:10 15:1 49:18

ran 15:4 31:22

Randy 18:17

read 10:25 11:4 13:17,22 14:7 40:12

real 37:3

really 11:2,20 12:16 32:6 34:5 35:7,12

reason 23:7 26:1 27:15,18,25 30:24 47:6

reassess 49:24

recall 10:15 12:6,9 13:21,24 14:19 16:2, 4 17:16 18:1,14,22, 24 19:14,16 21:5,15, 17,18 23:18,19 25:7 28:8,13 29:14,17,19, 20 30:4,6,7,11 31:7 32:4 34:3 35:7,12 36:5,21,23,24 37:1 41:1 45:12,19 46:9

received 50:21

recitation 23:25 28:6

recognize 41:13

recollection 24:18 25:22 34:12 40:15

recommendation 45:23

record 6:4 52:4

redacted 30:1 32:2

redaction 23:14

redactions 14:13

redirect 47:24 50:18

refer 42:3

referred 20:12

referring 20:4

reflect 25:1,21

refresh 15:16 30:17

remain 18:11 21:4 24:11 25:14 45:24 47:8

remainder 11:16

remained 26:14

remaining 27:23

remember 10:6,9 11:2 12:10,13,14,16 14:22 17:21 19:3,10 21:9,12 23:16,24 25:7,9,10,11 29:10 30:14 31:12 32:6 34:14 35:8 44:20

remembered 16:15 28:19

removal 30:23 38:3

remove 27:6 30:2 48:23

removed 25:18 26:4, 24 38:8 42:25

removing 24:23 30:5, 19

rented 24:24

repeat 12:21

reporter 6:5 7:3,12

Reporters 6:6

**Reporting** 6:5 52:5

**represent** 6:16,19,22 24:17 41:21 42:13 43:2

**representing** 6:24

**request** 49:12

**requirement** 24:11 25:13

**reserve** 47:23

**responsibility** 7:15

**rest** 32:9 37:12

**retaining** 22:22

**Ricky** 18:19

**right** 7:21,22,23 8:15, 19 9:3 10:8 12:2,18 13:2,6,11 18:7,18 19:22 20:18 21:2,21 22:9,23 23:8 24:14 25:4 27:21 28:4 29:5,22 30:16 31:25 32:11 33:12,15 34:7, 18 36:1 37:8 38:25 40:23 41:11,17 42:4, 16 44:3,11,24 45:6, 14,17 46:14,16 47:24 50:25 51:17, 18

**Riley** 18:8,13,17

**ripped** 51:11

**risk** 41:2

**risk-taker** 44:18,22

**role** 15:10

**rolled** 8:13

**room** 28:11 37:19,20, 22 41:22 42:1 45:12, 14 46:4,6 47:1,4

**row** 25:18

**run** 31:5 34:19,22 44:24

---

## S

**Sacramento** 6:14

**safe** 49:5

**salesperson** 40:1,5,7

**San** 6:7

**saw** 32:2

**saying** 19:10 21:13 23:22 27:4

**says** 11:23 13:17 14:15 15:22 18:8 19:13 23:14 24:14, 22 25:17 29:24 32:2 34:8 36:17 37:10,15, 23 38:5

**scissor** 24:24 27:9 28:13 30:2,5,19 31:5,7 38:3 41:23 42:14 43:4,7

**scratched** 24:2

**screen** 7:14 18:5 41:15 42:20

**scribble** 11:9

**second** 24:15 25:2 27:7 30:11

**section** 11:23 16:8 18:4 22:15,21 23:5 32:1 34:8 35:19,20 38:8 40:11 42:19

**sections** 47:3

**Secure** 6:10

**see** 15:8 18:4 19:22 32:10 36:13 41:14 42:6,21 48:3 51:21

**seeing** 31:7 37:9

**seen** 39:11

**self-supporting** 34:9, 11 35:14,24 48:9,12

**sell** 22:18

**sense** 46:4

**sentence** 15:7 24:14 25:1 35:5 36:2

**series** 14:13

**served** 8:10

**server** 8:10

**shelves** 24:3

**shelving** 15:7 39:2,7

**short** 37:20

**shortly** 40:13 43:13

**show** 10:18 19:19 33:19 36:8 41:12 46:3

**showing** 20:8 26:13 42:16

**Shredding** 6:10

**side** 16:21,24 21:13, 15 24:23 28:12 35:9, 11,22 37:7,19,20,21 45:13,14 46:14,16

**sideways** 37:19

**signature** 11:11,12, 24,25 12:17

**signed** 12:8,19,24 14:1,3 27:4 36:19

**signing** 12:14 14:8

**simply** 22:1

**single** 44:21

**sir** 21:2 39:19

**sit** 10:9 17:16 31:8

**site** 14:16 25:22 27:14 49:7

**six** 18:3

**skip** 11:1

**slash** 9:10

**slide** 34:22

**slowly** 16:10 19:7

**somebody** 10:16 11:18,19 17:17 18:14 21:18,23 23:19 27:3

**sorry** 12:21 17:8 23:12 24:5 28:21 33:23 42:14 43:3 46:2

**sound** 31:4

**sounds** 25:4 30:16

**south** 25:19

**space** 19:6,7 22:20

**specific** 46:10

**specifically** 17:16 19:14 49:19

**specify** 32:13 33:13

**spent** 15:22

**sprinkler** 25:8

**sprinklers** 25:11

**square** 24:25

**staircase** 19:23 20:4, 9,12,16,20,22 21:13 22:22 23:2 24:11 25:14 27:23 28:20 29:15,19 42:3,7 45:10,13,14,15,24 50:23

**staircases** 19:20 28:23 29:12

**stairs** 18:10 19:2 21:4 22:2 47:7

**stairwell** 18:24 32:14

33:5,14,19 37:8
46:20

**stairwells** 18:9,15,23
19:13,15

**standard** 34:5

**standing** 24:15 27:9
37:8

**start** 19:15 48:23

**started** 25:20 28:16
31:14 39:12 47:1
48:17

**starting** 6:16 15:13
18:3 23:12,13 24:2
25:19 29:23

**state** 31:3

**statement** 10:16,20
12:6,19,23 13:3,9,
16,18,23 14:2,5,7,
10,19 15:25 21:2
23:17 24:6,17,22
25:17,21 27:4,10,17
29:22,23 30:18 32:1,
9 33:18,21 34:7,25
36:2,9,17,22 40:11

**States** 6:11

**stay** 21:14 22:2

**stayed** 20:17

**stepladder** 26:19

**stop** 9:13 34:10,16

**stopped** 43:14

**store** 22:15

**stored** 22:17

**straight** 37:5

**Street** 6:13

**strike** 27:15

**structural** 35:1,3

**struggling** 28:15

**strut** 27:8 30:3 36:3
38:4

**subpoena** 8:11,14

**subpoenaed** 7:19

**sufficient** 49:4

**suggesting** 34:25

**summer** 9:3

**supervisor** 49:22

**support** 26:10 27:8
30:3 31:18 38:4 49:1

**supported** 26:9 33:23
34:1 35:20

**supporting** 35:25
48:15

**sure** 11:14 48:3

**surprise** 41:5

**swear** 7:4

**swore** 7:13

**sworn** 7:6

**system** 19:23 28:23
31:18 32:12,20 33:9,
23 34:1,4,8,9,12
35:9,15 37:13,24
39:2,7 48:13,20,24
49:4 50:5

**systems** 40:2

T

**take** 25:8 35:19,21
40:9

**taken** 6:13 26:20,22

**takes** 22:20

**talk** 21:3 27:1

**talked** 40:5 49:7

**talking** 7:14 16:16

17:13 19:21 26:5
31:15 45:20

**Tamra** 6:6

**tear** 18:9,15,23 19:4,
14 22:19 23:3,4
35:25 40:9 50:22

**tearing** 22:16 39:12
40:2 45:10,21 47:3

**television** 7:14

**tell** 7:13,16 8:6 13:4
39:2,22

**telling** 22:2

**temp** 30:13

**temporary** 24:5

**ten** 36:18

**testified** 7:6

**testify** 16:18

**testifying** 6:9 9:1

**thank** 47:22 50:17
51:25 52:2

**thing** 10:25 19:5

**think** 16:15 24:15
25:9 30:14 43:22

**Thomas** 6:8,18 7:5,9,
11,12 18:22 36:18
41:12 43:13 47:22
48:2 50:21 51:25

**thought** 12:10 32:6
44:13

**three** 14:17,21 16:20
17:13 32:3

**time** 12:15 13:11
15:17 19:11 26:22
27:14,16,22 28:2
29:11 36:22,23 38:3
40:13,14,21,23
43:10 44:6,8 45:7,9,
21 46:18 47:23 49:3

50:17,21 51:25

**times** 44:19

**today** 7:16,18 8:2
10:9 17:17 31:8 48:4
50:2,9

**told** 13:6 18:8,14
29:20 37:11 44:5
46:9

**top** 7:22 14:15 26:11
37:14 38:17,22
47:14

**tore** 37:13

**torn** 46:20

**transcribed** 12:7

**tricky** 18:20

**truck** 29:24

**true** 13:19,22 14:2,20
15:10,25 21:1 24:6
27:10 29:6 34:12
36:5

**trust** 45:4

**truth** 7:13,16 8:7 13:4

**try** 49:11

**trying** 33:10

**two** 9:15 10:6 16:19
17:13 19:14,20
24:23 25:17,19 26:5,
6,7,9,14,23 28:5
30:3,4,8,22 37:10,
11,13 42:21 48:25
49:1

**Ty** 30:14

**typical** 32:24 48:12
49:10

**typically** 16:5 19:4
22:10 39:23,25
44:19,22

**Glen A. Thomas**

**Tyreece** 30:15,18
  31:22 32:5 38:9 43:7

**Tyri** 30:15

**U**

**Um** 18:24 28:10 35:7

**Um-hmm** 15:9 36:20

**understand** 7:12,15
  9:1 10:3,19 14:12
  21:23 22:8 39:3
  43:13,24 46:2,13
  50:2

**understanding** 14:5
  48:7

**understood** 9:20 48:9

**unfair** 43:22

**unfortunately** 18:19
  33:8

**United** 6:11

**unsafe** 49:13,15,21
  50:25 51:5

**upright** 31:13

**upset** 8:2,3,20,23

**use** 19:2 22:15 24:24
  26:11 28:23,25
  29:12

**V**

**vaguely** 44:20

**Van** 6:21

**verbal** 23:17

**verbally** 23:14

**verify** 16:9

**versus** 6:9

**video** 6:3

**W**

**walking** 16:16 17:22

**wall** 26:9 28:1,14,16,
  17 31:13,15,19
  34:23 35:10,11 37:5,
  23,24 38:18 46:16
  48:13,15

**want** 10:25 11:4 19:2
  40:8

**wanted** 17:2 18:10,25
  21:4 22:16 39:6,9

**warehouse** 16:20
  22:15,21 28:12
  41:22

**wasn't** 28:11 51:4

**watching** 28:19

**waving** 31:13

**way** 11:6 16:12 20:22
  22:12 23:2,3,4,6
  25:12,20 27:23
  29:14 33:5 34:6
  35:15,18 38:16
  46:11,12,21,22 47:2,
  6

**ways** 51:9

**We'll** 22:5

**week** 8:11 24:16,19
  32:11

**well-taken** 17:8

**went** 14:23 29:10
  31:11

**West** 6:6

**wife's** 9:24

**witness** 7:4 17:21
  20:25 21:9 29:9
  38:16 39:17 41:16
  45:19 46:18

**wobble** 28:16 50:4

**wobbling** 28:16

**wobbly** 34:20

**woman** 21:22

**wood** 24:3

**work** 9:19 19:7 22:5
  23:13 24:17 25:2
  26:1 27:18,22 30:24
  32:24 33:8 35:18
  38:2,14 44:4 45:7
  48:17

**worked** 10:5,7 15:19
  19:11 47:2 49:19

**worker** 44:12,13

**workers** 24:5

**Workers'** 43:19 44:1

**working** 9:7 10:1,2
  15:17 16:6,10,20,23
  21:12 23:23 25:5
  35:18 43:14 49:3

**wouldn't** 19:17 26:19
  39:21

**write** 11:20 27:3

**writes** 27:3

**writing** 11:17 15:22

**wrote** 10:17 11:3
  12:10

**Y**

**yeah** 7:11 11:14
  12:25 13:1 14:9,21
  16:1,15 18:6,21
  19:10 20:6 24:20
  25:4,24 30:9,10,16,
  21 34:14 36:15
  38:16 39:9 44:16
  45:8 46:18,19 47:15

**year** 10:6

**years** 10:6 11:3 13:7
  15:13,19

**yelled** 31:5

**yellow** 20:12 33:14
  42:6,21