

# MASTER SALE OF GOODS AGREEMENT

Between

## IRON MOUNTAIN INFORMATION MANAGEMENT LLC

And

## HAMMERHEAD, LLC

EXHIBIT

I

# TABLE OF CONTENTS

**ARTICLE I** ................................................................................................................6

**ARTICLE II AGREEMENT TO PURCHASE AND SELL GOODS** ........................10

Section 2.01 Purchase and Sale ...................................................................................**10**

Section 2.02 No Minimum Quantities ..........................................................................**10**

**ARTICLE III ORDER OF PRECEDENCE** ...........................................................**10**

**ARTICLE IV NON-BINDING FORECASTS** .........................................................**10**

Section 4.01 Provision of Forecasts..............................................................................**10**

Section 4.02 Forecasts Are Non-binding.......................................................................**10**

**ARTICLE V ORDER PROCEDURE**.......................................................................**10**

Section 5.01 Purchase Orders .......................................................................................**10**

Section 5.02 Acceptance and Rejection of Purchase Orders..........................................**11**

Section 5.03 Buyer's Right to Terminate Individual Transactions. ...............................**11**

Section 5.04 Seller's Right to Terminate Individual Transactions.................................**11**

Section 5.05 Effect of Termination of Individual Transactions......................................**11**

Section 5.06 Buyer's Right to Request Amendments to Purchase Orders. .....................**11**

**ARTICLE VI SHIPMENT AND DELIVERY** .........................................................**11**

Section 6.01 Shipment and Delivery Requirements ......................................................**11**

Section 6.02 Packaging and Labeling............................................................................**12**

Section 6.03 Acceptance of Goods................................................................................**12**

Section 6.04 Latent Defects...........................................................................................**12**

**ARTICLE VII TITLE AND RISK OF LOSS** .........................................................**13**

Section 7.01 Title and Risk of Loss..............................................................................**13**

**ARTICLE VIII PRICE AND PAYMENT** ...............................................................**13**

Section 8.01 Price..........................................................................................................**13**

Section 8.02 Most Favored Customer............................................................................**13**

Section 8.03 Invoices.....................................................................................................**13**

Section 8.04 Invoice Disputes. ......................................................................................**14**

Section 8.05 Payment Terms.................................................................................................14

Section 8.06 Setoff Permitted...............................................................................................14

**ARTICLE IX INTELLECTUAL PROPERTY RIGHTS** ...........................................**14**

**ARTICLE X TERM; TERMINATION**..........................................................................**14**

Section 10.01 Initial Term.....................................................................................................14

Section 10.02 Buyer's Right to Terminate the Agreement....................................................14

Section 10.03 Seller's Right to Terminate for Cause ...........................................................15

Section 10.04 Effect of Expiration or Termination. .............................................................16

**ARTICLE XI CONFIDENTIALITY**..............................................................................**16**

Section 11.01 Scope of Confidential Information.................................................................16

Section 11.02 Protection of Confidential Information ..........................................................17

**ARTICLE XII CERTAIN OBLIGATIONS OF SELLER** ..........................................**17**

Section 12.01 General Compliance With Laws Covenant.....................................................17

Section 12.02 Covenant to Provide Import- and Export-related Information........................18

Section 12.03 Materials Disclosure.......................................................................................18

**Section 12.04 Protection Against Supply Interruptions.** ....................................................**18**

**Section 12.05 Duty to Advice**:..............................................................................................**18**

**ARTICLE XIII REPRESENTATIONS AND WARRANTIES** ..................................**18**

Section 13.01 Seller's Representations and Warranties ........................................................18

Section 13.02 Buyer's Representations and Warranties:.......................................................19

**ARTICLE XIV PRODUCT WARRANTIES**.................................................................**20**

Section 14.01 Product Warranties .........................................................................................20

Section 14.02 Remedies for Breach of Warranties ...............................................................20

**ARTICLE XV INDEMNIFICATION** .............................................................................**21**

Section 15.01 Seller Indemnification.....................................................................................21

Section 15.02 Exceptions and Limitations on Indemnification .............................................21

Section 15.03 Seller Intellectual Property Indemnification ..................................................21

Section 15.04 Exceptions to Seller's Intellectual Property Indemnification ........................22

**ARTICLE XVI LIMITATION OF LIABILITY** ...........................................................**22**

Section 16.01 No Liability for Consequential or Indirect Damages..............................................22

**ARTICLE XVII INSURANCE OBLIGATIONS** ...............................................................**23**

Section 17.01 Insurance...................................................................................................................**23**

**ARTICLE XVIII MISCELLANEOUS**.................................................................................**23**

Section 18.01 Further Assurances. ................................................................................................**23**

Section 18.02 Entire Agreement.....................................................................................................**24**

Section 18.03 Survival....................................................................................................................**24**

Section 18.04 Notices......................................................................................................................**24**

Section 18.05 Interpretation...........................................................................................................**24**

Section 18.06 Headings...................................................................................................................**25**

Section 18.07 Severability...............................................................................................................**25**

Section 18.08 Amendment and Modification..................................................................................**25**

Section 18.09 Waiver ......................................................................................................................**25**

Section 18.10 Cumulative Remedies...............................................................................................**25**

Section 18.11 Equitable Remedies..................................................................................................**26**

Section 18.12 Assignment...............................................................................................................**26**

Section 18.13 Successors and Assigns............................................................................................**26**

Section 18.14 No Third-Party Beneficiaries...................................................................................**26**

Section 18.15 Dispute Resolution...................................................................................................**26**

**Section 18.16 Choice of Law**........................................................................................................**26**

Section 18.17 Choice of Forum.......................................................................................................**27**

**Section 18.18 Waiver of Jury Trial**.............................................................................................**27**

**Section 18.19 Counterparts**.........................................................................................................**27**

**Section 18.20 Relationship of Parties**.........................................................................................**27**

**Section 18.21 Anti-Birbery and Anti-Coruption** .............................................. ...............**277**

**Section 18.22 Code of Ethics**........................................................................................................**277**

**Section 18.23 Audit Rights and Requirements**.................................................. ...............**278**

**Section 18.24 Publicity**.................................................................................................................**29**

**ARTICLE XIX FORCE MAJEURE**......................................................................................**29**

**Section 19.01 Force Majeure**........................................................................................................**29**

**ARTICLE XX SAFETY AND SECURITY** .................................................................**30**

Section 20.01 Safety and Security.................................................................................**30**

**ARTICLE XXI DATA PROTECTION**.......................................................................**30**

Section 21.01 Data Protection...................................................................................**30**

**ARTICLE XXII US GOVERNMENT FLOW DOWN CLAUSES** ...........................**31**

Section 22.01 U.S. Government Flow Down Clauses. .................................................**31**

Exhibit A: Summary of Iron Mountain's Background Investigation Requirements for
Third Party Relationships.........................................................................................**33**

Schedule 1: Goods Specifications..............................................................................**35**

Schedule 2: Price Schedule......................................................................................**36**

# MASTER SALE OF GOODS AGREEMENT

This Master Sale of Goods Agreement, (together with the Statement of Work, Purchase Order, Summary of Iron Mountain's Background Investigation Requirements for Third-Party Relationships, Price Schedule, and any other Schedules or Exhibits attached hereto (the "**Agreement**"), is entered into between Iron Mountain Information Management LLC, a Delaware corporation, with its principal place of business at One Federal Street, Boston Massachusetts 02110 ("**Iron Mountain**" or "**Buyer**") and Hammerhead, LLC, a state of California Limited Liability Company, with its principal place of business at 18952 MacArthur Blvd., Suite 460, Irvine, CA 92612 ("**Seller**" or "**Vendor**", and together with Buyer, the "**Parties**", and each, a "**Party**").  This Agreement shall be effective as of February 13, 2017 (the "Effective Date").

## RECITALS

WHEREAS, Buyer is in the business of information management;

WHEREAS, Seller is in the business of selling Rack Remediation and Installation Services; and

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer the Goods (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

Capitalized terms have the meanings set forth or referred to in this **Article I**.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law, in equity or otherwise.

"**Affiliate**" means those entities controlling, controlled by, under common control with, or having a common parent with, either Iron Mountain or Seller.  For purposes of the foregoing definition, "control" (including "controlling", "controlled by" and "under common control with") shall mean ownership of: (a) not less than fifty percent (50%) of the voting stock of a corporation, (b) the right to vote not less than fifty percent (50%) of the voting stock of a corporation, or (c) not less than fifty percent (50%) ownership interest in a partnership or other business entity. Iron Mountain may request, in writing, that Seller provide the Goods to all or certain of its Affiliates.

"**Basic Purchase Order Terms**" means any one or more of the following terms specified by Buyer in a Purchase Order pursuant to **Section 5.01**: (a) the Goods to be purchased, including make/model; (b) the quantity of each of the Goods ordered; (c) the Delivery Date; (d) the unit Price for each of the Goods to be purchased; (e) the billing address; and (f) the Delivery Location; in each case, including all terms and conditions attached to, or incorporated into, such Purchase Order.

"**Claim**" means any Action brought against an Entity entitled to indemnification under **Article XV**.

"**Control**" (and with correlative meanings, the terms "Controlled by" and "under common Control with") means, with respect to any Entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Entity, whether through the ownership of voting securities, by contract, or otherwise.

"**Days**" when used in this Agreement shall mean business days (unless explicitly stated otherwise), which is any day except Saturday, Sunday or any other day on which commercial banks located in the United States are authorized or required by Law to be closed for business.

"**Defective Goods**" means Goods shipped by Seller to Buyer pursuant to this Agreement that do not conform to the warranties in **Section 14.01**.

"**Delivery Date**" means the delivery date for Goods ordered hereunder that is set forth in a Purchase Order.

"**Delivery Location**" means the street address specified in the applicable Purchase Order.

"**EDI**" means the electronic data interchange technology agreed on by the Parties for use under this Agreement.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Entity**" means any individual, partnership, corporation, trust, limited liability entity, unincorporated organization, association, Governmental Authority or any other business organization other than the Parties to this Agreement.

"**Excess Goods**" means Goods that, when counted together with all other Goods having the same make/model number and received by Buyer under the same Purchase Order, are in excess of the quantities of the Goods ordered under that Purchase Order.

"**Forecast**" means a good faith projection or estimate of Buyer's requirements for Goods during each month of the period, which approximates, based on information available at the time to Buyer, the quantity of Goods that Buyer may order for each such month.

"**Goods**" means the specifications for the goods set forth in **Schedule 1**.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award or determination entered by or with any Governmental Authority.

"**Individual Transaction**" means an individual transaction under this Agreement that is governed by the terms and conditions of a Purchase Order that has been accepted by Seller pursuant to **Section 5.02** and that incorporates by reference the terms and conditions of this Agreement.

"**Intellectual Property Rights**" means all industrial and other intellectual property rights comprising or relating to: (i) Patents; (ii) Trademarks; (iii) internet domain names, whether or not Trademarks, registered by any authorized private registrar or Governmental Authority, web addresses, web pages, website and URLs; (iv) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights and copyrightable works, software and firmware, application programming interfaces, architecture, files, records, schematics, data, data files, and databases and other specifications and documentation; (v) Trade Secrets; (vi) semiconductor chips, mask works and the like; and (vii) all industrial and other intellectual property rights, and all rights, interests and protections that are associated with, equivalent or similar to, or required for the exercise of, any of the foregoing, however arising, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights or forms of protection pursuant to the Laws of any jurisdiction throughout in any part of the world.

"**Law**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order or other requirement or rule of law of any Governmental Authority.

"**Nonconforming Goods**" means any goods received by Buyer from Seller that: (i) do not conform to the model number listed in the applicable Purchase Order; (ii) do not fully conform to the Specifications; or (iii) on visual inspection, are deemed Defective by Buyer. Where the context requires, Nonconforming Goods are deemed to be Goods for the purposes of this Agreement.

"**Notice**" when used in this Agreement, and with the correlative meaning "**Notify**", shall mean a written communication from one Party to the other Party.

"**Patents**" means all patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models).

"**Personnel**" of a Party means agents, employees or subcontractors engaged or appointed by such Party.

"**Prices**" means the rates and charges, as specified in the price schedule or Statement of Work attached to this Agreement.

"**Purchase Order**" means Buyer's purchase order issued to Seller hereunder, including the Basic Purchase Order Terms.

"**Representatives**" means a Party's Affiliates, and each of their respective Personnel, officers, directors, partners, shareholders, agents, attorneys, third-party advisors, successors and permitted assigns.

"**Seller Contracts**" means all contracts or agreements to which Seller is a party or to which any of its material assets are bound.

"**Specifications**" means the requirements for the Goods attached hereto in any SOW or Exhibit, or referenced in this Agreement or any Exhibit, and which shall be deemed incorporated into this Agreement by such reference.

"**Taxes**" means any and all sales, use, gross receipts, environmental, ad valorem or excise tax or any other similar taxes, fees, duties or charges of any kind imposed by any Governmental Authority on any amounts payable by Buyer under this Agreement; exclusive, however, of any taxes, assessments, or other levies imposed on Seller's income or capital (including leased or purchased property, equipment or software), any franchise taxes, any taxes in lieu of net income taxes and any other direct taxes imposed on Seller.

"**Trademarks**" means all rights in and to US and foreign trademarks, service marks, trade dress, trade names, brand names, logos, trade dress, corporate names and domain names, and other similar designations of source, sponsorship, association or origin, together with the goodwill symbolized by any of the foregoing, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights and all similar or equivalent rights or forms of protection in any part of the world.

"**Trade Secrets**" means all inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections, patent disclosures and other confidential and proprietary information and all rights therein.

"**US**" means the United States of America.

## ARTICLE II
### AGREEMENT TO PURCHASE AND SELL GOODS

**Section 2.01   Purchase and Sale.** Subject to the terms and conditions of this Agreement, during the Term, Buyer shall purchase Goods from Seller, and Seller shall sell Goods to Buyer, at the Prices specified in the price schedule or the SOW.

**Section 2.02   No Minimum Quantities.** Notwithstanding any Forecasts, Buyer is not obligated to purchase any minimum quantities from Seller under this Agreement.

## ARTICLE III
### ORDER OF PRECEDENCE

The Parties intend for the express terms and conditions contained in this Agreement to exclusively govern and control each of the Parties' respective rights and obligations regarding the purchase and sale of the Goods, and the Parties' agreement is expressly limited to such terms and conditions. Notwithstanding the foregoing, in the event of an inconsistency between this text and the Basic Purchase Order Terms, this text shall take precedence.

Without limiting this **Article III**, any additional, contrary or different terms contained in any of Seller's confirmations, invoices or other communications, and any other attempt to modify, supersede, supplement or otherwise alter this Agreement, are deemed rejected by Buyer and will not modify this Agreement or be binding on the Parties unless such terms have been fully approved in a signed writing by authorized Representatives of both Parties.

## ARTICLE IV
### NON-BINDING FORECASTS

**Section 4.01   Provision of Forecasts.** From time-to-time, Buyer may, but shall not be required to, provide Seller with Forecasts.

**Section 4.02    Forecasts Are Non-binding.** The Forecasts are for information purposes only. Any product quantities cited in or pursuant to this Agreement, except for quantities cited in a Purchase Order as firm and agreed to by the Parties, are preliminary and non-binding only. Buyer makes no representation or warranty as to the quantity of Goods that it will purchase, if any.

## ARTICLE V
### ORDER PROCEDURE

**Section 5.01   Purchase Orders.** Buyer shall issue Purchase Orders to Seller via e-mail or by using EDI under mutually agreed terms.

**Section 5.02   Acceptance and Rejection of Purchase Orders.** Seller shall confirm to Buyer the receipt of each Order issued hereunder (each, a "**Confirmation**") within three (3) Days following Seller's receipt thereof by Notice, which for purposes of this Section shall include EDI or e-mail.  Each Confirmation must reference Buyer's Purchase Order number, confirm acceptance of the Purchase Order or, solely if permitted under this **Section 5.02**, advise Buyer of Seller's rejection of such Purchase Order, the date of acceptance or rejection and the basis for rejection, if applicable. If Seller fails to issue a Confirmation within the time set forth in the first sentence of this **Section 5.02**, or otherwise commences performance under such Purchase Order, Seller will be deemed to have accepted the Purchase Order. Buyer may withdraw any Purchase Order prior to Seller's acceptance thereof. Seller may only reject a Purchase Order if Seller has sent Buyer a Notice of termination under **Section 5.04** or **Section 10.03**.

**Section 5.03   Buyer's Right to Terminate Individual Transactions.** In addition to its rights under **Section 10.02** to terminate all Individual Transactions in connection with the termination of this Agreement, Buyer may, in its sole discretion, on Notice to Seller, without liability or penalty, terminate any Individual Transaction with or without cause effective immediately or otherwise specified in such Notice.

**Section 5.04   Seller's Right to Terminate Individual Transactions.** Seller may, on Notice to Buyer, terminate an Individual Transaction after Buyer receives Notice under **Section 10.03**.

**Section 5.05   Effect of Termination of Individual Transactions.** If any Individual Transaction is terminated under this **Article V** or **Article X**, in accordance with Buyer's written direction, Seller shall immediately:

(a)       Cease work, subject to the terms and conditions of this **Section 5.05**; and

(b)       Deliver to Buyer on request all or any portion of Goods under the relevant Individual Transaction at the Prices as specified in the price schedule or the SOW.

**Section 5.06   Buyer's Right to Request Amendments to Purchase Orders.** Buyer may, on Notice to Seller, request changes to a Purchase Order. On or before five (5) Days after receiving the request, Seller shall submit to Buyer its good faith description of the impact of such changes on the Basic Purchase Order Terms. Buyer may then submit an amended purchase order reflecting all Buyer-accepted changes.

## ARTICLE VI
### SHIPMENT AND DELIVERY

**Section 6.01   Shipment and Delivery Requirements.** Time, quantity and delivery to the Delivery Location are of the essence under this Agreement. Seller shall assemble, pack, mark and ship Goods strictly in the quantities, by the methods required, to the Delivery Locations and by the Delivery Dates, specified in this Agreement and/or the Purchase Order. The Delivery Date shall mean the date that Goods are actually received at the Delivery Location. If Seller does not comply with any of its delivery

obligations under this **Section 6.01**, without limiting Buyer's other rights under this Agreement or applicable Law, Buyer may, in Buyer's sole discretion and at Seller's sole cost and expense:

(a)    Approve a revised Delivery Date; or

(b)    Require expedited or premium shipment.

Unless otherwise expressly agreed to by the Parties in writing, Seller may not make partial shipments of Goods to Buyer.

**Section 6.02    Packaging and Labeling.** Seller shall properly pack, mark and ship Goods as instructed by Buyer and otherwise in accordance with applicable Law or industry standards if no Law exists, and shall provide Buyer with shipment documentation showing the Purchase Order number, Seller's identification number for the subject Goods, the quantity of pieces in shipment, the number of cartons or containers in shipment, Seller's name, the bill of lading number and the country of origin.

**Section 6.03    Acceptance of Goods.** Buyer shall have ten (10) Days following receipt of the Goods to inspect and accept (or reject) the Goods. If Buyer determines, in its sole discretion that Goods delivered under this Agreement are Nonconforming Goods or Excess Goods, Buyer may, at its option:

(a)    If such Goods are Nonconforming Goods, either:

      (i)    Reject Nonconforming Goods (including entire lots of Goods) for a refund plus any inspection, test, shipping, handling and transportation charges paid by Buyer and procure replacement goods, in which event (and without limiting Buyer's other remedies) Seller shall pay to Buyer the difference between the cost of such replacement goods and the Goods, if the cost of the replacement goods is higher; or

      (ii)    Require prompt correction or replacement of such Goods on Buyer's written instruction, or

(b)    If such Goods are Excess Goods, reject such Excess Goods for a refund, plus any inspection, test, shipping, handling and transportation charges paid by Buyer.

Buyer may ship from any location, at Seller's expense and risk, the Nonconforming Goods or Excess Goods to the nearest authorized Seller location. If Buyer exercises its option to replace Nonconforming Goods, Seller shall, after receiving Buyer's shipment of Nonconforming Goods, ship to Buyer, at Seller's expense and risk of loss, the replaced Goods in a timely manner.

**Section 6.04    Latent Defects.** Without limiting its rights under **Section 6.03**, if the Goods have been accepted by Buyer, but Buyer later discovers such Goods are Defective, then Buyer shall have the rights set forth in **Section 6.03 (a)** above, provided that the cause of the Defective Goods was not discoverable through a commercially reasonable inspection and acceptance procedure at the time of Delivery.

# ARTICLE VII
## TITLE AND RISK OF LOSS

**Section 7.01    Title and Risk of Loss.**  Notwithstanding any terms to the contrary, title to and risk of loss or damage to the Goods shipped under any Individual Transaction shall be FOB Destination regardless of whether  Seller has received payment for such Goods, provided that Buyer will not be relieved of its obligation to pay for Goods in accordance with the terms hereof.

# ARTICLE VIII
## PRICE AND PAYMENT

**Section 8.01    Price.** Seller shall provide Goods to Buyer for the prices set forth in **Schedule 2** attached hereto ("**Prices**"). All Prices include, and Seller is solely responsible for, all costs and expenses relating to packing, crating, boxing, transporting, loading and unloading, insurance and any other similar financial contributions or obligations relating to the production, manufacture, sale and delivery of the Goods. All Prices are firm and are not subject to increase for any reason, including changes in market conditions, increases in raw material, component, labor or overhead costs or because of labor disruptions or fluctuations in production volumes.

**Section 8.02    Most Favored Customer.** Seller represents and warrants that each of the Prices set forth on **Schedule 2** is at least as low as the price charged by Seller to other buyers for similar volumes of the same Goods or similar goods. If, at any time during the Term, Seller charges any other buyer a lower price for the same Goods or similar goods, Seller shall apply that price to all same or similar Goods under this Agreement. If Seller fails to meet the lower price, Buyer may, at its option, in addition to all of its other rights or remedies under this Agreement or at Law, terminate this Agreement without liability pursuant to **Section 10.02**.  The Parties shall reflect any adjustment to pricing under this **Section 8.02** in an amendment to the price schedule, attached as **Schedule 2**; provided, however, that, notwithstanding anything to the contrary contained in **Section 2.01**, the execution and delivery of any such amendment by each of the Parties will not be a condition to the effectiveness of such Price adjustment.

**Section 8.03    Invoices.** Seller shall issue invoices to Buyer for all Goods ordered in the previous month. Each invoice for Goods must set forth in reasonable detail the amounts payable by Buyer under this Agreement and contain the following information, as applicable: a reference to this Agreement; Purchase Order number, amendment number and line-item number; Seller's name; Seller's identification number; carrier name; ship-to address; weight of shipment; quantity of Goods shipped; number of cartons or containers in shipment; bill of lading number; country of origin and any other information necessary for identification and control of the Goods. Buyer reserves the right to return and withhold payment for any invoices or related documents that are inaccurate or incorrectly submitted to Buyer.

**Section 8.04   Invoice Disputes.** Buyer shall Notify Seller of any dispute with any invoice within ten (10) Days from Buyer's receipt of such invoice. Buyer will be deemed to have accepted all invoices for which Seller does not receive timely notification of disputes. The Parties shall seek to resolve all such disputes expeditiously and in good faith in accordance with the dispute resolution provisions set forth in **Section 18.15.** Notwithstanding anything to the contrary, Seller shall continue performing its obligations under this Agreement during any such dispute.  This **Section 8.04** shall not limit Buyer's rights as set forth in **Section 18.23** of this Agreement.

**Section 8.05   Payment Terms.** Except for any amounts disputed by Buyer in good faith, Buyer shall pay all invoiced amounts due to Seller within sixty (60) Days following the later of: (a) Buyer's receipt of Seller's invoice or (b) Buyer's receipt of applicable Goods.  Payment of invoices will not be deemed acceptance of the Goods as set forth in **Section 6.03** or waive Buyer's right to inspect.

Buyer shall make all payments in US dollars by check, wire transfer, purchasing card, or Buyer Initiated Payment System.

**Section 8.06   Setoff Permitted.** Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right or remedy it has or may have, Buyer may set off or recoup any liability it owes to Seller against any invoice.

# ARTICLE IX
## INTELLECTUAL PROPERTY RIGHTS

Seller grants Buyer all of the Seller's Intellectual Property Rights relating to the Goods needed to exercise Buyer's rights under this Agreement.

# ARTICLE X
## TERM; TERMINATION

**Section 10.01  Initial Term.** The term of this Agreement commences on the Effective Date and continues for a period of <u>one (1) year</u> unless and until earlier terminated as provided under this Agreement (the "**Initial Term**").  Upon expiration of the Initial Term, this Agreement shall terminate unless the Parties sign an amendment for an additional term (each a "Renewal Term" and together with the Initial Term, the "Term").

**Section 10.02  Buyer's Right to Terminate the Agreement.** Buyer may terminate this Agreement (including all related Individual Transactions in accordance with **Section 5.03**), upon Notice to Seller:

(a)      If Seller repudiates, or if Buyer has a reasonable belief that Seller will repudiate, any of its obligations under this Agreement;

(b)      except as otherwise specifically provided under this **Section 10.02**, if Seller is in material breach of, or if Buyer has a reasonable belief that Seller may breach, any representation, warranty or covenant of Seller under this Agreement and either the Buyer has a reasonable belief that such breach cannot be cured within thirty (30) Days or, if the breach can be cured, it is not cured by Seller within thirty (30) Days following Buyer's Notice to Seller of such breach;

(c)      Notwithstanding the generality of **Section 10.02(b)**, if Seller fails to timely deliver Goods conforming to the requirements of, and otherwise in accordance with, the terms and conditions of this Agreement;

(d)      If Seller:

(i)      Becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due;

(ii)     Files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law;

(iii)    Makes or seeks to make a general assignment for the benefit of its creditors; or

(iv)    Applies for or has appointed a receiver, trustee, custodian or similar agent by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business;

(e)      If Seller fails to provide Buyer, within a commercially reasonable time after Buyer's request but in no case exceeding ten (10) Days after such request, with adequate and reasonable assurance of Seller's financial and operational capability to perform timely all of Seller's obligations under this Agreement;

(f)      In the event of a Force Majeure Event affecting the Seller's performance of this Agreement for more than fifteen (15) Days;

(g)      If, without obtaining Buyer's prior written consent, (i) Seller sells, leases or exchanges a material portion of Seller's assets, (ii) Seller merges or consolidates with or into another Entity, or (iii) a change in Control of Seller occurs; or

(h)      At its option, at any time and for any reason with thirty (30) Days prior written Notice to Seller.

**Section 10.03 Seller's Right to Terminate for Cause.** Seller may terminate this Agreement (including all related Individual Transactions in accordance with **Section 5.04**) upon Notice to Buyer:

(a)      If Buyer is in material breach of any representation, warranty or covenant of Buyer under this Agreement, and either the Seller has a reasonable belief that such material breach cannot be cured within thirty (30) Days or, if the breach can be cured, it is not cured by Buyer within thirty (30) Days following Seller's Notice of breach to Buyer.

(b)      If Buyer:

(i)    Becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due;

(ii)   Files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law;

(iii)  Makes or seeks to make a general assignment for the benefit of its creditors; or

(iv)   Applies for or has appointed a receiver, trustee, custodian or similar agent by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

**Section 10.04 Effect of Expiration or Termination.**

(a)    Unless Buyer directs otherwise in writing, any termination under **Section 10.02** or **Section 10.03** automatically terminates all related Individual Transactions under **Article V**.

(b)    Upon the expiration or earlier termination of this Agreement, each Party shall promptly:

(i) Return to or destroy all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other Party's Confidential Information; and

(ii) Permanently erase all of the other Party's Confidential Information from its computer systems, except for copies that are maintained as archive copies on its disaster recovery and/or information technology backup systems. Each Party shall destroy any such copies upon the normal expiration of its backup files;

(c)    Termination of this Agreement will not constitute a waiver of any of the terminating Party's rights, remedies, or defenses under this Agreement, at law, in equity or otherwise.

# ARTICLE XI
## CONFIDENTIALITY

**Section 11.01 Scope of Confidential Information.** From time to time during the Term, either Party (as the "**Disclosing Party**") may disclose or make available to the other Party (as the "**Receiving Party**") information about its business affairs, goods and services, Forecasts, confidential information and materials comprising or relating to Intellectual Property Rights, Trade Secrets, third-party confidential information and other sensitive or proprietary information, including the terms of this Agreement, and marked, designated or otherwise identified as "confidential" constitutes "**Confidential Information**" hereunder. Confidential Information excludes information that, at the time of disclosure and as established by documentary evidence:

(a)    Is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this **Article XI** by the Receiving Party or any of its Representatives;

(b)    Is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information;

(c)    Was known by or in the possession of the Receiving Party or its Representatives before being disclosed by or on behalf of the Disclosing Party;

(d)    Was or is independently developed by the Receiving Party without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information; or

(e)    Is required to be disclosed pursuant to applicable Law.

**Section 11.02  Protection of Confidential Information.** The Receiving Party shall, for one (1) year from disclosure of such Confidential Information:

(a)    Protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

(b)    Not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and

(c)    Not disclose any such Confidential Information to any Entity, except to the Receiving Party's Representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement.

The Receiving Party shall be responsible for any breach of this **Article XI** caused by any of its Representatives.

# ARTICLE XII
## CERTAIN OBLIGATIONS OF SELLER

**Section 12.01  General Compliance With Laws Covenant.**  Seller shall at all times comply with all Laws applicable to this Agreement and its obligations under this Agreement, including Seller's sale of the Goods. Without limiting the generality of the foregoing, Seller shall:

(a)    At its own expense, maintain all certifications, credentials, licenses and permits necessary to conduct its business relating to the sale of the Goods; and

(b)    Not engage in any activity or transaction involving the Goods, by way of shipment, use or otherwise, that violates any Law.

**Section 12.02  Covenant to Provide Import- and Export-related Information.**  Without prejudice to Buyer's rights and remedies under **Section 12.01**, on Buyer's written request, Seller shall promptly provide all information necessary to export and import Goods under this Agreement, including, as applicable, the Export Control Classification Numbers (ECCN) and subheadings or munitions list category numbers, and shall Notify Buyer of any changes to the information provided by Seller to export and import Goods under this Agreement.

**Section 12.03  Materials Disclosure.**  For each shipment of Goods, Seller shall provide Buyer, in writing, sufficient advance warning and Notice (in addition to including appropriate labels on Goods, containers and packing) of any hazardous or restricted material that is an ingredient or a part of the shipment, together with such special handling instructions as may be necessary to advise logistics providers, handlers of the Goods and personnel how to exercise that measure of care and precaution that will comply with any applicable Laws and prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the Goods, containers and packing.

**Section 12.04 Protection Against Supply Interruptions.** Seller shall, at Seller's sole cost and expense, take such actions as are necessary or appropriate to ensure the uninterrupted supply of Goods to Buyer during any foreseeable or anticipated event or circumstance that could interrupt or delay Seller's performance under this Agreement, including any labor disruption, whether or not resulting from the expiration of Seller's labor contracts (and whether or not such occurrence constitutes a Force Majeure Event as defined hereunder).

**Section 12.05 Duty to Advise.** Seller shall promptly provide Notice to Buyer of any of the following events or occurrences, or any facts or circumstances reasonably likely to give rise to any of the following events or occurrences:

(a)      Any failure by Seller to perform any of its obligations under this Agreement;

(b)      Any delay in delivery of Goods;

(c)      Any defects or quality problems relating to Goods;

(d)      Any change in Control of Seller;

(e)      Any deficiency in Buyer Specifications, samples, prototypes or test results relating to this Agreement; or

(f)      Any failure by Seller, or its subcontractors or common carriers, to comply with the Law.

In addition, Seller shall promptly Notify Buyer of any change in Seller's authorized Representatives, insurance coverage or professional certifications.

# ARTICLE XIII
## REPRESENTATIONS AND WARRANTIES

**Section 13.01 Seller's Representations and Warranties.** Seller represents and warrants to Buyer that:

(a)      It is a corporation/limited liability company duly organized, validly existing and in good standing in the jurisdiction of its incorporation;

(b)      It is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement;

(c)      It has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted under this Agreement and to perform its obligations under this Agreement;

(d)      The execution of this Agreement by its Representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of the Party;

(e)      When executed and delivered by each of Buyer and Seller, this Agreement will constitute the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws and equitable principles related to or affecting creditors' rights generally or the effect of general principles of equity; and

(f)      Seller represents and warrants to Buyer that it is in compliance with all Laws and Seller Contracts applicable to this Agreement, and to the Goods and the operation of its business.

**Section 13.02  Buyer's Representations and Warranties.** Buyer represents and warrants to Seller that:

(a)      It is a limited liability company duly organized, validly existing and in good standing in the jurisdiction of its formation;

(b)      It is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement;

(c)      It has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted under this Agreement and to perform its obligations under this Agreement;

(d)      The execution of this Agreement by its Representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of the Party;

(e)      The execution, delivery and performance of this Agreement by Buyer will not violate, conflict with, require consent under or result in any breach or default under:

> (i)      Any of Buyer's organizational documents; or

> (ii)     Any applicable Law; and

(f)      When executed and delivered by each of Seller and Buyer, this Agreement will constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws and equitable principles related to or affecting creditors' rights generally or the effect of general principles of equity.

# ARTICLE XIV
## PRODUCT WARRANTIES

**Section 14.01  Product Warranties.** Seller warrants to Buyer that:

(a)      For a period of <u>two (2) years</u> from the date of acceptance of the Goods (the "**Warranty Period**"), such Goods will conform to the Specifications and will be free from significant defects in material and workmanship;

(b)      Goods are free of defects in design (except for written designs provided by Buyer, unless the defects in Buyer's designs are based on Seller's specifications);

(c)      No claim, lien or action exists or is threatened against Seller that would interfere with Buyer's use or sale of the Goods;

(d)      The Goods do not infringe any third-party Intellectual Property Rights; and

(e)      Buyer will receive good and valid title to the Goods, free and clear of all encumbrances and liens of any kind;

(f)      The Goods are new and do not contain used or reconditioned parts, unless otherwise specified in **Schedule 1**;

(g)      To the extent the Goods include software code, the Goods contain no harmful code; and

(h)      It has disclosed to Buyer in writing the existence of any third-party code, including open source code, that is included in or is provided in connection with the Goods and that Seller and the Goods are in compliance with all licensing agreements applicable to such third-party code;

**Section 14.02  Remedies for Breach of Warranties.** During the Warranty Period, if Goods do not comply with the warranties in **Section 14.01**, in addition to other remedies available at Law or in this Agreement, Seller shall, at Buyer's discretion:

(a)      Repair or replace such Defective Goods; or

(b)      Credit or refund the Price of such Defective Goods plus any inspection, test and transportation charges paid by Buyer, less any applicable discounts, rebates or credits.

For such Defective Goods, Buyer may return, at Seller's expense and risk of loss, such Defective Goods to the nearest authorized Seller location at Seller's cost.  Seller shall, at Seller's expense and risk of loss, return any repaired or replaced Goods in a timely manner. If Seller fails to repair or replace Goods in a timely manner following Buyer's election of its right under **Section 14.02(a)**, Buyer may repair or replace, and Seller shall reimburse Buyer for actual and reasonable expenses.

Where Buyer elects to exercise its right under **Section14.02(b)**, Seller shall reimburse Buyer for actual and reasonable expenses in procuring replacement goods, including any costs related to labor or installation of the replacement goods.

## ARTICLE XV
### INDEMNIFICATION

**Section 15.01  Seller Indemnification.** Subject to the terms and conditions of this Agreement, including those set forth in **Section 15.02**, Seller (as "**Indemnifying Party**") shall indemnify, defend and hold harmless Buyer and its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, "**Indemnified Party**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and costs of enforcing any right to indemnification under this Agreement (collectively, "**Losses**"), arising out of, resulting from or in connection with  any Claim brought against Buyer by  a third party alleging:

(a)        Breach or non-fulfillment of any representation, warranty, contractual obligation or covenant set forth in this Agreement by Indemnifying Party or Indemnifying Party's Personnel;

(b)        Any negligent or act or omission of Indemnifying Party or its Personnel (including any recklessness or willful misconduct) in connection with the performance of its obligations under this Agreement;

(c)        Any bodily injury, death of any person or damage to real or tangible personal property caused by the acts or omissions of Indemnifying Party or its Personnel; or

(d)        Any failure by Indemnifying Party or its Personnel to comply with any applicable Laws.


**Section 15.02  Exceptions and Limitations on Indemnification.** Notwithstanding anything to the contrary in this Agreement, Indemnifying Party is not obligated to indemnify or defend Indemnified Party against any claim if such claim or corresponding Losses arise out of or result from Indemnified Party's or its Personnel's:

(a)        Gross negligence or willful misconduct; or

(b)        Failure to comply with any of its material obligations set forth in this Agreement.


**Section 15.03  Seller Intellectual Property Indemnification.** Subject to the terms and conditions of **Section 15.04**, Seller shall defend, or at Buyer's option cooperate in the defense of, hold harmless and indemnify, including legal fees, Buyer and its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, the "**Buyer Indemnitees**") from and against all Losses arising out of any third-party Claim brought against Buyer alleging that any of the Goods or Buyer receipt or use thereof infringes any Intellectual Property Right.

In addition, if such a Claim is or is likely to be made, Seller shall, at its own expense, exercise the first of the following that is practicable:

(a)        Obtain for Buyer the right to continue to use and sell the Goods consistent with this Agreement;

(b)      Modify the Goods so they are non-infringing and in compliance with this Agreement;

(c)      Replace the Goods with non-infringing ones that comply with this Agreement; or

(d)      At Buyer's request, accept the cancellation and return (at Seller's expense) of infringing Goods without Buyer having any cancellation liability and refund to Buyer any amount paid for such infringing Goods.

If the Goods, or any part of the Goods, become, or in Seller's opinion are likely to become, subject to a Claim that qualifies for intellectual property indemnification coverage under this **Section 15.03**, Seller shall, at its sole option and expense, notify Buyer to cease using such Goods.

Buyer shall notify Seller of third-party Claims against Buyer, and cooperate in the investigation, settlement and defense of such Claims at Seller's expense.

**Section 15.04  Exceptions to Seller's Intellectual Property Indemnification.** Notwithstanding anything to the contrary in this Agreement, Seller is not obligated to indemnify or defend any Buyer Indemnitee against any claim (whether direct or indirect) under **Section 15.03** if such claim or corresponding Losses arise out of or result from, in whole or in part,:

(a)      The circumstances described in **Section 15.02(a)** and **Section 15.02(b)**;

(b)      Use of the Goods by Buyer in combination with any products, materials or equipment supplied or recommended to Buyer by an Entity other than Seller or its authorized Representatives, and the infringement would have been avoided if the Goods had not been combined; or

(c)      Any modifications or changes made to the Goods by or on behalf of any Entity other than Seller or its Representatives, and the infringement would have been avoided without this modification or change.

# ARTICLE XVI
## LIMITATION OF LIABILITY

**Section 16.01  No Liability for Consequential or Indirect Damages.** EXCEPT FOR LIABILITY FOR INDEMNIFICATION, OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, NEITHER PARTY NOR ITS REPRESENTATIVES IS LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED IN ADVANCE BY THE OTHER PARTY OR COULD HAVE BEEN REASONABLY FORESEEN BY BUYER, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.

# ARTICLE XVII
## INSURANCE OBLIGATIONS

**Section 17.01 Insurance.** Prior to furnishing the Goods and/or Services, Seller shall procure and maintain the types of insurance listed below and in the minimum limits shown. Such insurance shall be provided by an insurer authorized to do business in the jurisdiction where Services will be performed and that maintains an A.M. Best's rating of "A, XI" or better. Seller will provide a certificate of such insurance prior to commencing services, which will identify Buyer as an additional insured on the Automobile Liability and General Liability policies.

| Coverage | Limits |
|---|---|
| Workers Compensation | Statutory |
| Employers' Liability | $1.0 million per accident or bodily injury by accident, $1.0 million aggregate for disease, and $1.0 million per employee for bodily injury by disease. |
| General Liability, including contractual | $5.0 million combined single limit |
| Automobile Liability | $1.0 million per accident, combined single limit |
| Errors and Omissions | $5.0 million per occurrence combined single limit |
| Crime Insurance | $2.0 million per occurrence |

Upon written request by Buyer, but at least annually, and upon any decrease in insurance coverage amounts or limits, Seller shall provide Buyer with certificates of insurance, and, if required by Buyer, shall name Buyer as an additional insured with respect to any general liability insurance.

# ARTICLE XVIII
## MISCELLANEOUS

**Section 18.01 Further Assurances.** Upon Buyer's reasonable request, Seller shall, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, necessary to give full effect to this Agreement.

**Section 18.02  Entire Agreement.** Subject to **Article III**, this Agreement, including and together with any related exhibits, schedules, attachments and appendices, together with the Individual Transactions, constitutes the sole and entire agreement of the Parties with respect to the purchase and sale of the Goods, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding the same.

**Section 18.03  Survival.** Subject to the limitations, exclusions, and other provisions of this Agreement, the following provisions contained herein shall survive the expiration or earlier termination of this Agreement: (a) the representations and warranties; (b) the indemnifications; (c) the limitation of liability; and (d) any other provision that, in order to give proper effect to its intent, should survive such expiration or earlier termination. All other provisions of this Agreement shall not survive.

**Section 18.04  Notices.** All Notices, requests, consents, claims, demands, waivers and other communications under this Agreement must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section). Unless otherwise agreed herein, all Notices must be delivered by personal delivery, nationally recognized overnight courier or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) on receipt by the receiving Party, and (b) if the Party giving the Notice has complied with the requirements of this Section.

| Notice to Buyer: | Iron Mountain Information Management LLC |
| --- | --- |
| | One Federal Street, Boston MA 02110 |
| | E-mail: procurement@ironmountain.com |
| | Attention: SVP Global Procurement |
| Notice to Seller: | 18952 MacArthur Blvd., Suite 460, Irvine, CA 92612 |
| | [Facsimile: FAX NUMBER |
| | [E-mail: info@hammerheadllc.com |
| | Attention: Jeff Andrews |

**Section 18.05  Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; (d) words denoting the singular have a comparable meaning when used in the plural, and vice-versa; and (e) words denoting any gender include all genders. Unless the context otherwise requires,

references in this Agreement: (x) to sections, exhibits, schedules, attachments and appendices mean the sections of, and exhibits, schedules, attachments and appendices attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The Parties drafted this Agreement without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The exhibits, schedules, attachments and appendices referred to herein are an integral part of this Agreement to the same extent as if they were set forth verbatim herein.

**Section 18.06  Headings.** The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

**Section 18.07  Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 18.08  Amendment and Modification.** No amendment to or modification of this Agreement is effective unless it is in writing and signed by an authorized Representative of each Party.

**Section 18.09  Waiver.**

(a)      No waiver under this Agreement is effective unless it is in writing, and signed by an authorized Representative of the Party waiving its right;

(b)      Any waiver authorized on one occasion is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion;

(c)      None of the following constitutes a waiver or estoppel of any right, remedy, power, privilege or condition arising from this Agreement;

        (i)      Any failure or delay in exercising any right, remedy, power or privilege or in enforcing any condition under this Agreement; or

        (ii)      Any act, omission or course of dealing between the Parties.

**Section 18.10  Cumulative Remedies.** Except as otherwise expressly set forth herein, all rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties or otherwise.

**Section 18.11  Equitable Remedies.** Each Party acknowledges and agrees that (a) a breach or threatened breach by such Party of any of its obligations under **Article XI**  may give rise to irreparable harm to the other Party for which monetary damages would not be an adequate remedy and (b) in the event of a breach or a threatened breach by such Party of any such obligations, the other Party shall, in addition to any and all other rights and remedies that may be available to such Party at law, at equity or otherwise in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

**Section 18.12  Assignment.** Without the prior written consent of the other Party, neither Party shall assign any right or subcontract any obligation under the Agreement, except Buyer may assign any right or subcontract any obligation to any of its Affiliates.  The Party whose consent is required shall not unreasonably withhold or delay its consent.

Any purported assignment or delegation in violation of this Section is null and void. No assignment or delegation relieves the assigning or delegating Party of any of its obligations under this Agreement.

**Section 18.13  Successors and Assigns.** This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

**Section 18.14  No Third-Party Beneficiaries.**  This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other Entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 18.15  Dispute Resolution.** Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity hereof (each, a "**Dispute**"), shall be submitted for negotiation and resolution to the Vice President of Seller (or to such other person of equivalent or superior position designated by Seller in a written Notice to Buyer) and to the Senior Vice President, Global Procurement, of Buyer (or to such other person of equivalent or superior position designated by Buyer in a written Notice to Seller), by delivery of written Notice (each, a "**Dispute Notice**") from either of the Parties to the other Party.

**Section 18.16  Choice of Law.** This Agreement, including all Individual Transaction documents and exhibits, schedules, attachments and appendices attached to this Agreement and thereto and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the law of the Commonwealth of Massachusetts  without regard to the conflicts of laws provisions thereof to the extent such principles or rules would require or permit the application of the law of any jurisdiction other than those of the Commonwealth of Massachusetts. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods does not apply to this Agreement.

**Section 18.17  Choice of Forum.** Each Party irrevocably and unconditionally agrees that it shall not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all Individual Transactions and exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all contemplated transactions in any forum other than in any state or federal court in the Commonwealth of Massachusetts.  Each Party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

**Section 18.18  Waiver of Jury Trial.** Each Party acknowledges and agrees that any controversy that may arise under this Agreement, including any Individual Transactions or exhibits, schedules, attachments and appendices attached to this Agreement, is likely to involve complicated and difficult issues and, therefore, each such Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement, including any Individual Transactions, exhibits, schedules, attachments or appendices attached to this Agreement, or the transactions contemplated hereby.

**Section 18.19  Counterparts.** This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

**Section 18.20  Relationship of Parties.** Nothing in this Agreement creates any agency, joint venture, partnership or other form of joint enterprise, employment or fiduciary relationship between the Parties. Seller is an independent contractor under this Agreement. Neither Party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement or undertaking with any third party. Neither Party shall (orally or in writing) publicly disclose, issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of this Agreement or the subject matter hereof, without the prior written approval of the other Party (which shall not be unreasonably withheld, conditioned or delayed).

**Section 18.21  Anti-Bribery and Anti-Corruption.**  Seller shall comply with all applicable laws and regulations on bribery, corruption, and prohibited business practices.  Subject to all applicable laws, Seller has not and shall not offer, promise, make or agree to make any payments or gifts directly or indirectly to anyone for the purpose of influencing, or inducing anyone to influence decisions in favor of, Buyer or any of its subsidiaries or Affiliates.

**Section 18.22  Code of Ethics.**  Seller shall comply with Buyer's Code of Ethics and Business Conduct which is available at:  www.ironmountain.com/code.

**Section 18.23 Audit Rights and Requirements.**

(i) Vendor Internal Audits.  Vendor shall conduct its own independent internal or external reviews and audits consistent with the audit practices of well managed companies and in accordance with best industry practices.  The scope of these reviews and audits shall include, but not be limited to, a review of Vendor's: (a) risk management and internal control environment as it relates to the Goods, as well as Vendor's information security program and physical security program, disaster recovery, and business continuity plans; and (b) system controls, including SSAE 16, SOC 1, SOC 2, and SOC 3, (subparagraphs (a) and (b) collectively the "Vendor Internal Audits"). The Vendor Internal Audits shall be conducted at least annually.  Upon Iron Mountain's written request, Vendor shall provide Iron Mountain a written summary of the Vendor Internal Audits (the "Vendor Internal Audit Reports") and promptly remediate any weaknesses or deficiencies reflected in the Vendor Internal Audit Reports. Vendor's written summary of the Vendor Internal Audit Reports shall contain, at a minimum, the audit name, the audit objective, the audit observations, the remediation plan to audit observations, and the timing of the remediation plan. The Vendor Internal Audit Reports shall be deemed the Confidential Information of Vendor.

(ii) Iron Mountain Audits.  Iron Mountain and its representatives, designees, agents, auditors, and any federal, state, or other governmental bodies or agencies having statutory, regulatory, or administrative authority (each a "Governmental Authority") over Iron Mountain or its customers may enter Vendor's premises to perform audits, inspections, and examinations of Vendor's data, books,  records, and other documentation and information in any media relating to the Goods for the purposes of: (a) verifying (i) the accuracy of charges, fees, credits and other amounts due and payable by either party hereunder, (ii) the achievement of Service Levels, and (iii) Vendor's compliance with its obligations in performing the Vendor Internal Audits; and (b) conducting security and financial audits substantially similar to the Vendor Internal Audits (subparagraphs (a) and (b) collectively the "Iron Mountain Audits"). Any information collected by Iron Mountain in connection with the Iron Mountain Audits shall be deemed the Confidential Information of Vendor.

(iii) Government Required Audits.  Vendor agrees that in the event any Governmental Authority requires any customer of Iron Mountain to conduct audits on Vendor, including but not limited to audits similar to the Vendor Internal Audits or the Iron Mountain Audits, then Vendor agrees to permit any such customer to perform such audits, provided however that the customer shall be required first to sign a confidentiality agreement acceptable to Vendor.

(iv) All audits under this **Section 18.23** shall be conducted during Vendor's business hours and upon ten (10) Days Notice to Vendor with no more than reasonable disruption to Vendor's business activities, subject to the requirements of agencies of any Governmental Authority.  Vendor shall assist and fully cooperate with Iron Mountain and any other party with audit rights hereunder as reasonably required to carry out the audits described in this **Section 18.23**.

(v) Vendor shall promptly remediate any weakness or deficiencies found in the course of any audit under this **Section 18.23**. If, as a result of an audit pertaining to Vendor's charges, it is determined that Vendor has overcharged Iron Mountain, Iron Mountain shall notify Vendor of the overcharged amount and:

(a) Vendor shall promptly pay to Iron Mountain such overcharged amount, plus interest at the prime rate as set out in the Wall Street Journal calculated from the date of Vendor's receipt of the overcharged amount until the date of payment to Iron Mountain; and (b) if any such overcharged amount is five percent (5%) or more of the Charges for the period audited, Vendor shall, at Iron Mountain's request and in addition to (a) above, promptly reimburse Iron Mountain for the reasonable out-of-pocket expenses of such audit.

**Section 18.24 Publicity.**  The Seller agrees not to use Buyer's or its Affiliate ('s/s') name, trademark or logo in any way on its web site or in any of its advertising or other written material provided to third parties, and shall not create a link, either directly or indirectly between Seller's web site and Buyer's web site, without the prior written consent of Buyer.  Seller agrees to seek approval from a Vice President of Corporate Marketing and Communications of Buyer to issue any news release or public communication in which Buyer or its activities with the Seller are mentioned.

# ARTICLE XIX
## FORCE MAJEURE

**Section 19.01 Force Majeure.** Any delay or failure of either Party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such Party's control, without such Party's fault or negligence and that by its nature could not have been foreseen by such Party or, if it could have been foreseen, was unavoidable (which events may include natural disasters, embargoes, explosions, riots, wars or acts of terrorism) (each, a "**Force Majeure Event**"). Seller's financial inability to perform, changes in cost or availability of materials, components or services, market conditions or supplier actions or contract disputes will not excuse performance by Seller under this **Article XIX**. Seller shall give Buyer prompt written Notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. Seller shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized and resume full performance under this Agreement. In addition to its other rights under this Agreement (including **Section 10.02(f)**) or the Law, during any Force Majeure Event, Buyer may, at its option:

(a)        Purchase Goods from other sources without liability to Seller, and require Seller to reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the Prices for such Goods under this Agreement; or

(b)        Require Seller to provide Goods from other sources in quantities and at a time requested by Buyer and at the Prices for the Goods hereunder.

If requested by Buyer, Seller shall, within five (5) Days of such request, provide adequate assurances that a Force Majeure Event will not exceed thirty (30) Days. The rights granted to Seller with respect to excused delays under this **Article XIX** are intended to limit Seller's rights under theories of *force*

*majeure*, commercial impracticability, impracticability or impossibility of performance, or failure of presupposed conditions or otherwise, including any rights arising under the UCC or the Law.

## ARTICLE XX
### SAFETY AND SECURITY

**Section 20.01 Safety and Security.**  If Seller is performing Services within a Buyer facility or on its premises, the Seller agrees to comply with Buyer's policies and procedures relating to safety and security. Seller also recognizes that that a key component to Buyer's security policy is the performance of criminal background investigations and drug testing of all of its employees, Sellers, and contractors.  Seller warrants that it will comply with Buyer's policy on Background Investigation Requirements for Third-Party Relationships ("Policy"), a summary of which is attached hereto as **Exhibit A**, and as may be amended from time to time.  If applicable, as detailed in **Exhibit A**, Seller shall certify to Buyer that Seller meets the "Desired Result" as specifically defined in such Policy.  If Seller has been provided physical or logical access to Buyer facilities or networks, or to Personal Data, Seller represents and warrants that it shall immediately notify Buyer of any changes in the status of, including but not limited to:  (a) termination of employment; (b) assignment to or reassignment from a then current SOW; (c) change in level or type of access; or (d) any other material change that affects this Section.

## ARTICLE XXI
### DATA PROTECTION

**Section 21.01 Data Protection.**  Seller recognizes that due to the nature of Buyer's storage business, a high level of security is required to be maintained for the protection of sensitive Personal Data.  "Personal Data" is defined as any data related to or associated with an identified or identifiable natural person including, but not limited to, any Buyer employee information, or Buyer customer information.  If it is foreseeable that Seller and/or Seller's personnel may have access to any Personal Data at any time in connection with this Agreement, regardless of where the Personal Data resides, Seller agrees to implement and maintain adequate technical, physical and organizational controls, consistent with prevailing industry standards, as appropriate to meet its obligations under all applicable state and federal laws and regulations related to the security and privacy of Personal Data, including maintaining a comprehensive written information security program that meets the requirements of MA 201 CMR 17.00. Upon termination of this Agreement for any reason, Seller shall return, or, at the written request of Buyer, destroy and retain no copies of all Personal Data created or received by Seller on behalf of Buyer or its customers, and Seller shall cause its own third party service Sellers to do the same.

## ARTICLE XXII
### US GOVERNMENT FLOW DOWN CLAUSES

**Section 22.01 U.S. Government Flow Down Clauses.**

(a) If the goods or services provided by Seller are used in support of a Prime Contract with the Federal Government, Seller will comply with the following provisions of the Federal Acquisition Regulation (FAR), 48 CFR Part 52:

> (i) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr. 2010) if the agreement exceeds $5,000,000 and has a performance period of more than 120 calendar days; (ii) 52.222-54, Employment Eligibility Verification (Jul. 2012); (iii) 52.219-8, Utilization of Small Business Concerns (Jan. 2011) if the agreement offers further subcontracting opportunities.  If the agreement (except agreements with small business concerns) exceeds $650,000 ($1,500,000 for construction of any public facility), the Seller must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities; (iv) 52.222-26, Equal Opportunity (Mar. 2007); (v) 52.222-35, Equal Opportunity for Veterans (Sept. 2010); (vi) 52.222-36, Affirmative Action for Workers with Disabilities (Oct. 2010); and (vii) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec. 2010) (E.O. 13496) (for agreements that exceed $10,000 and that will be performed wholly or partially in the United States);

(b) If Buyer informs Seller that services to be performed by Seller are subject to the Service Contract Act of 1965, 41 USC § 6701 et seq. ("SCA"), as implemented by the Department of Labor in 29 CFR. Part 4 and FAR Subpart 22.10, Seller will comply with (A) FAR 52.222-41, Service Contract Act of 1965 (Nov. 2007); and (B) 52.222-17, Non-displacement of Qualified Workers (Jan. 2013) (E.O. 13495);

(c) Seller represents that as of the time of award of this Agreement, (i) the Seller and its principals are not debarred, suspended, or proposed for debarment by the Federal Government;  and (ii) Seller will include the requirements of FAR 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors, Debarred, Suspended, or Proposed for Debarment (Dec. 2010) (appropriately modified for the identification of the parties) in each subcontract that exceeds $30,000 in value and is not a subcontract for commercially available off-the-shelf ("COTS") items, as defined in FAR 2.101;

(d) Seller will promptly supply information requested by Buyer for compliance with Subcontracting Reporting Representations of FAR 52.204-10, and product country of origin requirements, including but not limited to:  (i) the Buy American Act (41 USC 10a-10d); (ii) Trade Agreements identified at 48 CFR 25.400; and (iii) "Buy America" requirements of 49 U SC 5323j, 49 CFR Part 661, and 23 CFR 635.410; and

As used in the referenced FAR clauses, "Contract" means this Agreement; "Contracting Officer" means the U.S. Government Contracting Officer; "Contractor" and "Offeror" means Seller; "Prime Contract" means a prime contract between Buyer and the Federal government or between a customer of Buyer and the Federal Government; and "Subcontract" means any contract placed by Seller with lower-tier subcontractors under this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Iron Mountain Information Management LLC

By _____

Name: Douglas A. Berry

Title: VP Project Delivery


Hammerhead LLC

By _____

Name Jeffrey T. Andrews

Title: President

## EXHIBIT A – SUMMARY OF IRON MOUNTAIN'S BACKGROUND INVESTIGATION REQUIREMENTS FOR THIRD-PARTY RELATIONSHIPS

Vendor must ensure that it has performed background investigation searches that meet the following criteria:

1.   If the Vendor and the Vendor's Personnel do/does not have any physical or logical access to Iron Mountain facilities or networks and do not have access to any Iron Mountain or Iron Mountain Customer Data, a background  investigation is not required.

2.   If the Vendor and the Vendor's Personnel has/have physical or logical access to Iron Mountain facilities or networks, or has access to Iron Mountain Customer Data, then the following minimum searches must be completed and achieve the following results:

| Background Investigation Type | Desired Result |
|---|---|
| Social Security Number Trace | Valid Social Security Number |
| Verified authorization to work in the U.S. | Authorized to work in the U.S. |
| Ten (10) year criminal convictions search: | |
|     Federal | No criminal record |
|     Statewide (if available) | No criminal record |
|     County | No criminal record |
| Five (5) panel drug screen | Negative results |
| Determination whether an individual employee is a "U.S. Person" (for ITAR purposes) | |
| Review of the following government lists: | |
|     OFAC SDN List | Not on list |
|     Office of Inspector General | Not on list |
|     General Services Administration | Not on list |

3.   If the Vendor and the Vendor's Personnel has/ have unescorted physical access to Iron Mountain facilities or Customer facilities, the following search must also be included in the employee's background investigation:

| Background Investigation Type | Desired Result |
|---|---|
| Sex Offender searches (as permitted by law) | Not a sex offender |

Furthermore, Vendor shall certify to Iron Mountain that background investigations are completed at a minimum of every three (3) years for any of Vendor's Personnel associated with this Agreement.

**Schedule 1 – Rack Guard Guidelines**

<u>**SECTION III – RACK GUARDING**</u>

Provide separate pricing for rack guarding to be installed within new rack phase and previous racking installs based on the specs below:

- Standard IM catwalk racking
    1) Guard rails…around staging areas where record center staff or transportation run pallets into the rack that surround the staging area.
    2) Corner guards… when entering from the staging area into the rack system main aisles
    3) Corner guards…corner guards when going from one main aisle to another main aisle or transfer aisle.
    4) Corner guards/rails….across/next to VRC lift  (picture below)
    5) Corner guards/post protection…around rack where no VRC's are located and pallet drops are used.
    6) Main aisle post protection…there may be instances where we want post protection along a heavily used aisle (Rack Armour post protection for this application).
    7) Replace/upgrade severely damaged rack frames.

- Non-standard rack…….thin gauge shelving, 12'-15' ladder access(box or open shelf) or open shelf catwalk shelving that requires PIT use:
    1) Guard rails…..Depending on size of bldg. and activity…there may be a need for more extensive guard rail to protect end frames where thin gauge shelving is lining the main aisles and PIT's are necessary.
    2) Same as 1-6 above.

- Order Picker bldgs.:
    1) Guard rail protection on all row end frames where order pickers are used
    2) Rail guide systems or wire guide for aisle protection
    3) Guard rail around staging areas
    4) Replace/upgrade severely damaged rack frames

## Schedule 2 – Pricing Structure and Services

**Scope of Program & Services:**

Rack Remediation services and materials for Rack Remediation work identified through IRM's Rack Inspection process.  All work will be performed according to IRM's Rack Remediation standards.

- **Materials:** Necessary materials will be identified per project by Hammerhead as part of the survey process conducted by Hammerhead's team of engineers. All material will be quoted per project.

- **Project Management:** Hammerhead's project management team will coordinate project management activities with IRM's Real Estate Project Managers (REPM) and local management. Hammerhead's project management team will be responsible for providing the REPMs, or designee, a quote and project timeline and work plan for each project.

- **Engineering Services:**  Hammerhead will provide engineering services for each project to assess the criticality of work to be performed and identify the impact of the remediation work on the racking system as a whole prior to performing remediation work.  As part of the assessment process, Hammerhead will also provide recommendations for guard protection relative to identified remediation. All assessments and recommendations will be consistent with local, state, and federal government code.

**Margin Cost Structure Applied When Quoting IRM Projects**

Margins below include average Sales, General, and Administrative costs.  The cost plus margin applies to material and labor to provide remediation services.  The following shall be pass through costs: freight, professional engineering fees, travel expenses, permit costs, and any fees related to GC and expediting services.

| Project Size | Margin (including SG&A) |
|---|---|
| Under $50,000 | 30% |
| $50,001 - $100,000 | 27% |
| $100,001 - $200,000 | 24% |
| Over $200,000 | 21% |