**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JONATHAN RAMOS**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**IRON MOUNTAIN SECURE SHREDDING, INC., IRON MOUNTAIN INFORMATION MANAGEMENT, INC., IRON MOUNTAIN INCORPORATED, and IRON MOUNTAIN MANAGEMENT SERVICES, INC.**<br><br>**Defendants.** | **CIVIL ACTION NO. 2:19-CV-11202**<br><br>**DISTRICT COURT JUDGE: ELDON E. FALLON**<br><br>**MAGISTRATE JUDGE: KAREN WELLS ROBY** |

**PLAINTIFF JONATHAN RAMOS'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jonathan Ramos ("Ramos") with respect opposes Defendant Iron Mountain Information Management, LLC's ("IMIM") Motion for Summary Judgment. As shown herein, IMIM is liable to Ramos on multiple grounds for their direct negligence. First, IMIM authorized an unsafe practice by requiring the disassembly of the rack system occur left-to-right, instead of Rackmasters' recommended front-to-back method. Second, IMIM breached its duty to provide a safe place for Ramos to work by failing to secure the support columns to the center wall, causing the columns to fall onto Ramos. Third, IMIM failed to warn Ramos or Rackmasters that the support columns were unsecured to the wall, despite their knowledge of the condition. Fourth, IMIM created the condition that caused Ramos's injury. Finally, IMIM assumed a duty to ensure safe disassembly of the racks by mandating a procedure different from the one selected by Rackmasters.

IMIM does not contest the fact that it changed Rackmasters' method of work to an unsafe method. Further, it is undisputed that IMIM was the custodian of the support columns that collapsed

and injured Ramos in the context of Louisiana Civil Code articles 2317, 2317.1, and 2322. Evidence shows that the support columns were inadequately secured to the center wall, and therefore unreasonably dangerous. For these reasons, IMIM cannot evade liability for its role in causing Ramos's injury and thus, IMIM's Motion should be denied.

## 1. SUMMARY OF THE CASE

This case arises from Ramos's catastrophic 18-foot fall from a scissor lift on June 15, 2018. On that date, Ramos was working for Rackmasters disassembling a metal-framed shelving rack system within a IMIM warehouse in Harahan, Louisiana. The scissor lift carrying Mr. Ramos was knocked over by the metal support beams along of the edge wall of the rack system. OSHA concluded "the support beams were not securely attached to the wall before they fell away from the wall."[1] Ramos sued IMIM for premises liability under La. C.C. arts. 2317, and 2317.1, failure to provide a safe building upon which Mr. Ramos could perform his tasks, vice, ruin, or defect of the support columns, and further alleges *res ipsa loquitor*.

The parties deposed IMIM through its corporate representative on July 25, 2022. In that deposition, IMIM testified it knew the support columns were not secured to the wall and admitted to requiring Rackmasters to change their disassembly procedure to keep the stairs in place. That deposition transcript will be submitted as a supplement to this memorandum as soon as it is obtained.

## 2. SUMMARY OF THE EVIDENCE

### A. IMIM's Warehouse Facility in Harahan, Louisiana.

IMIM leased warehouse space at 6200 Humphreys Street, in Harahan, Louisiana (the "warehouse"), commencing July 1, 1997.[2] The warehouse is divided into two parts by a center wall,

[1] Exhibit 1, Affidavit of Wood, at para. 14.
[2] Exhibit 8, 1997 Property Lease.

connected through a catwalk/staircase system at one end.[3] The two parts of the warehouse are designated as building 2 and building 3. Within building 3, IMIM maintained a large self-supporting metal-framed shelving rack system covering the warehouse floor extending 168 feet from end to end, and 23 feet high. After 21 years in the warehouse, IMIM agreed to vacate the warehouse by August 31, 2018.[4]

IMIM hired Hammerhead, LLC, to perform the "disassembly of the open file and box storage *rivet style catwalk system* in rooms 2 and 3, including 1,161 units of shelving at 23' tall, all bar-grating aisles, *stairways* and sprinkler system."[5] In their master agreement, IMIM requires Hammerhead to follow their "policies and procedures related to safety and security."[6] IMIM designated local managers to coordinate project delivery.[7] Hammerhead agreed to perform the work for $137,000[8], and turned around and subcontracted the entire job to Rackmasters, Inc. ("Rackmasters"), for $112,000.[9] Ramos was an installer for Rackmasters.[10] Ramos is known at Rackmasters as a hard worker who follows instructions, earned the trust of Rackmasters through doing quality work over time, and was eventually promoted to foreman.[11]

**B. Rackmasters' Work at the IMIM Warehouse.**

Rackmasters arrived at the warehouse on May 30, 2018.[12] Glen Thomas ("Thomas") was the foreman in charge of Rackmasters' operations at the warehouse.[13] Thomas was also a part owner

---

[3] Exhibit 3, Deposition of Jonathan, at Tr. 33:2 – 11 ("Ramos Dep.").
[4] Exhibit 9, June 7, 2018 Letter (at IMIM 46).
[5] Exhibit 6, May 21, 2018 Hammerhead Letter (emphasis added) (at IMIM 40).
[6] IMIM Master Agreement, (Def. Ex. I) (R. Doc. 98-13, at p. 30).
[7] IMIM Master Agreement, (Def. Ex. I) (R. Doc. 98-13, at p. 36).
[8] Ex. 6, at IMIM 40.
[9] Exhibit 10, May 24, 2018 Rackmasters Purchase Order.
[10] Exhibit 2, Deposition of Glenn Thomas, at Tr. 15:1 – 5 ("Thomas Dep.").
[11] Ex. 2, Thomas Dep., at Tr. 44:5 – 45:8.
[12] Exhibit 5, OSHA Report Narrative, at IM 332.
[13] Ex. 2, Thomas Dep., at Tr. 40:22 – 24.

of Rackmasters.[14] At the outset of the job, Thomas received from IMIM a paper copy of the rack system, and the copy did not specify the beams or columns nor the back stairwell.[15] Thomas testified is very important the plans are accurate.[16]

In a typical disassembly, Rackmasters will independently determine how to disassemble a rack system.[17] Thomas spent the first day on the job determining how to disassemble the rack system.[18] Thomas determined Rackmasters should to tear down the front staircase first.[19] However, as the job was about to begin, an IMIM representative, who was known to be "some kind of manager", instructed Thomas that IMIM "need the staircase to stay up."[20] The front staircase[21] that IMIM required to remain up until the end allowed access to building 2 on the other side of the center wall.[22] Thomas accepted IMIM's condition,[23] and reported the instruction to Ramos.[24] At this time, no Rackmasters employees knew this requirement would make the job unsafe.[25]

If Rackmasters were permitted to make their own decision on how to disassemble the racks, Thomas testified he "would have torn the stairwell down first. That just would have been the way I would have done this. But again, we were asked not to, so we did it a different way. So we left the catwalk up to the very end."[26]

If they had worked according to Thomas' recommended method, Rackmasters would have started from the back of the room, and worked forward tearing down bay by bay, all the way to the

[14] Ex. 2, Thomas Dep., at Tr. 9:6 – 16.
[15] Ex. 2, Thomas Dep., at Tr. 32:9 – 33:11.
[16] Ex. 2, Thomas Dep., at Tr. 32:9 – 33:11.
[17] Ex. 2, Thomas Dep., at Tr. 16:5 – 12.
[18] Ex. 2, Thomas Dep., at Tr. 14:22 – 16:1.
[19] Ex. 2, Thomas Dep., at Tr. 18:8 – 19:11.
[20] Ex. 2, Thomas Dep., at Tr. 21:5 – 25.
[21] See, e.g. Exhibit 7, Front Staircase (IMIM 5).
[22] Ex. 2, Thomas Dep., at Tr. 20:4 – 20.
[23] Ex. 2, Thomas Dep., at Tr. 22:1 – 10.
[24] Ex. 2, Thomas Dep., at Tr. 53:21 – 54:7.
[25] Ex. 2, Thomas Dep., at Tr. 50:21 – 51:12.
[26] Ex. 2, Thomas Dep., at Tr. 46:19 –23.

columns and beams, one section at a time.[27] The reason Rackmasters did not disassemble the bays using that method is because IMIM imposed a last-minute condition that the stairs had to remain in place.[28]

During the disassembly, Ramos testified the stairs remained in continuous use by IMIM employees during the disassembly:

> "[Iron Mountain] still had employees going in and out of the other half of the warehouse -- like I told you, what was connecting where they were working, there was stairways on our end of the building going up to the floor to the second step of the mezzanine. So their employees had to go in up and down to be able to do what they were supposed to do. So they instructed us to keep the stairs up…which made us have to go a different route. We usually clear out a building from the front to the back, and so we had to work from the right side of the building to the left just to leave the stairs up for them to be able to go up and down from the other building."[29]

IMIM's requirement to change the method of disassembly fundamentally changed the job to one unfamiliar to Rackmasters. Ramos testified:

> "I was told by Glenn Thomas because the Iron Mountain employees needed access to that second floor so they could clear out that second half of the warehouse so we could later go in and tear that side down...We were going to have to do things differently because they wanted to stairs up."[30]

The requirement to keep the staircase up forced Rackmasters to work left-to-right instead of back to front. Ramos testified "[i]f [IMIM] wouldn't have instructed us to leave the stairs up to allow their employees to have access to the other side, we would have cleared the building from the front to the back starting with the initiation stairs working our way back and at the same time eliminating the columns that tipped over. We would be eliminating those as we worked back. So that would eliminate the possibility of the columns tipping over."[31] IMIM's required disassembly

[27] Ex. 2, Thomas Dep., at Tr. 46:9 – 47:5.
[28] Ex. 2, Thomas Dep., at Tr. 47:6 – 8.
[29] Ex. 3, Ramos Dep., at Tr. 52:3 – 21.
[30] Ex. 3, Ramos Dep., at Tr. 68:19 - 69:13.
[31] Ex. 3, Ramos Dep., at Tr. 54:19 – 55:4.

method introduced the risk of columns toppling over. Ramos testified "if we would have worked the way that we usually worked, the columns would never have been there."[32]

Plaintiff's liability expert Mitchell Wood ("Mr. Wood") testified IMIM imposed a new condition that the front staircase remain in place to "keep their pathways opened" until the end of the project.[33] Mr. Wood testified the safe method of disassembly was front-to-back,[34] and that the stairwells remaining up to the end required the disassembly occur left-to-right, which is as unsafe practice.[35]

**C. The Column Collapse and Ramos's Injury at the Warehouse.**

While Rackmasters' disassembly was underway, the staircase remained in daily use by IMIM employees clearing products.[36] Due to IMIM's change of the disassembly method, Rackmasters' disassembly proceeded left to right at the second level.[37] Rackmasters disassembled the shelving system up to the last two bays to permit continuous use of the catwalk, which also required the columns and beams adjacent to the interior wall remain in place.[38] On the day Ramos fell, the front staircase was still up so IMIM employees could use it.[39]

While disassembling shelving, Ramos heard someone yell, then he saw the columns falling like dominos, working their way to his position.[40] Thomas does not recall any warning signs about the rack falling.[41] OSHA concluded the metal support beams hit the scissor lift carrying Ramos,

[32] Ex. 3, Ramos Dep., at Tr. 52:22 – 53:6.
[33] Ex. 4, Wood Dep., at Tr. 27:3 – 28:14.
[34] Ex. 4, Wood Dep., at Tr. 31:18 – 32:11.
[35] Ex. 4, Wood Dep., at Tr. 88:1 – 90:14.
[36] Ex. 3, Ramos Dep., at Tr. 70:7 – 25, 33:2 – 11;
Ex. 2, Thomas Dep., at Tr. 16:13 – 24.
[37] Ex. 2, Thomas Dep., at Tr. 24:13 – 20.
[38] Ex. 2, Thomas Dep., at Tr. 26:4 – 12.
[39] Ex. 2, Thomas Dep., at Tr. 28:22 – 29:21
[40] Ex. 3, Ramos Dep., at Tr. 31:23 – 32:6; See also, Exhibit 11, Photos of Fallen Columns.
[41] Ex. 2, Thomas Dep., at Tr. 40:17 – 41:9.

knocking it over,[42] because "the support beams were not securely attached to the wall before they fell away from the wall."[43] Mr. Wood concluded the "final section of rack adjacent to the wall did not have bracing, and were not securely attached to 'structure'. Their 'uprights' or rack columns were not secured to the adjacent walls."[44]

Rackmasters did not know the columns were inadequately braced to the wall, and had they known that information, they would have done the job differently.[45] The shelving fell because the columns were not attached to the wall and ground correctly.[46] Mr. Wood testified it is typical for a company like Rackmasters to rely on IMIM's knowledge of their own facility when dictating the disassembly method,[47] and that IMIM should have been aware the support beams were not attached to the wall.[48] Mr. Wood testified the proper method of disassembling the rack system was the method originally chosen by Rackmasters—front-to-back—which method would retain structural support of the cross beams, columns, and support members left intact at the edge, which is typical of a shelving system.[49] Mr. Wood concluded the hazardous condition would not have occurred except for IMIM's requirement that the stairway remain in place.[50]

Mr. Wood testified the support beams should have been secured with two anchors in the ground, not one.[51] Further, the columns were not attached to the adjacent walls, and the lack of bracing was the *prima facie* cause of the collapse, which knocked over the scissor lift.[52] Because the support columns were held up by the rack system itself, and there was inadequate support the

---

[42] Ex. 5, OSHA Report Narrative, at IMIM 342.
[43] Ex. 5, OSHA Report Narrative, at IMIM 340 -341.
[44] Ex. 1, Affidavit of Wood, at para. 13.
[45] Ex. 2, Thomas Dep., at Tr. 47:12 – 21, 27:25 – 28:3, and 38:11 – 19.
[46] Ex. 3, Ramos Dep., at Tr. 50:11 – 14.
[47] Ex. 4, Wood Dep., at Tr. 102:15 – 103:3.
[48] Ex. 4, Wood Dep., at Tr. 81:22 – 82:1.
[49] Ex. 4, Wood Dep., at Tr. 29:19– 32:4.
[50] Ex. 1, Affidavit of Wood, at para. 20.
[51] Ex. 4, Wood Dep., at Tr. 53:2 – 6.
[52] Ex. 4, Wood Dep., at Tr. 70:18 – 71:13.

columns once the disassembly was underway, the method of disassembly required by IMIM created this dangerous condition.[53]

## 3. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. Stated differently, if the record as a whole could not lead a rational trier of fact to find for the plaintiff, summary judgment must be denied. *See Matsushita Elec. Indus. Co. v. Zenith Radio.*, 475 U.S. 574, 586, (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## 4. LAW AND ARGUMENT

### A. IMIM Is Liable to Ramos for Authorizing Rackmasters' Unsafe Practice.

Rackmasters determined the front staircase needed to be torn down first and the rack disassembly proceed from front-to-back. [54] However, right before the work began, IMIM changed the work method by requiring the staircase remain up until the end and requiring the work to proceed left-to-right.[55] IMIM's condition changed the disassembly from a safe method to one that was unavoidably dangerous.[56]

#### 1. Premises Owner are Liable to Independent Contractors for Injuries Resulting from their Authorization of an Unsafe Practice.

The custodian of a premises is considered directly negligent, and therefore liable for the injury of an independent contractor working at his premises if "the work undertaken by the

[53] Ex. 4, Wood Dep., at Tr. 72:8 – 29.
[54] Ex. 2, Thomas Dep., at Tr. 14:22 – 16:1.
[55] Ex. 2, Thomas Dep., at Tr. 21:5 – 25.
[56] Ex. 4, Wood Dep., at Tr. 88:1 – 90:14.

independent contractor is inherently or intrinsically dangerous" or if "the owner…gives express or implied authorization to an unsafe practice." *Williams v. Gervais F. Favrot Co.*, 499 So. 2d 623, 625 (La. App. 4 Cir. 1987). Regarding the second ground, the Fifth Circuit clarifies the premises owner is liable for the injury of an independent contractor if he "expressly or impliedly authorized the *particular manner* which will render the work unsafe." *Echeverry v. Jazz Casino Company, L.L.C.*, 988 F.3d 221, 233 (5th Cir. 2021). Similarly, a premises owner may be held liable if he exercises control over the contractor's methods of operation. *Migliori v. Willows Apartments*, 727 So.2d 1258, 1261, (La. App. 4 Cir. 2/3/99). Stated differently, Courts strongly consider whether the contractor has the power to complete the job "in a manner in which they saw fit." *Nippa v. Chevron, USA*, 774 So.2d 310, 314, (La. App. 4 Cir. 11/15/00). A key factor to attaching liability is whether the premises owner's employees participate in the decision to use the negligent procedure. *Echeverry*, 727 So.2d at 234 (quoting *Graham v. Amoco Oil Co.*, 21 F.3d 643 (5th Cir. 1994)).

Louisiana courts have found a principle liable for authorizing an unsafe practice of a contractor on their premises where a contractor was instructed to enter a chemical tank without proper safety gear, *Sandbom v. BASF Wyandotte, Corp.*, 674 So. 2d 349, 355 (La. App. 1 Cir. 4/30/96); where a premises owner allows contractors to come and go as they please, *Falcon v. Surcouf*, 236 So. 3d 716, 724 (La. App. 5 Cir. 12/27/17); where a contractor used a buffing machine in an unsafe manner, *Alexander v. Lowes Companies*, 701 So. 2d 239, 243 (La. App. 1 Cir. 9/19/97); or when a premises owner issued a hot work permit and may have employed a firewatcher, *Lewis v. Indus. Demolishers, Inc.*, 799 So. 2d 539, 543 (La. App. 4 Cir. 9/12/01). Louisiana courts will have also found that expert testimony showing the authorized practice was unsafe precludes summary judgment. *Falcon v. Surcouf*, 236 So. 3d 716, 725 (La. App. 5 Cir. 12/27/17).

In a similar case, the Louisiana Fourth Circuit Court of Appeal affirmed a jury verdict holding a premises owner liable for the injury to an independent contractor who was tasked with excavating an alley. *Horton v. Blackrock Aggregates, LLC*, 213 So.3d 429, 442 (La. App. 4 Cir. 2017). In *Horton*, the act of excavating the alley itself made the alley wall unstable. *Id.* The court found the premises owner violated his duty to the contractor to protect him from the danger posed by the potential collapse of the wall into the alley. *Id.*

Further, the Louisiana Second Circuit Court of Appeal affirmed a jury verdict holding a premises owner liable for injury to an independent contractor hired to work at their plant who were forced to cross a highway at a dangerous location. *Donavan v. Jones*, 658 So.2d 755, 766 (La. App. 2 Cir. 1995). Although a crosswalk existed, the court concluded the plant's requirement to park in a specific lot made it "obvious the contractor employees would not use the crosswalk." *Id.* at 767. Once the plant "designates a parking lot across a major highway for contractor employees", it has a duty to ensure safe crossing. *Id.* at 766.

**2. IMIM Authorized the Unsafe Disassembly Method.**

In this case, evidence shows IMIM expressly or impliedly authorized the warehouse disassembly to proceed left to right by mandating the stairs remain up to the end. [57] Like the premises owner in *Horton*, the disassembly itself allowed the columns fall because they were inadequately secured to the wall. Further, like the owner in *Donovan*, IMIM designated a method of disassembly of the racks by requiring the stairwell remain up to the end, and consequently had a duty to ensure that method was safe. Instead, evidence shows disassembly from left-to-right was inherently unsafe.[58] Expert testimony demonstrates the method of disassembly required by IMIM

[57] Ex. 3, Ramos Dep., at Tr. 68:19 - 69:13; Ex. 4, Wood Dep., at Tr. 88:1 – 90:14.
[58] Ex. 4, Wood Dep., at Tr. 88:1 – 90:14.

was unsafe.[59] Record evidence also shows Rackmasters was not free to complete the job in a manner in which they saw fit.[60]

IMIM's employees required the stairwells remain in place after Rackmasters advised the stairs had to come down first. IMIM's instruction materially altered the method of disassembly in the specific way that made the work unsafe by requiring disassembly using a negligent procedure. As such, this case is fundamentally distinguishable from *Klein v. Cisco-Eagle, Inc.*, where a contractor built an entirely new structure and the owner merely asked to wait to see the room's layout before installing lighting. 855 So.2d 84, 851 (La. App. 2 Cir. 2003). The *Klein* court found the plaintiff was "entirely free to do the work his own way." *Id.*, at 850. In this case, IMIM *actually exercised* control of the order of disassembly in a manner requiring an entirely different—and unsafe—sequence. As such, IMIM gave express or implied authorization to an unsafe practice. Therefore, IMIM is liable to Ramos for the injury that resulted from the unsafe practice. At a minimum, evidence establishes genuine issues of material fact regarding whether IMIM authorized an unsafe practice, and consequently this matter should be decided by a jury.

**B. IMIM Violated Its Duty to Provide Ramos a Safe Place to Work.**

IMIM is liable to Ramos for failing to provide a safe place for him to work. Louisiana law establishes a premises owner has a duty of exercising reasonable care for the safety of persons on its premises and a duty of not exposing such persons to unreasonable risks of injury or harm. *Mundy v. Department of Health and Human Resources,* 620 So.2d 811, 813 (La. 1993). These duties "extend to employees of independent contractors for whose benefit the owner must take reasonable steps to ensure a safe working environment." *Donavan*, 658 So.2d at 755 (citing *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154 (5th Cir.1994)); *Thomas v. A.P. Green Indus., Inc.*, 933 So.2d 843, 852

[59] Ex. 1, Affidavit of Wood, at para. 20.
[60] Ex. 2, Thomas Dep., at Tr. 46:9 – 47:5; Thomas Dep., 47:6 – 8.

(La. App. 4 Cir. 5/31/06). Likewise, Louisiana law has no "repairman" exception to liability under La. C.C. arts. 2317 and 2322. *Meaux v. Wendy's Int'l, Inc.*, 51 So. 3d 778, 791 (La. App. 5 Cir. 10/26/10), *writ granted*, 57 So. 3d 321 (La. 2/18/11).

As a person working on their premises, IMIM owed Ramos a duty to ensure that the warehouse was reasonably safe. Whether a premises owner has breached this duty is a fact-intensive inquiry. *Siverd v. Permanent General Ins. Co.*, 922 So.2d 497, 501 (La. 2/22/06); *Thomas*, 933 So.2d at 852.

In a similar case, the Fifth Circuit affirmed judgment finding a premises owner liable to a plaintiff working at its facility where the plaintiff slipped in a puddle of hydraulic fluid on a ladder. *Dobbs v. Gulf Oil Co.*, 759 F.2d 1213, 1215 (5th Cir. 1985). The plaintiff was asked to carry a bucket of hydraulic fluid to the crane operator, which required the plaintiff to climb a metal ladder leading to the cab of the crane, causing him to slip in a pool of hydraulic fluid that had accumulated on the steps of the ladder. *Id.* The hydraulic fluid was caused by a tank leak on the crane. *Id.*

In this case, it is uncontested that the support columns were not attached to the wall prior to the disassembly.[61] Evidence shows the columns should have been secured with two anchors in the ground, not one,[62] and the lack of bracing was the *prima facie* cause of the collapse.[63] Like the *Dobbs* case, IMIM breached their duty to provide Ramos a safe place to work by requiring him to disassemble a series of columns unsecured to the wall after disassembling the rack system.[64] IMIM knew the support columns were held up by the rack system itself and not otherwise secured to the wall. Yet IMIM still required the columns remain up until the end of the disassembly.[65]

---

[61] Ex. 3, Ramos Dep., at Tr. 50:11 – 14.
[62] Ex. 4, Wood Dep., at Tr. 53:2 – 6.
[63] Ex. 4, Wood Dep., at Tr. 70:18 – 71:13.
[64] Ex. 4, Wood Dep., at Tr. 70:18 – 71:13.
[65] Ex. 4, Wood Dep., at Tr. 72:8 – 29.

The defendant attempts to argue liability should be restricted because the area of Rackmasters' repairs presents an "obvious" risk of harm. *See*, *e.g.*, *Meaux v*, 51 So. 3d at 791. However, in this case, evidence shows the risk of harm to Ramos was not obvious to Rackmasters or Ramos. Rackmasters did not know IMIM's requirement would make the job unsafe,[66] and there is no evidence of warning signs about the rack falling.[67] Had Rackmasters known the columns were not secured to the wall, they would not have worked left-to-right.[68] Therefore, the risk of harm to Ramos was not obvious to him or Rackmasters. Because a reasonable jury can find IMIM violated its duty to provide a safe place to work, summary judgment should be denied.

### C. IMIM Failed to Provide any Warning that the Support Columns Were Not Secured to the Wall.

IMIM admits they knew the support columns were not secured to the interior wall. IMIM offers no argument or suggestion that it warned Rackmasters about this condition. Premises owners are "liable for acts of omission as well as commission, but there must also be a duty imposed by the relationship of the parties that would be breached by act of omission." *Lenoir v. Sewerage & Water Bd. of New Orleans*, 535 So. 2d 490, 492 (La. App. 4 Cir. 1988), *writ denied*, 540 So. 2d 332 (La. 1989). In this case, by altering Rackmasters' method of work and requiring them to work next to unsecured columns, IMIM had a duty to warn Rackmasters the columns were unsecured. Rackmasters did not know the columns were not secured to the wall, and had they known that information, they would have done the job differently.[69] The support columns fell because the columns were not attached to the wall and ground correctly.[70]

---

[66] Ex. 2, Thomas Dep., at Tr. 50:21 – 51:12.
[67] Ex. 2, Thomas Dep., at Tr. 40:17 – 41:9.
[68] Ex. 2, Thomas Dep., at Tr. 47:12 – 21, 27:25 – 28:3, and 38:11 – 19.
[69] Ex. 2, Thomas Dep., at Tr. 47:12 – 21, 27:25 – 28:3, and 38:11 – 19.
[70] Ex. 3, Ramos Dep., at Tr. 50:11 – 14.

Even if IMIM were to argue it lacked actual knowledge that the columns were not secured to the wall, Louisiana law would impute constructive knowledge. To determine whether to apply constructive knowledge of a condition, Louisiana courts consider the duration a premises owner has operated at a location, whether it made improvements or modifications during that time, and whether it regularly conducted business at the property. *Mayeux v. Marmac Acquisition, L.L.C.*, 900 So. 2d 976, 979 (La. App. 5 Cir. 3/29/05). Constructive knowledge has been found for conditions existing at a premises for 10 years (*Moody v. Blanchard Place Apartments,* 793 So.2d 281 (La. App. 2 Cir. 6/20/01)); 23 years (*Johnson v. City of Winnfield*, 862 So.2d 433 (La. App. 2 Cir. 12/10/03); and 20 years (*Meaux*, 51 So. 3d at 788–89).

In this case, IMIM occupied the warehouse for 21 years before the column collapsed. During that time period, IMIM conducted continuous business operations within the warehouse, and was solely responsible for maintaining the rack system and support columns. For these reasons, even if even if IMIM attempted to argue it lacked knowledge of the dangerous condition, sufficient evidence exists to find constructive knowledge.

**D. IMIM is Liable for Creating the Condition that Caused Ramos's Injury.**

IMIM created the condition that caused Ramos's injury by requiring Rackmasters disassemble the rack system before the staircase and catwalk, resulting in a wall of unsecured columns. In connection with a premises operator's duty of reasonable care, "[b]oth the Fifth Circuit and [District Courts] have found summary judgment to [premises] owners to be unwarranted when a question of fact exists as to whether <u>the owner created the hazard that resulted in the plaintiff's injury</u>." *Venezia v. ConocoPhillips Co.*, 2014 WL 107962, at *5 (E.D. La. Jan. 9, 2014) (citing *See Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157–58 (5th Cir.1994); *Smith v. Chevron U.S.A.*,

*Inc.*, 1999 WL 615174 at *2 (E.D. La. Aug. 12, 1999); *Verdin v. Shell Offshore, Inc., et al.*, 1996 WL 67660 at *3 (E.D. La. Feb. 15, 1996)).

Evidence and testimony shows Rackmasters did not safely disassemble the rack front-to-back because IMIM imposed a last-minute condition that the stairs had to remain in place.[71] Ramos testified IMIM "instructed us to keep the stairs up…which made us have to go a different route. We usually clear out a building from the front to the back, and so we had to work from the right side of the building to the left just to leave the stairs up for them to be able to go up and down from the other building."[72] IMIM's required disassembly method introduced the risk of columns toppling over. Ramos testified "if we would have worked the way that we usually worked, the columns would never have been there."[73] The safe method of disassembly was front-to-back.[74] Therefore, IMIM created the condition that caused the columns to collapse by requiring the work occur left to right, which was as unsafe practice.[75] Because IMIM created the hazard resulting in Ramos' injury, they are liable for their direct negligence.

**E. By Requiring Rackmasters to Use a Different Disassembly Method, IMIM Assumed a Duty to Ensure that Method was Safe.**

IMIM prevented Rackmasters from disassembling the rack in their chosen manner of front to back, and instead required they work from left to right to keep the stairwell in place. By requiring IMIM assumed a duty that their revised work method could be done safely.

Duty is a question of law. *Harris v. Pizza Hut*, 455 So.2d 1364, 1371 (La.1984). The particular facts and circumstances of each individual case determine the extent of the duty and the resulting degree of care necessary to fulfill that duty. *Socorro v. City of New Orleans*, 579 So.2d

[71] Ex. 2, Thomas Dep., at Tr. 47:6 – 8.
[72] Ex. 3, Ramos Dep., at Tr. 52:3 – 21.
[73] Ex. 3, Ramos Dep., at Tr. 52:22 – 53:6.
[74] Ex. 4, Wood Dep., at Tr. 31:18 – 32:11.
[75] Ex. 4, Wood Dep., at Tr. 88:1 – 90:14.

931, 938 (La. 1991). By undertaking a task, a party assumes a duty to perform that task in a reasonable and prudent manner. *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 221 (La. App. 2 Cir. 1992).

By dictating the order of disassembly, IMIM voluntarily assumed the duty of determining whether the left-to-right disassembly could be done safely. As set forth above, the left-to-right disassembly method made the project unreasonably dangerous, and was the direct cause of the columns collapsing on Ramos. Because IMIM assumed the duty of determining whether the left-to-right disassembly could be done safely, and failed to reasonably discharge this duty, IMIM is liable to Ramos for breach of its assumed duty to determine whether the disassembly method could be done safely.

**4.    CONCLUSION**

For reasons set forth herein, IMIM is liable to Ramos for its own direct negligence under several theories. First, IMIM authorized an unsafe practice by imposing a condition that required the disassembly occur left-to-right, instead of Rackmasters' recommended front-to-back method. Second, IMIM breached its duty to provide a safe place for Ramos to work by failing to secure the support columns to the wall, causing them to fall onto Ramos. IMIM failed to warn Ramos that the columns were unsecured to the wall, despite knowledge of this condition. Moreover, by requiring a different disassembly method, IMIM created the condition that caused Ramos's injury, and assumed a duty to ensure safe the method was safe.

It is undisputed that IMIM was the custodian of the support columns that collapsed and injured Ramos. Evidence shows that the support columns were not attached to the dividing wall, and therefore unreasonably dangerous. For these reasons, genuine issues of material fact preclude summary judgment regarding whether IMIM authorized an unsafe practice, therefore IMIM's Motion should be denied.

        **Respectfully Submitted:**

**BRUNO & BRUNO, LLP**

*/s/ Daniel A. Meyer*
Joseph M. Bruno, Sr. (La. Bar No. 3604)
Daniel A. Meyer (La. Bar No. 33278)
855 Baronne Street
New Orleans, LA 70115
Telephone: (504)-525-1335
Facsimile: (504)-561-6775
jbruno@brunobrunolaw.com
dmeyer@brunobrunolaw.com
*Counsel for Jonathan Ramos*

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing pleading upon all counsel of record by electronic filing through CM/ECF, or other electronic transmission this July 26, 2022.

*/s/ Daniel A. Meyer*
Daniel A. Meyer