1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF LOUISIANA

3                 ---o0o---

4

5    JONATHAN RAMOS,

6            Plaintiff,
     vs.                              Civil Action No.
7                                     2:19-CV-11202
     IRON MOUNTAIN SECURE SHREDDING,
8    INC., et al.

9
             Defendants._____/
10

11

12

13

14

15    REMOTE VIDEOTAPED and VIDEOCONFERENCED DEPOSITION OF

16                  GLEN A. THOMAS

17              SACRAMENTO, CALIFORNIA

18                   VIA ZOOM

19             MONDAY, MAY 9th, 2022

20

21                                    **EXHIBIT**

22                                    **2**

23   Reported by:

24   Tamra Elaine Keen, RPR, CLR, CCRR, CSR No. 5404

25   Job No.: 10100409

1          You understand you are here testifying about

2     an incident that occurred with Mr. Ramos in Louisiana

3     during the summer of 2018, right?

4          A.    Yes.

5          Q.    Okay.

6                Let's just say, from between late May and

7     early June 2018, who were you working for?

8          A.    RackMasters.

9          Q.    And what was your job at RackMasters?

10         A.    I was foreman slash part owner.

11         Q.    Are you still a part owner of RackMasters?

12         A.    No.

13         Q.    When did you stop being a part owner of

14    RackMasters?

15         A.    Probably a month, maybe two months, after we

16    got back from Louisiana.

17         Q.    Why was that?

18         A.    I didn't feel like I was being compensated

19    correctly for the work I was putting in.

20         Q.    Understood.

21               Do you have any family members that were also

22    owners of RackMasters?

23         A.    The other owner was my father-in-law, my

24    wife's dad.

25         Q.    From late May to early June 2018, was Jonathan

1          Would you have signed below as Interviewee if

2     that statement was not true?

3          A.    No, I would not have signed.

4          Q.    Is it fair to say that looking at this

5     statement, and understanding how you would comport

6     yourself, that is more likely than not that you had the

7     opportunity to read and correct this statement before

8     signing it?

9          A.    Yeah, most likely.

10         Q.    I'm going to go through this statement, if you

11    don't mind.

12         I understand this is not in your handwriting.

13    There are some redactions.  I'm going to have a series

14    of questions about this.

15         At the top it says:  RackMasters was assigned

16    the contract around 5/14/18 and I arrived at the site

17    around 5/30 -- I believe it should be 18 -- with three

18    employees.

19         Do you recall whether that statement is, in

20    fact, true?

21         A.    Yeah, I mean, it was with three employees.  I

22    don't remember the exact dates.

23         Q.    Was one of the employees that you went out

24    first to the -- to wherever you arrived, Mr. Ramos?

25         A.    Yes.

Glen A. Thomas

1        Q.    What was Mr. Ramos' job at the Iron Mountain

2    job in Louisiana?

3        A.    He was the installer and a foreman, as well,

4    for us.  He had ran a few jobs as well.  We just brought

5    everybody out to this job.

6        Q.    The bottom of page 1 of Exhibit 1 is the

7    sentence:  We were contracted to dismantle the shelving.

8              Do you see that?

9        A.    Um-hmm.

10       Q.    Is that true?  Is that what your role was

11   there?

12       A.    Yes.

13       Q.    Starting at page 2, you say:  I have 2.5 years

14   experience in doing this.

15       A.    Yes.

16       Q.    Does that refresh your memory as to how long

17   you had been working with Mr. Ramos at the time of this

18   accident?

19       A.    Probably about 2.5 years.  He had worked there

20   before I had.

21       Q.    Moving on.

22             The writing says:  I spent the first full day

23   assessing the job.  That is, what and how it was to be

24   done.

25             Is that statement true?

1      A.    Yeah, I guess, to the best of my knowledge.

2      **Q.    Do you recall what you did in order to**

3  **determine or assess what and how it was to be done?**

4      A.    I don't recall.

5      **Q.    What do you typically do to determine what and**

6  **how the job needs to be done when you were working for**

7  **RackMasters?**

8      A.    I would determine what -- what section needs

9  to come down first to just verify that we are just

10  slowly working in a, you know, pattern to go back and

11  forth on the rack.  And that would be I would just have

12  to figure out what's the best way to get that down.

13      **Q.    While conducting your assessment, were you**

14  **accompanied by anyone from Iron Mountain?**

15      A.    Yeah, I think I remembered -- like, are you

16  talking about with me, walking the aisles?

17      **Q.    Either with you or some other point that you**

18  **were just about to testify?**

19      A.    There's just -- there was just two, maybe

20  three other people that were working in the warehouse.

21  They were on the other side of the building, and they

22  were doing whatever Iron Mountain does with their files.

23  They were over there.  We were working on the other

24  side.

25          We had very little contact with each other.

```
1          A.   I don't recall.

2          Q.   Okay.

3               Starting about six lines down where I am

4     blocking out, can you see this -- this section on your

5     screen in front of you?

6          A.   Yeah.

7          Q.   All right.

8               It looks to me like it says:  I told Riley

9     that I needed to tear down the stairwells, open

10    parenthesis 2, but Iron Mountain wanted the stairs to

11    remain until the very end.

12              And then period.

13              Do you -- does that name say "Riley" to you,

14    or do you recall somebody who you told that you needed

15    to tear the stairwells down?

16         A.   No, I don't know who -- who that would be.

17    Riley, Randy.  I don't know.  It looks like "Riley",

18    you're right.

19         Q.   It could be Ricky.  Unfortunately, the

20    handwriting is a little tricky?

21         A.   Yeah.

22         Q.   Well, Mr. Thomas, what do you recall about the

23    need to tear the stairwells down?

24         A.   Um, I recall there was a stairwell in the

25    front and the back.  I believe they wanted to keep the
```

1   one in the front up because they needed to go up and

2   down it still.  They didn't want to use the back stairs.

3   I just remember it being in the front.

4          I would have -- typically, you would tear that

5   down first, because it's the first thing in line, you

6   know, it clears -- it gets an open space for you so you

7   have more space to work, and then you can slowly work

8   into the rack as you go.

9       Q.   Okay.

10      A.   I do remember them saying, yeah, they needed

11  it up.  So we worked around it the whole time.

12      Q.   Okay.

13          Now the part where it says:  Stairwells 2.  Do

14  you recall specifically that you needed to tear down two

15  stairwells at the start of the project?

16      A.   Just the one that I can recall, the one in the

17  front.  The one in the back wouldn't have mattered until

18  the very end.

19      Q.   Okay.  I'm going to -- I'm going to show you

20  photos of two staircases, and I'm going to ask you which

21  one is the front and the back you are talking about.

22          All right.  Do you see a photo of what appears

23  to be a staircase with an iron racking system around it?

24      A.   Yes.

25          MR. MEYER:  Okay.  I'm marking this as Exhibit

```
 1   2.
 2              (Exhibit 2 is marked for identification.)
 3   BY MR. MEYER:
 4        Q.   Is that the staircase you were referring to as
 5   the front or the back?
 6        A.   Yeah, I believe that would be the front.
 7              MR. MEYER:  Okay.
 8              Now -- now I'm showing you Exhibit 3.  This is
 9   a different staircase.
10              (Exhibit 3 is marked for identification.)
11   BY MR. MEYER:
12        Q.   Is this the yellow staircase that you referred
13   to as the one in the back?
14        A.   Yes.
15        Q.   Okay.
16              So Exhibit 3 depicts the staircase that would
17   not have mattered until the end whether it stayed up or
18   down, right?
19        A.   Yes.
20        Q.   Just so I'm clear, the staircase that's
21   depicted in Exhibit 2 that you called the front
22   staircase, this staircase would, if you had your way,
23   have come down first?
24              MS. KRAMAR:  Object to form.
25              THE WITNESS:  Yes.
```

```
 1                MR. MEYER:  Is that true?

 2                All right going back to your statement, sir.

 3                Let's talk about the language here:  But Iron

 4     Mountain wanted the stairs to remain until the very end.

 5          Q.   Do you recall that instruction or condition

 6     being communicated to you?

 7          A.   Yes.

 8                MS. KRAMAR:  Object to form.

 9                THE WITNESS:  I do remember.

10     BY MR. MEYER:

11          Q.   How was that communicated?

12          A.   I just remember the lady that was working on

13     the other side there saying:  No, I need that staircase

14     to stay up.

15          Q.   Do you recall who the lady on the other side

16     was?

17          A.   I do not recall her name, no.

18          Q.   Do you recall her being somebody from Iron

19     Mountain?

20          A.   She was an employee, yes, of Iron Mountain.

21          Q.   All right.

22                This was -- was this woman giving the

23     instruction, did you understand her to be somebody with

24     authority for Iron Mountain?

25          A.   I assumed she was some kind of a manager.
```

1    Q.   Did you have any discussion beyond her simply

2    telling you this is -- these stairs need to stay up,

3    about that instruction?

4    A.   No, I said:  You got it, ma'am.  Not a

5    problem.  We'll work around it.

6         Like I always do.

7    Q.   So it is your general practice that if a

8    customer gives you a condition you understand that you

9    are to accommodate that condition, right?

10   A.   Yes, that's typically what we would do.

11   Q.   Okay.

12        How did that condition change the way you

13   planned the job?

14   A.   It just allowed us to -- we basically had to

15   use another section of the warehouse to store the

16   material that we were tearing down.  Everything wanted

17   to be stored and kept.  They were going to move it to

18   another location, sell it, I don't know what they do

19   with it after.  Our job was to tear it down and put it

20   in piles for them.  But that takes place -- takes space

21   so we needed another section of their warehouse.

22   Q.   Did retaining the -- the front staircase

23   necessitate this job being done from left to right

24   instead of from front to back?

25   A.   No.  No, it didn't.

1   what happened.

2          Starting after this part that's scratched out:

3   The first phase of the job we moved wood on the shelves

4   at the beginning of the job.  I hired a company --

5   sorry.  I hired temporary workers, laborers from ADDECO.

6          Is that statement true?

7      A.   Yes.

8      Q.   Was Mr. Ramos involved in that phase?

9      A.   Yes.

10     Q.   Was this phase anyway effected by the

11  requirement that the front staircase remain in place?

12     A.   No.

13     Q.   Continuing on in what appears to be the same

14  sentence, it says:  Going left to right and front to

15  back second level -- I think it's -- standing on the

16  fully intact platform or catwalk the first week.

17         Does that statement represent the work that

18  took place, to the best of your recollection, during the

19  first week?

20     A.   Yeah.  Yeah.

21     Q.   Okay.  Moving down a bit.

22         Your statement says:  The next phase consisted

23  of removing the first two bays on the S dot E side of

24  the building to allow for the use of a rented scissor

25  lift.  Each square on the map is a bay.

1          Does that sentence accurately reflect the

2     second phase of the work that was done at the Iron

3     Mountain facility in Louisiana?

4          A.   Yeah, that sounds about right.

5          Q.   Was Mr. Ramos involved in working for that

6     phase?

7          A.   I don't recall.  I remember there was

8     something about sprinkler pipes we had to take down.  I

9     -- I think I remember him being a part of that, but I

10    don't fully remember.  So he could have been a part of

11    that and the sprinklers.  I just don't remember.

12         Q.   Do you know if this phase was in any way

13    effected by your requirement that the -- or the

14    condition that the front staircase remain in place?

15         A.   No.  No, it was fine.

16         Q.   Moving on.

17              Your statement says:  Once the first two bays

18    were removed we then dismantled each row up to the last

19    two bays, starting at the south -- S dot W corner.  This

20    phase started 6/4 and all the way up to 6/14/18.

21              Does this statement accurately reflect your

22    recollection of what happened on site from June 4 until

23    June 14, 2018?

24         A.   Yeah.

25         Q.   At any point during those approximately 11

Glen A. Thomas

1   days, did you have any reason to believe that the work

2   being done was dangerous?

3        A.   No.

4        Q.   When you say the bays were removed "up to the

5   last two bays", what do you -- what are you talking

6   about?  What does those "last two bays" mean?

7        A.   I believe the last two bays were the two bays

8   that were up against the catwalk, which were up against

9   the wall.  We left two extra bays there so it supported

10  the catwalk.  So it continued to further support the

11  catwalk, so we could still use the catwalk up top if we

12  needed to.

13       Q.   Okay.  Showing you Exhibit 8 again.

14            Are either of the two bays that remained in

15  place depicted on Exhibit 2?

16       A.   No.

17       Q.   Are they in a different part of this facility?

18       A.   They would be back there, like back where that

19  little stepladder kind of is, but they wouldn't have

20  been there anymore.  We would have had to have taken

21  them down by now.

22       Q.   So by the time this photo was taken, which was

23  after the fall occurs, the last two bays would have

24  already been removed?

25       A.   Yes.

1        Q.   Okay.   Let's talk about your description of

2   the incident.

3             On Exhibit 1, you write -- or somebody writes

4   that you signed off on -- your statement saying:   On

5   6/15/18 around 9:50 a.m. the accident happened.   I

6   instructed my crew to first remove the bar grating or

7   flooring on the second level.   I had Antonio Cruz

8   debolting the bar grating from the support strut while

9   standing on the scissor lift.

10             First, is that statement true and correct to

11   the best of your knowledge what was going on the morning

12   of the incident with Mr. Ramos?

13        A.   Yes, to the best of my knowledge.

14        Q.   At this time, did you or anybody on site have

15   any reason -- strike that.

16             At the time -- at the time depicted in this

17   statement, which is June 15, around 9:50, did you have

18   any reason to believe that the work being done was

19   dangerous?

20        A.   No, I did not.

21        Q.   All right.

22             Was the work being done at this time effected

23   in any way by the staircase remaining in place?

24        A.   No.

25        Q.   Do you have any reason to believe that the

1   columns were insufficiently fastened to the wall at this

2   time?

3        A.   No.  I did not believe they were.

4        Q.   All right.

5             The next approximately two paragraphs is your

6   recitation of what happened.  Before I get into that,

7   why don't I just ask you?

8             What do you recall -- how do you recall the

9   fall happened?

10        A.   Um, I was -- I was moving material, so I

11   wasn't always in that room.  I was moving it from one

12   side to the other side of the warehouse.

13             What I recall is the scissor lifts were up

14   against the wall.  They were taking the beams out.  And

15   then, I guess they were struggling taking a beam out,

16   and he started wobbling it.  The wall started to wobble

17   a little, and that's what caused the wall to come down.

18             That's kind of to the best of my knowledge of

19   what I remembered watching.

20        Q.   While you were disassembling the staircase --

21   sorry.

22             While you were disassembling the racking

23   system, were the staircases in use, both the front and

24   back?

25        A.   The back was not in use.  I believe they were

Glen A. Thomas

1   still using the front.

2       Q.   Who is "they" that was "still using the

3   front"?

4       A.   The Iron Mountain people.

5       Q.   All right.

6            Was that also true on the 15th, the day of the

7   injury?

8            MS. KRAMAR:  Object to form.

9            THE WITNESS:  I believe they were using it.  I

10  don't fully remember if they actually went up and down

11  it all the time, but that was the point of leaving the

12  staircases, so they could use it.

13  BY MR. MEYER:

14      Q.   Do you recall, one way or the other, whether

15  there were Iron Mountain people using the staircase on

16  the day of the injury?

17      A.   I do not recall.

18      Q.   What about the day before the injury?  Do you

19  recall people at Iron Mountain using the staircase?

20      A.   I don't recall if they were.  I was just told

21  to leave it up so they could.

22      Q.   All right.  Let's go to your statement.

23           Starting at page 3, Exhibit 1, the statement

24  says:  I used the fork truck forks to lift the grating

25  and bring to the floor.  I was the only fork operator.

1          Looking at your statement there's a section

2     that says:  I only saw -- redacted -- jump from the left

3     about three or four feet above the floor.

4          Do you recall if it was Mr. Ramos or

5     Mr. Tyreece who jumped from the lift?

6          A.   I don't really remember.  I thought they both

7     jumped from the lift.

8          Q.   Okay.

9          Let's cover the rest of your statement here.

10          You say, if you can see the part I'm blocking

11     out right now:  The week before I arrived my boss Brian

12     Maclean gave me a paper copy of the rack system, and the

13     copy did not specify the beams or columns or the back

14     stairwell.

15          First, who is Brian Maclean?

16          A.   He was the other owner.

17          Q.   That's your father-in-law?

18          A.   Yes.

19          Q.   Do you know where Brian Maclean got the paper

20     copy of the rack system?

21          A.   I do not know.

22          Q.   Do you know if he got it from Iron Mountain?

23          A.   I do not know that.

24          Q.   Is it typical of your work in doing a

25     dismantling job to get plans in advance?

Glen A. Thomas

```
 1        A.   Yes.

 2        Q.   Is it important that those plans are accurate?

 3        A.   Yes, very important.

 4        Q.   Did the absence on the plans of the beams or

 5   columns or back stairwell effect this job in any way?

 6        A.   No.

 7        Q.   Why is that?

 8        A.   Because, unfortunately, when you work with the

 9   rack system nothing is ever accurate.  So you are always

10   adjusting and always just trying to figure it out as you

11   are going through it.

12        Q.   All right.

13             When you say didn't specify the "back

14   stairwell", that's the yellow one that we look at,

15   right?

16        A.   Yes.

17        Q.   Okay.

18             But the racks, according to your statement, it

19   did show the front stairwell?

20        A.   Yes.

21        Q.   Moving on in your statement you say:

22   Generally I do my own assessment as to the racking

23   system -- sorry -- how the racking system is supported.

24             Period.

25             Did you do your own assessment of the racking
```

1   was a salesperson.  They were just a person that deals

2   with racking systems and tearing them down, and that's

3   how we got the job.

4           So I would assume Rack -- or Iron Mountain

5   would have talked to the salesperson.  So whatever their

6   conversations were, were whatever.  And then the

7   salesperson then contacts us and say:  Hey, we have got

8   a job for you.  Do you want it?

9           We take it, we go out and tear it down or we

10  build it.

11  **Q.   Now going back to your statement.  The section**

12  **that we read a few minutes ago about the events that**

13  **took place the time period shortly before the fall, to**

14  **me it seems fairly comprehensive, like at the time you**

15  **had a good recollection about what was going on that**

16  **whole morning.**

17  **So the question is:  Were you present in the**

18  **Iron Mountain facility during that whole morning when**

19  **the fall happened?**

20  A.   Yes, I was -- yes, I was present the whole

21  time.

22  **Q.   Now -- and you were the foreman, so you were**

23  **basically in charge of the job at that time, right?**

24  A.   Yes.

25  **Q.   Okay.**

1            Do you do you recall any indication before the

2    rack actually fell that there was a risk that this rack

3    was going to fall?

4         A.   No, I did not have any indication.

5         Q.   It was a surprise when it happened?

6         A.   Yes, absolutely.

7         Q.   Obviously, if you knew about the rack being

8    about to fall, you would have done something different?

9         A.   Yes.

10             MS. KRAMAR:  Object to form.

11             MR. MEYER:  All right.

12             Mr. Thomas, I'm going to show you a couple of

13   photographs and ask you if you recognize the area.

14             Do you see the photograph labeled IM 33 on the

15   screen in front of you?

16             THE WITNESS:  Yes.

17             MR. MEYER:  All right.  I'm marking the as

18   Exhibit 5.

19             (Exhibit 5 is marked for identification.)

20   BY MR. MEYER:

21        Q.   Does this Exhibit 5 accurately represent the

22   room -- the Iron Mountain warehouse room the immediate

23   aftermath of the scissor lift falling?

24        A.   Yes.

25        Q.   Okay.  Now just so I can orient myself in the

Glen A. Thomas

1    Q.   Filing a Workers' Compensation claim for his

2    injury against your father-in-law's company?

3    A.   No, absolutely not.  It's his right.  I

4    encourage it, if anyone gets hurt at work.

5    Q.   You told me earlier you don't know Mr. Ramos

6    anymore.  Obviously, at some point in time you did?

7    A.   Yes.

8    Q.   At the time that you knew him, did you guys

9    get along?

10   A.   Yes, we did.

11   Q.   All right.

12        Was he a hard worker?

13   A.   Yes, I thought he was a very hard worker.

14   Q.   Do you feel like he listened to you and

15   followed your instructions?

16   A.   Yeah.  Yeah, I do.

17   Q.   Did you find him to be careless or a

18   risk-taker?

19   A.   Not typically.  There were definitely times I

20   can vaguely remember, but I mean that is with every

21   single person on my crew.  I couldn't blame him for

22   anything being a risk-taker, like typically.

23   Q.   You said earlier that at some point Mr. Ramos

24   would have actually run jobs, right?

25   A.   Yes.

1    Q.   So he had a position of some authority within

2    RackMasters?

3    A.   Yes, he did.

4    Q.   He had gained some trust within the company?

5    A.   Yes, he did.

6    Q.   All right.  Do you feel like he had earned

7    that through doing quality work over time?

8    A.   Yes, absolutely.  Very -- very well, yeah.

9    Q.   Okay.  I'm going to ask you one more time

10   about tearing down the staircase.

11         Was there ever any discussion that you could

12   recall of breaking down this room from the front

13   staircase side to the back staircase side, as opposed to

14   from the right side of the room away from the staircase

15   and then towards the staircase?

16         MS. KRAMAR:  Object to form.

17         MR. MEYER:  What I would call right to left.

18         MS. KRAMAR:  Object to form.

19         THE WITNESS:  No, I don't recall there being

20   much more of a conversation than just talking about it

21   the one time and not tearing it down.

22         MR. MEYER:  Okay.

23   Q.   Would your original recommendation, but for

24   the condition that the staircase remain in place, have

25   been to break down the racks moving from the front to

1    the back?

2         A.    I'm sorry, I don't understand the question.

3         Q.    Maybe I show you a photograph.  It might be

4    helpful to have some sense of the room.

5               Okay, I'm back at Exhibit 5.  Now I'm looking

6    at what I would say back to front of the room.

7               Is that a fair description?

8         A.    Yes.

9         Q.    So was -- you just told me you don't recall

10   any specific instruction, but if you -- or any specific

11   conversation about it, but if you had your way you could

12   do this demolition in any way you chose, would you have

13   done it from what was actually done, which I understand

14   to be the left side of this picture to the right side of

15   the picture, finishing where the columns would have been

16   before they fell on the right side of the wall?

17              MS. KRAMAR:  Object to form.

18              THE WITNESS:  Yeah, I mean, only the one time

19   we had that conversation.  I mean, yeah, I would have

20   torn the stairwell down first.  That just would have

21   been the way I would have done this.  But again, we were

22   asked not to, so we did it a different way.  So we left

23   the catwalk up to the very end.

24   BY MR. MEYER:

25        Q.    So just to qualify that.  You would have

Glen A. Thomas

1   started here in the front of the room, which is the far

2   end of Exhibit 5, and then worked your way to the back,

3   periodically tearing down sections of the column as you

4   advance to the back of the room?

5        A.   Yes, that is how I would have done it.

6        Q.   And the reason you did not do it that way is

7   because there was a condition that the stairs had to

8   remain up?

9        A.   Yes.

10            MS. KRAMAR:   Object to form.

11   BY MR. MEYER:

12        Q.   And you did not know in advance that the

13   columns were not braced in the middle, but only at the

14   top and at the bottom?

15        A.   Yeah.

16            MS. KRAMAR:   Object to form.

17   BY MR. MEYER:

18        Q.   And that is information that, had you known

19   that, you would have been able to do this job

20   differently?

21        A.   Yes.

22            MR. MEYER:   Mr. Thomas, thank you for your

23   time.   I have no other questions.   I'll reserve the

24   right to redirect.

25   ///

**Page 47**

1    A.   Yes, absolutely.

2    Q.   I understand Mr. Ramos isn't here today to

3  join us with this discussion, but if we assumed that he

4  felt or he observed any kind of wobble in the racking

5  system before this incident happened, would it have been

6  best practice for Mr. Ramos to notify you or the other

7  crew that this movement was observed in the rack?

8    A.   Yes.

9    Q.   Prior to your deposition today, have you met

10  any of the other attorneys involved in this case?

11    A.   Nope, I have never met anybody.

12    Q.   Okay.

13         And I said "other attorneys", but we have not

14  met, correct?

15    A.   No.

16         MS. KRAMAR:  I believe that's all the

17  questions I have at this time, thank you.

18         MR. MEYER:  Brief redirect.

19                         EXAMINATION

20  BY MR. MEYER:

21    Q.   Mr. Thomas, at the time that you received the

22  condition from Iron Mountain not to tear down the

23  staircase first, is it fair to say to you that you did

24  not know that that condition would make this demolition

25  or dismantling unsafe, right?

Glen A. Thomas

```
 1        A.   Yes.
 2             MS. KRAMAR:  Object to form.
 3  BY MR. MEYER:
 4        Q.   It wasn't obvious to you that that was a
 5  condition that would make this unsafe?
 6        A.   Yes, absolutely.  If it was obvious, I would
 7  have been -- said something.  We would have had a longer
 8  discussion.
 9        Q.   Because the ways that the columns were mounted
10  was not apparent until you actually got in there and
11  ripped it down?
12        A.   Yes.
13        Q.   Now you were asked to make an assumption about
14  a hypothetical Mr. Ramos had heard or said something
15  earlier by opposing counsel.
16             Now you were with Mr. Ramos all morning when
17  the fall happened, right?
18        A.   Right in the building, yes.
19             MS. KRAMAR:  Object to form.
20  BY MR. MEYER:
21        Q.   Now did you hear or see anything like what you
22  were asked to assume?
23        A.   No.
24             MR. MEYER:  Okay.  No other questions.
25             Mr. Thomas, thank you for your time.  You are
```

1   free to go.

2           MS. KRAMAR:  Thank you.

3           MR. BUTKO:  This ends the deposition on

4   May 9th, 2022.  We are off the record at 11:08 a.m.

5           Media will be held by Aptus Court Reporting.

6           (Proceedings concluded at 11:08 a.m.)

7                      ---o0o---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE of REPORTER

 2           I, the undersigned, a Certified Shorthand

 3   Reporter of the State of California, do hereby certify:

 4           That the foregoing proceedings were taken before

 5   me via videoconference at the time and herein set forth;

 6   that any witness in the foregoing proceedings, prior to

 7   testifying, were duly sworn; that a record of the

 8   proceedings was made by me using machine shorthand,

 9   which was thereafter transcribed under my direction;

10   that the foregoing transcript is a true record of the

11   testimony given.

12           Further, that if the foregoing pertains to the

13   original transcript of a deposition in a federal case,

14   before completion of the proceedings, review of the

15   transcript [ X ] was [  ] was not requested.

16

17           I further certify I am neither financially

18   interested in the action nor a relative or employee of any

19   attorney or party to this action.

20           IN WITNESS WHEREOF, I have this date subscribed

21   my name.

22   Dated:  May 9th, 2022

23                         _____

24                              Tamra Elaine Keen

25                         RPR, CLR, CCRR, CSR No. 5404
```

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2    Case Name: Ramos vs. Iron Mountain Secure Shredding, Inc.

 3    Date of Deposition: 05/09/2022

 4    Job No.: 10100409

 5

 6              I, GLEN A. THOMAS, hereby certify

 7    under penalty of perjury under the laws of the State of

 8    _____ that the foregoing is true and correct.

 9              Executed this _____ day of

10    _____, 2022, at _____.

11

12

13                    _____

14                    GLEN A. THOMAS

15

16    NOTARIZATION (If Required)

17    State of _____

18    County of _____

19    Subscribed and sworn to (or affirmed) before me on

20    this _____ day of _____, 20__,

21    by_____,    proved to me on the

22    basis of satisfactory evidence to be the person

23    who appeared before me.

24    Signature: _____ (Seal)

25
```